TODD A. NOAH (SBN 152328)
PAUL K. TOMITA (SBN 188096)
DERGOSITS & NOAH LLP
Four Embarcadero Center, Suite 1450
San Francisco, California 94111
Tel: (415) 705-6377
Fax: (415) 705-6383
E-mail:  tnoah@dergnoah.com
         ptomita@dergnoah.com

Attorneys for Plaintiff MMJK, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MMJK, INC.<br><br>    Plaintiff,<br><br>vs.<br><br>ULTIMATE BLACKJACK TOUR, LLC<br><br>    Defendant. | Case No. C 07 03236 BZ<br><br>**PLAINTIFF MMJK, INC.'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:  August 15, 2007<br>Time: 10:00 a.m.<br>Location: Courtoom G<br>Honorable Bernard Zimmerman |

**TO THE DEFENDANT AND ITS ATTORNEYS OF RECORD:**

YOU ARE HEREBY NOTIFIED that on August 15, at 10:00 a.m. in Courtroom G, 15th Floor of the San Francisco Division of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, Plaintiff MMJK, Inc. ("MMJK") will move for a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure.

Plaintiff seeks a preliminary injunction enjoining defendant Ultimate Blackjack Tour, LLC ("UBT") from hosting online game tournaments that pay out prizes that have immediate value (i.e., cash, cash-equivalent notes and objects) to the winners and require entrants to either pay a subscription

-1-

fee or utilize an "alternative means of entry" to enter. Defendant is currently hosting such tournaments on its Web sites www.playubt.com and www.clububt.com.

## I. INTRODUCTION

Plaintiff is entitled to a preliminary injunction because it has demonstrated a likelihood of success on the merits of its claim against Defendant for infringement of U.S. Patent No. 7,094,154 ("the '154 patent"). The claims of the '154 patent are directed to computer networked multi-player games of both chance and skill that allow subscription-based and non-subscription players (using an "alternative method of entry") the chance to win prizes that have immediate value (i.e., cash, cash-equivalent notes and objects). The claim chart set forth in Appendix A demonstrates unequivocally that the online game tournaments hosted on Defendant's Web sites that pay out prizes having immediate value (i.e., cash, cash-equivalent notes and objects) and include paid subscriptions and "alternative means of entry" meet each limitation of the claims of the '154 patent. Further, because of the strong showing of the likelihood of success, Plaintiff is entitled to a presumption of irreparable harm.

In addition to the presumption, Plaintiff has established that it would actually be irreparably harmed by Defendant's continuing infringement. Aside from Defendant's infringement on Plaintiff's right to exclusivity as the patent holder, if Defendant is not enjoined by this Court Plaintiff would lose market share at a critical time in the market's development. A recent law passed by Congress has left millions of U.S. online poker players searching for an alternative online poker Web site. Because of the market share dynamics of multi-player networked games, especially online poker, this is market share that Plaintiff will not be able to capture as the market develops if the Defendant is not enjoined. In other words, if Defendant continues to provide its infringing service and reaches a point of "critical mass" in terms of numbers of subscribers, it will prevent Plaintiff from ever being able to achieve comparable market share. Online game tournament players want to play on the Web sites with the largest number of players because these sites support the largest prize pool and the players can always find other players to play against, regardless of the time of day or the specific game.

To assist it in reaching this "critical mass," Defendant currently has television shows on CBS

and the Superstation WGN cable network featuring televised card game tournaments. By leveraging the current consumer brand recognition of "UBT" card tournaments from its television shows, Defendant will likely be able to achieve this "critical mass" on its Web sites before Plaintiff unless it is enjoined by this Court. Once it does, this market share will be forever lost to Plaintiff thereby causing irreparable harm to Plaintiff.

Further, the balance of hardships weighs in favor of granting an injunction. As set forth above, Plaintiff faces ongoing irreparable harm as Defendant's infringement continues. Any alleged hardship to Defendant is a consequence of its infringement and does not outweigh the irreparable harm to Plaintiff in the event that the Court does not issue an injunction. Further, Defendant's infringing tournaments only represent a portion of the online tournaments offered by Defendant on its Web sites. In particular, the only tournaments hosted by Defendant that are at issue in this litigation are those tournaments that: 1) allow players to enter by being valid paid subscribers to its service; 2) pay out prizes that have immediate value (i.e., cash, cash-equivalent notes and objects); and 3) allow players to enter for free by using an "alternative means of entry." Defendant also hosts tournaments that do not require entrants to be paid subscribers to its service nor require an alternative means of entry to enter. Thus, even if the Court issues a preliminary injunction, Defendant would still be able host many non-infringing tournaments.

Finally, the public interest would not be disserved by a preliminary injunction. Defendant's service does not involve public health or safety or any other public interest; rather, it is merely for entertainment. The public has an interest in maintaining a strong patent system which outweighs allowing users of Defendant's Web sites to continue to play game tournaments on Defendant's infringing web sites.

## II.     STATEMENT OF FACTS

The '154 patent is directed to computer networked game systems that use subscription-based players and non-subscription players who can participate in tournaments through alternative methods of entry. (Noah Decl., Exhibit A, col. 1, line 66 - col. 2, line 1.) Game tournaments are hosted by a server

-3-

computer connected to one or more client computers operated by participating players. (Noah Decl., Exhibit A, col. 2, lines 2-4.)   A subscription-based membership is established by charging players a fee for a pre-determined membership time period. (Noah Decl., Exhibit A, col. 2, lines 7-9.)  Non-subscription or non-registered players can participate in the online game or tournament without payment of the subscription fee by utilizing an alternative method of entry. (Noah Decl., Exhibit A, col. 2, lines 17-20; col. 5, lines 17-20.)  The "alternative method of entry" may require the non-subscription player to submit identifying information on an index card including the player's name, address, e-mail address, etc. (Noah Decl., Exhibit A, col. 5, lines 20-21.)  The game server hosts at least one game round, with each game round potentially eliminating one or more players until a winning player and one or more runner-up players are determined. (Noah Decl., Exhibit A, col. 2, lines 24-29.)  A prize pool consisting of prizes that have immediate or inherent value, such as cash, cash-equivalent notes or objects, is disbursed to the winning player and any eligible runner-up players. (Noah Decl., Exhibit A, col. 2, lines 29-33.)

On September 30, 2006, Congress passed the Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA), which caused several online gambling Web sites, such as www.partypoker.com, to exit the U.S. online poker market.  Plaintiff and defendant are now directly competing for millions of displaced U.S. online poker players by offering their respective online game tournaments. (Kellerman Decl., ¶¶ 4, 5 and 6.)   U.S. gambling laws do not apply to the tournaments hosted on Plaintiff's Web site, www.betzip.com, because it offers a free alternative method of entry into tournaments rather than requiring all customers to pay a subscription fee to use its services, including tournament entry.  Indeed, it is the free alternative method of entry that makes the cash and prize tournaments hosted on Plaintiff's Web site legal sweepstakes and thus in compliance with the UIGEA and other U.S. gaming laws.  This "alternative method of entry" is one of the limitations recited in the claims of the '154 patent.

On June 17, 2007, Plaintiff first learned that Defendant was hosting online game tournaments on its Web sites www.playubt.com and www.clububt.com that: 1) allow players to enter by being valid subscribers to its service; 2) pay out prizes that have immediate value (i.e., cash, cash-equivalent notes and objects); and  3) allow players to enter for free by using an alternative method of entry. (Kellerman

-4-

Decl., ¶ 4.) A player can download software from either of Defendant's Web sites and subscribe to Defendant's service to play in these tournaments. (Noah Decl., Exhibit B, pp. 1 and 2.) Players can also enter these tournaments hosted on Defendant's Web sites for free (without subscribing) by utilizing, according to Defendant's Web site, an "alternative means of entry." (Noah Decl., Exhibit B, pp. 12 and 13.) In order to play in these tournaments using an alternative means of entry, the player is required to send in to Defendant a 3x5 index card with his or her name, address, e-mail address and birth date. (Noah Decl., Exhibit B, p. 12.) Although these subscription-based tournaments hosted on Defendant's web sites may be in compliance with the UIGEA and other U.S. gaming laws, they are infringing the claims of the '154 patent and unless enjoined by this Court, will cause severe and irreparable harm to Plaintiff's business.

## III. ARGUMENT

### A. THE STANDARD FOR PRELIMINARY INJUNCTIONS IN PATENT CASES.

"Courts have the power to grant injunctions to prevent the violation of patent rights." *Pfizer, Inc. v. Teva Pharmaceuticals USA, Inc.*, 429 F.3d 1364, 1372 (Fed. Cir. 2005). The decision to grant a preliminary injunction is within the sound discretion of the district court. *Ranbaxy Pharmaceuticals, Inc. v. Apotex, Inc.*, 350 F.3d 1235, 1239 (Fed. Cir. 2003). The party moving for a preliminary injunction has the burden of showing the following four factors: "(1) a reasonable likelihood of its success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's . . . impact on the public interest." *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1374 (Fed. Cir. 2006). In the present case, these four factors weigh heavily in Plaintiff's favor and, therefore, its motion for a preliminary injunction should be granted.

### B. THE EVIDENCE DEMONSTRATES THAT PLAINTIFF WILL LIKELY SUCCEED ON THE MERITS.

#### 1. The Legal Standards in Determining Patent Infringement.

A patent infringement analysis involves two steps: (1) construing the asserted claims to

-5-

determine their scope and meaning; and (2) comparing the properly construed claims to the accused device to determine whether all of the claim limitations are present either literally or by a substantial equivalent. *Oakley, Inc. v. Sunglass Hut International,* 316 F.3d 1331, 1339 (Fed. Cir. 2003). The scope and meaning of the disputed terms of a patent claim are a matter of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

To determine the scope of the claims, the Federal Circuit has held that it is necessary to first consider intrinsic evidence, namely the claims, the specification and the prosecution history of the patent. *Markman*, 52 F.3d at 979. This intrinsic evidence must be considered *prior to* review of additional evidence that is extrinsic to the patent documents. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Claim construction begins with the words of the claim. *Philips v. AWH Corporation*, 415 F.3d 1303, 1312 (Fed. Cir. 2005); *Vitronics Corp*, 90 F.3d at 1582. The words in the claim must be interpreted in light of the intrinsic evidence of record, including the written description, the drawings, and the prosecution history, if in evidence. *Philips*, 415 F.3d at 1317. The intrinsic record is the primary source for determining claim meaning. *Vitronics Corp*, 90 F.3d at 1582.

### 2.    UBT is Literally Infringing the Claims of the '154 Patent

Plaintiff has a substantial likelihood of prevailing on the issue of infringement. The terms of the claims of the '154 patent can readily be construed based upon their plain and ordinary meaning or the definitions of these terms provided in the '154 patent specification. For example, a "subscription-based" member or player is defined in the '154 patent specification as a player who has paid a registration or subscription fee. (Noah Decl., Exhibit A, col. 5, lines 43-45.) Likewise, a "non-subscription player" is defined in the '154 patent specification as a player who has registered with the game site without paying the registration or subscription fee. (Noah Decl., Exhibit A, col. 5, lines 44-47.)

Set forth in Appendix A attached hereto is a claim chart which demonstrates that every limitation of the claims of the '154 patent is literally met by the online subscription-based tournaments hosted by Defendant on its Web sites. As shown in Appendix A, the tournaments hosted on Defendant's Web sites are subscription-based, pay out prizes that have immediate value (i.e., cash, cash-equivalent notes and

-6-

objects) and include an "alternative means of entry" for entering the tournaments. The Court will plainly see from this comparison that there is a substantial likelihood that Plaintiff will succeed on the merits of this case. Not only are all of the limitations of the independent claims 1 and 5 met by these tournaments hosted on Defendant's Web sites, but so too are the limitations of the dependent claims. *See* Appendix A.

### C. PLAINTIFF WILL BE IRREPARABLY HARMED IF DEFENDANT IS NOT PRELIMINARILY ENJOINED.

When the patent owner makes a strong showing of a likelihood of success on the merits, it is entitled to a presumption of irreparable harm. *Oakley, Inc.*, 316 F.3d at 1345. Thus, based upon it's strong showing of infringement, Plaintiff is entitled to the presumption that it will be irreparably harmed if Defendant is not preliminarily enjoined from hosting tournaments, which pay out prizes that have immediate value (i.e., cash, cash-equivalent notes and objects) to the winners and require entrants to either pay a subscription fee or utilize an "alternative means of entry" to enter.

In addition to the presumption, Plaintiff will actually be irreparably harmed by Defendant's continuing infringement if not enjoined by this Court. "The patent statute provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money." *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994). Defendant directly competes with Plaintiff. (Kellerman Decl., ¶ 4.) The availability of Defendant's infringing tournaments leads directly to a loss of market share for Plaintiff's tournaments. (Kellerman Decl., ¶ 5.) If Defendant is not enjoined, Plaintiff may never be able to capture the market share Defendant has unlawfully obtained through its infringement. (Kellerman Decl., ¶ 7.) Indeed, it is well known in this industry that if a provider of online gaming services acquires a certain number of players which supports a larger prize pool, i.e., "critical mass", it is nearly impossible for other providers to achieve comparable market share. (Kellerman Decl., ¶ 7.)

Moreover, Defendant's ability to obtain this "critical mass" level is enhanced as a result of its current television shows on CBS and the Superstation WGN cable network featuring televised card game tournaments. (Noah Decl., Exhibit C.) (Kellerman Decl., ¶ 8.) Because of the current consumer brand recognition of "UBT" card tournaments from its television shows, now that Defendant has entered

-7-

the online tournament market it will likely be able to achieve this "critical mass" before Plaintiff unless it is enjoined by this Court. If it does, this market share will be forever lost to Plaintiff thereby causing irreparable harm to Plaintiff. (Kellerman Decl., ¶¶ 7 and 8.)

In addition, through the marketing power of CBS and Superstation WGN, Defendant will be able to direct millions of viewers of its television shows to the online game tournaments hosted on its Web sites through advertisements. (Kellerman Decl., ¶ 8.) This further contributes to the irreparable harm to Plaintiff. *See Oakley, Inc.*, 316 F.3d at 1345 ( irreparable harm found in view of evidence of exclusive market share and the accused infringer's sizable impending marketing efforts.)

Plaintiff's loss of market share is also happening at a critical time during the realignment of the online gaming market. (Kellerman Decl., ¶ 6.) Congress recently passed the Unlawful Internet Gambling Enforcement Act (UIGEA), which makes it illegal for financial institutions to enable transactions between U.S. consumers and online gambling sites. (Kellerman Decl., ¶ 6.) This law resulted in several online gambling Web sites, such as www.partypoker.com, exiting the U.S. market. (Kellerman Decl., ¶ 6.) As a result of the passage of the UIGEA, many U.S. consumers are now looking for alternative places to play games online, such as poker. (Kellerman Decl., ¶ 6.)

The UIGEA and other U.S. gambling laws do not apply to the tournaments that pay out prizes that have immediate value (i.e., cash, cash-equivalent notes and objects) hosted by Plaintiff at is Web site, www.betzip.com, because these tournaments offer a free alternative method of entry to non-subscribers. (Kellerman Decl., ¶ 6.) For the same reason, these laws do not apply to Defendant's online tournaments that pay out prizes that have immediate value (i.e., cash, cash-equivalent notes and objects) since they too offer an "alternative means of entry." (Noah Decl., Exhibit B, pp. 12 and 13.) However, since the claims of the '154 patent cover computer networked subscription-based game tournaments that offer prizes that have immediate value (i.e., cash, cash-equivalent notes and objects) to winners and include alternative methods of entry, Plaintiff's Web site (in terms of a subscription-based service) is the only legal option to online poker players under the UIGEA and other U.S. gaming laws because it is the only Web site that can provide these tournaments without violating the '154 patent.

In short, since Plaintiff is a relatively new company with only one primary service, loss of market share as a result of Defendant's ongoing infringement will cause severe and irreparable injury to Plaintiff which cannot be remedied by monetary damages. Plaintiff will not have the opportunity to capture lost market share if Defendant is not enjoined.

### D. THE BALANCE OF HARDSHIPS WEIGHS HEAVILY IN PLAINTIFF'S FAVOR.

The balance of hardships here weighs in favor of granting a preliminary injunction. As set forth above, Plaintiff faces ongoing irreparable injury as Defendant's infringement continues. As a small new business, every day of defendant's infringement affects plaintiff's business. *See, e.g.*, *Tivo Inc. v. Echostar Communications Corp.*, 446 F. Supp. 2d 664, 670 (E.D. Tex. 2006). As discussed above, Plaintiff's primary business is to provide computer networked tournaments, with which Defendant's service directly competes. The harm caused by such infringement weighs heavily in favor of an injunction. Plaintiff's strong showing on the likelihood of success tips the balance of hardships in favor of plaintiff. *Illinois Tool Works, Inc. v. Grip-Pak, Inc.,* 906 F.2d 679, 683 (Fed. Cir. 1990)(Because the Court must balance the hardships in view of its estimate of what is likely to happen at trial, it must consider plaintiff's likelihood of success in this case.)

On the other hand, any hardship to Defendant as a result of not being able to host the infringing tournaments does not outweigh the hardship to Plaintiff. In fact, Defendant was aware of Plaintiff's Web site and the '154 patent prior to offering tournaments on its own Web sites that pay out prizes that have immediate value (i.e., cash, cash-equivalent notes and objects) to winners and require entrants to either be subscribers to Defendant's service to enter or utilize a free alternative method of entry. (Kellerman Decl., ¶ 4.) Thus, defendant commenced its infringing conduct with its eyes wide open to the consequences of ultimately being found to infringe the '154 patent. Any claimed loss of market share by defendant as a result of an injunction does not overcome plaintiff's right to exclusivity. *Pfizer, Inc.*, 429 F.3d at 1382 ("Simply put, an alleged infringer's loss of market share and customer relationships, without more, does not rise to the level necessary to overcome the loss of exclusivity experienced by a patent owner due to infringing conduct.")

-9-

In addition, even if the Court grants Plaintiff's preliminary injunction, Defendant can continue to host online game tournaments that pay out prizes that have immediate value (i.e., cash, cash-equivalent notes and objects) to winners, but do not require an entrant to either be a subscriber to Defendant's service or utilize a free alternative method of entry to play. (Noah Decl., Exhibit B, pp. 2, 12 and 13.) Likewise, Defendant can continue to host tournaments that do not pay out prizes at all. (Noah Decl., Exhibit B, pp. 18-21.) In short, the only tournaments that Defendant would be enjoined from offering are tournaments that pay out prizes that have immediate value (i.e., cash, cash-equivalent notes and objects) and require entrants to either be subscribers to Defendant's service or utilize a free alternative method of entry.

### E. THE PUBLIC INTEREST IS BEST SERVED BY GRANTING A PRELIMINARY INJUNCTION.

The public interest is typically best served by the enforcement of valid patent rights. *Hybritech, inc. v. Abbott laboratories*, 849 F.2d 1446, 1448 (Fed. Cir. 1988). This interest is served by enforcing an adequate remedy for patent infringement, in this case, a preliminary injunction. *See, e.g.*, *Tivo Inc. v. Echostar Communications Corp.*, 446 F. Supp. 664 (E.D. Tex. 2006). Defendant's infringing system is not in any way related to public health or safety or any other critical public interest. Rather, Defendant's system is used solely for entertainment. Therefore, the public does not have a greater interest in allowing Defendant's customers to continue to play online game tournaments on Defendant's Web sites. In that regard, the public would not be denied the opportunity to play online game tournaments since Plaintiff's Web site is fully functional. (Kellerman Decl. ¶ 3.) In short, the public interest supports an injunction.

## IV.  CONCLUSION

For the reasons set forth above, this Court should grant Plaintiff's motion for preliminary injunction.

Dated: July 11, 2007                                                    DERGOSITS & NOAH LLP

                                                    By: /s/ Todd A. Noah
                                                        Todd A. Noah
                                                        Attorneys for Plaintiff MMJK, INC.

# APPENDIX A

| US PATENT NO. 7,094,154 | CLUB UBT COMPUTER NETWORKED TOURNAMENT PLAY |
|---|---|
| 1. A computer-implemented method of allowing a plurality of players to play a game over a computer network, the method comprising the steps of: | The www.clububt.com and www.playubt.com web sites both provide downloadable Club UBT software that allows players to play poker and blackjack games over a computer network. (Noah Decl., Exhibit B, p. 1.) |
| establishing a subscription-based membership for each player of the plurality of players by charging each player a fee for a pre-determined membership time period; | After the players have downloaded the Club UBT software, the players are charged a membership fee of $19.95 per month. (Noah Decl., Exhibit B, p. 2.) |
| hosting at least one game tournament for subscription-based players for a game that has elements of both chance and skill during the membership time period, the tournament consisting of at least one game round, each game round potentially eliminating one or more participant players until a winning player and one or more runner-up players are determined, | The Club UBT program allows the players to participate in poker and blackjack tournaments hosted on UBT server computers. Poker and blackjack are well known games of skill and chance. The tournaments consist of a plurality of game rounds in which a player can be eliminated by losing all of his or her game chips or by having the fewest chips at predetermined elimination rounds. When the tournaments end, the Club UBT server determines the winning player, the runner-up player and subsequent positions of all other players. (Noah Decl., Exhibit B, pp. 3, 4, 5, 6 and 7.) |
| wherein each player is required to make playing choices throughout the game; | The players must make choices throughout the Club UBT tournament game rounds. In poker tournament game rounds, the players can: bet a quantity of play chips, fold, call, or raise. In blackjack tournament game rounds, the players can bet a quantity of play chips, hit, hold, double down, or split. (Noah Decl., Exhibit B, pp. 8 and 9.) |
| establishing a prize pool for the tournament; | The Club UBT Web site describes a prize pool of cash, merchandise and shopping sprees for the tournament winners and other top finishers. The specific quantities of cash prizes for the winners and runner-ups are specified on the Club UBT Web site. (Noah Decl., Exhibit B, pp. 10 and 11.) |

-11-

| US PATENT NO. 7,094,154 | CLUB UBT COMPUTER NETWORKED TOURNAMENT PLAY |
|---|---|
| providing a means for allowing a non-subscription player to participate in the tournament without payment of the fee by submitting information relating to the non-subscription player prior to the hosting of the tournament, | Club UBT provides two methods for participating in the blackjack and poker tournaments for free without a paid subscription. One alternative method for entry into the tournaments is by mailing a card to Club UBT, which includes the legibly handwritten username, name, mailing address, e-mail address, and the player's date of birth. Club UBT gives these players seven days of free tournament play without a paid subscription. Another method for a non-subscription player to enter the tournaments is through a "try it for free" offer for two weeks of free tournament play. If the offer is accepted, the Club UBT server obtains player information including username, name, mailing address, e-mail address, and date of birth. By utilizing either of these methods, the non-paying players submit information about themselves before they are allowed to play in Club UBT tournaments. (Noah Decl., Exhibit B, pp. 12 and 13.) |
| wherein the non-subscription player is limited to one entry per tournament; and | In each tournament, the non-subscription player is limited to one entry per tournament. The Club UBT system does not allow a user to obtain multiple accounts and therefore prevents players from playing more than one entry per tournament. (Noah Decl., Exhibit B, pp. 3 and 14.) |
| disbursing the prize pool to the winning player and any eligible runner-up players in the form of prizes that have immediate value, subsequent to completion of the tournament. | The Club UBT Web site provides specific instructions for claiming prizes (including cash and merchandise, both of which have immediate value) and specifies that the prizes for merchandise will be shipped to the player within 30 days of claiming the prize. (Noah Decl., Exhibit B, p. 15.) |
| 2. The method of claim 1 wherein the game tournament is managed by a game administrator operating a game server computer coupled to one or more client computers operated by the participating players. | The Club UBT software is downloaded to client computers operated by players. The client computers are connected to the Club UBT server that manages the blackjack and poker tournaments. (Noah Decl., Exhibit B, p. 16.) |

-12-

| US PATENT NO. 7,094,154 | CLUB UBT COMPUTER NETWORKED TOURNAMENT PLAY |
|---|---|
| 3. The method of claim 2 wherein the computer network comprises the Internet. | The Club UBT server is connected to the client computers through the Internet. The client computers are required to have Internet Service Providers. (Noah Decl., Exhibit B, p. 16.) |
| 4. The method of claim 1 wherein the game comprises a card game | The Club UBT system provides blackjack and poker tournaments, which are both card games. (Noah Decl., Exhibit B, pp. 1, 8 and 9.) |
| 5. A computer-implemented method of allowing a plurality of players to play a game over a computer network, the method comprising the steps of: | The www.clububt.com and www.playubt.com Web sites both provide downloadable Club UBT software that allows players to play poker and blackjack games over a computer network. (Noah Decl., Exhibit B, p. 1.) |
| establishing a subscription-based membership for each player of the plurality of players by charging each player a fee for a pre-determined membership time period; | Once the players have downloaded the Club UBT software, the players ("club members") are charged a membership fee of $19.95 per month. (Noah Decl., Exhibit B, p. 2.) |
| hosting at least one game tournament for subscription-based players for a game that has elements of both chance and skill during the membership time period, the tournament consisting of at least one game round, each game round potentially eliminating one or more participant players until a winning player and one or more runner-up players are determined, | The Club UBT program allows the players to participate in poker and blackjack tournaments hosted on UBT server computers. Poker and blackjack are well known games of skill and chance. The tournaments consist of a plurality of game rounds in which a player can be eliminated by losing all of his or her game chips or by having the fewest chips at predetermined elimination rounds. When the tournaments end, the Club UBT server determines the winning player, the runner-up player and subsequent positions of all other players. (Noah Decl., Exhibit B, pp. 3, 4, 5, 6 and 7.) |
| wherein each player is required to make playing choices throughout the game; | The players must make choices throughout the Club UBT tournament game rounds. In poker tournament game rounds, the players can: bet a quantity of play chips, fold, call, or raise. In blackjack tournament game rounds, the players can bet a quantity of play chips, hit, hold, double down, or split. (Noah Decl., Exhibit B, pp. 8 and 9.) |
| establishing a prize pool for the tournament; | The Club UBT Web site describes a prize pool of cash, merchandise and shopping sprees for the tournament winners and other top finishers. The specific quantities of cash prizes for the winners and runner-ups are specified on the Club UBT Web site. (Noah Decl., Exhibit B, pp. 10 and 11.) |
| US PATENT NO. 7,094,154 | CLUB UBT COMPUTER NETWORKED |

-13-

|  | **TOURNAMENT PLAY** |
|---|---|
| distributing a fixed number of tokens to each player participating in the tournament for betting in the tournament, the fixed number not dependent upon any consideration provided by the player; | In the Club UBT poker and blackjack tournaments, all players are each given the same number of playing chips at the beginning of each tournament. (Noah Decl., Exhibit B, pp. 12 and 17.) |
| providing a means for allowing a non-subscription player to participate in the tournament without payment of the fee by submitting information relating to the non-subscription player prior to the hosting of the tournament, | Club UBT provides two methods for participating in the blackjack and poker tournaments for free without a paid subscription. One alternative method for entry into the tournaments is by mailing a card to Club UBT, which includes the legibly handwritten Club UBT username, name, mailing address, e-mail address, and the player's date of birth. Club UBT gives these players seven days of free tournament play without a paid subscription. Another method for a non-subscription player to enter the tournaments is through a "try it for free" offer for two weeks of free tournament play. If the offer is accepted, the Club UBT server obtains player information including username, name, mailing address, e-mail address, and date of birth. By utilizing either of these methods, the non-paying players submit information about themselves before they are allowed to play in Club UBT tournaments. (Noah Decl., Exhibit B, pp. 12 and 13.) |
| wherein the non-subscription player is limited to one entry per tournament; | In each tournament, the non-subscription player is limited to one entry per tournament. The Club UBT system does not allow a user to obtain multiple accounts and therefore prevents players from playing more than one entry per tournament. (Noah Decl., Exhibit B, pp. 3 and 14.) |
| distributing at least the same number of tokens to each non-subscription player participating in the tournament as each subscription player participating in the tournament, for betting in the tournament; and | In the Club UBT poker and blackjack tournaments, the subscription members and the non-paying players are each given the same number of playing chips at the beginning of the tournament. (Noah Decl., Exhibit B, p. 17.) |
| disbursing the prize pool to the winning player and any eligible runner-up players in the form of prizes that have immediate value, subsequent to completion of the tournament. | The Club UBT Web site provides specific instructions for claiming prizes (including cash and merchandise, both of which have immediate value) and specifies that the prizes for merchandise will be shipped to the player within 30 days of claiming the prize. (Noah Decl., Exhibit B, p. 15.) |
| **US PATENT NO. 7,094,154** | **CLUB UBT COMPUTER NETWORKED TOURNAMENT PLAY** |

-14-

| | |
|---|---|
| 6. The method of claim 5 wherein the game tournament is managed by a game administrator operating a game server computer coupled to one or more client computers operated by the participating players. | The Club UBT server manages the blackjack and poker tournaments. The Club UBT server is coupled to the client computers that are operated by remote players. (Noah Decl., Exhibit B, p. 16.) |
| 7. The method of claim 6 wherein the computer network comprises the Internet. | The Club UBT server is connected to the client computers through the Internet. The client computers are required to have Internet Service Providers. (Noah Decl., Exhibit B, p. 16.) |
| 8. The method of claim 5 wherein the game is a card game. | The Club UBT server provides blackjack and poker tournaments which are both card games. (Noah Decl., Exhibit B, pp. 1, 8 and 9.) |
| 9. The method of claim 8 wherein the card game comprises poker. | The Club UBT server provides poker tournaments. (Noah Decl., Exhibit B, pp. 1 and 8.) |

-15-