1  GREENBERG TRAURIG, LLP
   MATTHEW S. STEINBERG (SBN 82969)
2  STEVE P. HASSID (SBN 219913)
   2450 Colorado Avenue, Suite 400 East
3  Santa Monica, California 90404
   Telephone: (310) 586-7700
4  Facsimile: (310) 586-7800
   Email: steinbergm@gtlaw.com; hassids@gtlaw.com
5
   Attorneys for Defendants
6  Ultimate Blackjack Tour, LLC

7

8              UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11 | MMJK, Inc.,                    | CASE NO. C 3:07-CV-03236-BZ
12 |            Plaintiff,          | DECLARATION OF SANFORD I. MILLAR IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
13 | vs.                            |
14 | ULTIMATE BLACKJACK TOUR, LLC   |
15 |            Defendant.          | [Filed Concurrently with Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction, Declaration of L. Kenneth Rosenthal, Affidavit of Paul Forrest Hickman and Objections to Evidence Proffered by Plaintiff]
16
17
18
19 DATE:     August 15, 2007
   TIME:     10:00 a.m.
20 LOCATION: Courtroom G
   JUDGE:    Hon. Bernard Zimmerman

## DECLARATION OF SANFORD I. MILLAR

I, Sanford I. Millar, declare and state as follows:

1. The following facts are personally knows by me to be true and correct and if called as a witness I could and would competently testify thereto under oath.

2. I am an attorney at law. I became licensed to practice in the State of California in 1975. I earned my undergraduate degree in International Relations from the University of Southern California in 1971. I obtained my Juris Doctor from Southwestern University School of Law in 1974. I also achieved a Masters Degree in Business Taxation from the University of Southern California, Graduate School of Business in 1981. I have taught advanced corporate taxation in numerous programs including the Graduate School of Business at the University of Southern California and UCLA School of Continuing Education. I am a past member of the Taxation Law Advisory Commission of the State Bar of California. I have represented public and private companies in numerous areas of complex domestic and cross border transactions. In addition to my tax practice, I have practiced extensively in the gaming law area for in excess of five years. In connection with my gaming law practice, I have studied this area of the law extensively, and I am familiar with the legal concepts, legislation and precedents governing this area. Specifically, I am aware of the distinction between illegal gambling and illegal lotteries, on one hand, and legal sweepstakes, on the other hand.

3. Since June, 2005, I have been employed as Chief Operating Officer, Chief Financial Officer and General Counsel of Ultimate Blackjack Tour, LLC a Delaware limited liability Company (the "Company"), Defendant in this action. In connection with these duties, I prepare or cause to be prepared the financial statements of the Company including its financial projections. In addition, I negotiate or participate in negotiating and drafting all material agreements of the Company, including television agreements, advertising agreements, joint venture agreements, financing agreements and compliance documents. I also am responsible for ensuing that our products and services conform to the law and do not transgress any state or federal prohibitions against illegal lotteries or illegal gambling.

4. I have read all the pleadings in this case, including the Motion for Preliminary Injunction, Declaration of Todd A. Noah, Declaration of Jason Kellerman and the [Proposed] Order. My Declaration is in response to Plaintiff's claim of irreparable harm. I am also disclosing the impact that a

preliminary injunction would have on the Company at this critical time. Finally, I will discuss the fact that Plaintiff's website www.betzip.com is likely an illegal gambling site.

5. As part of my duties with the Company, I study our competitors and potential competitors and keep abreast of their business and activities. Therefore, I am aware of Plaintiff, and I have knowledge of its business prospects and its website. I am aware that Plaintiff is in no position realistically to capture any share of the market if this Court enjoins our business as requested in Plaintiff's motion. I have read nothing in Plaintiff's moving papers that would even begin to convince me otherwise. Specifically, I have studied the declaration of Jason Kellerman, Plaintiff's President and CEO. The thrust of Mr. Kellerman's declaration is that Plaintiff is losing market share based upon the assumption that the entire universe of potential customers in our industry will come to it if our Company is enjoined. However, Mr. Kellerman has put forth no data to show that Plaintiff has a customer base at all, or how the actions of our Company have specifically affected its business. Mr. Kellerman offers no specifics about the measures by which Plaintiff would capture our market and he has offered no data as to its financial ability to do so. Although Mr. Kellerman speaks generally about Plaintiff's "business development discussions," he fails to relate how these discussions could possibly reach fruition if our Company were enjoined. Revealingly, Mr. Kellerman admits in paragraph 8 of his declaration that Plaintiff lacks our Company's "marketing capabilities" and he fails to offer even a speculative notion of how an injunction against us would enhance Plaintiff's capabilities so that it could capture our market.

6. Mr. Kellerman then fails to reveal how or even to speculate why damages at law would not be an adequate remedy in the unlikely event it prevails in its patent infringement suit. I am aware that there is an actual standard measure of net revenue per subscriber that our Company, Plaintiff and all companies in our industry generate. Whether it is our Company, Plaintiff or any other similar company, the actual loss of net revenue can be calculated using generally accepted accounting principles.

7. On the other hand, our Company will be seriously harmed if a preliminary injunction is issued prohibiting the operation of our existing online game tournaments. The Company has a series of business units which interrelate to promote its "Club," its television show, its magazine, its "Tour" and its web sites. These units cross promote each other and both individually and collectively constitute our product offering. The Company uses its interdisciplinary approach to promote its principal product

2

DECL. OF SANFORD I. MILLAR IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION - CASE NO. C 3:07-CV-03236-BZ

lines, including our "Club" membership and our television show. The "Club" promotes the magazine, the television show and offers other services which in the aggregate exceed the price charged for "Club" membership which is $19.95 per month. Therefore, it is the "Club" membership that is valued at $19.95, not the playing of our games. A "Club" member is also allowed to play online. This subscriber base to our "Club" is the major component of the business model of our Company. "Club" membership is our major revenue source and it in turn leads to the success of the other components on our business, including our television show. The Company, which was formed in June of 2005, has produced in excess of 20 episodes of its television show of which 10 aired in the Fall of 2006, 8 of which will air in the Fall of 2007, and the remainder of which will air in 2008. All 20 episodes have aired or will air on CBS Network and WGN cable outlet. The television show is produced pursuant to the concept of a new form of tournament blackjack, called "Elimination Blackjack"™. The rules for Elimination Blackjack were created by the Company and are incorporated into its blackjack tournament section on its websites at www.PlayUBT.com and www.clubUBT.com. These websites also feature Texas Hold 'em Poker. The television show promotes the websites and the "Tour." The "Tour" consists of Elimination Blackjack tournaments held at licensed and legal resort casinos. Contestants for the television show can win a seat on the show by winning at a land based tournament or in an online tournament. The magazine, which is a unit of the Company, is the only combined Blackjack and Poker magazine in the country. It covers tournament results, has player rankings and is part of the "Club" offering.

  8.   Our Company's business concept is in sharp contrast to Plaintiff's website www.betzip.com which charges for online tournament access only. Through our entire product and services offering, our Company attracts viewers to our "Club" and to our television show. In turn, the television show ratings dictate advertising rates. All of these factors interrelate financially. The Company spends an average $670,000 per television episode in direct costs for production and air time on the show. The Company is committed to pay CBS $1,850,000 in the next 90 days for air time for the upcoming season. If this injunction is granted, CBS will likely elect not to air the show or not to air commercials advertising www.ClubUBT.com. All of this will then also have a chilling effect on all advertisers and on "Club" membership growth. In contrast to Mr. Kellerman's pure speculation about Plaintiff's irreparable harm, the harm that would be suffered by our Company if a preliminary injunction

3

DECL. OF SANFORD I. MILLAR IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION - CASE NO. C 3:07-CV-03236-BZ

were to issue is real. Our Company projects expenditures of nearly $150,000,000 in marketing and operational costs in the period of 2007 - 2010, which are predicated on the successful implementation of the integrated product offering and "Club" structure. Any delay in getting our product to market, to say nothing of the delay caused by a preliminary injunction, will absolutely cause substantial lost revenue, excessive expenses, lost reputation and lost goodwill.

9. In the period from the formation of our Company in June, 2005 through October 13, 2006, our Company invested in excess of $20 million in the development of its business model. On October 13, 2006, the President signed into law the Unlawful Internet Gambling Enforcement Act ("UIGEA"). As a result of this new legislation, the Company spent an additional $8 million from October 14, 2006 through June 30, 2007 in reengineering its software to comply with sweepstakes rules in various states and countries, hiring additional staff and revising its market plans. All of these efforts were directed to generating additional revenue both from "Club" subscription and from the television show. Since "Club" subscriptions in turn leads to greater popularity of the television show, "Club" subscriptions is the major component of the business model of the Company. Our Company has budgeted another $11 million of expenditures before the end of this year to promote our "Club" approach. If the proposed injunction is ordered, our Company will have to spend substantial sums on modifications resulting in a critical delay of marketing and promotion. The value of the next television broadcasts (which begin in September, 2007) as a promotional device for the "Club" will be lost, and therefore the $6 million in television cost will be lost. Our combined losses as a result of an injunction would be in excess of $15 million, composed as follows: television production and related expenses of $6 million, lost advertising revenue and barter value, overhead cost, marketing and redesigning totaling an additional $9 million.

10. I would now like to turn to another topic entirely; whether Plaintiff is operating an illegal gambling site. In order for games of chance to be legal, most states require that they be classified as a "sweepstakes" as opposed to a "lottery" or as "gambling." The manner by which this can be achieved is by providing players an "alternative means of entry" or "AMOE," as an alternative to requiring "consideration" or payment to earn the right to play and possibly win something of value. However, this AMOE cannot be illusory. Since most customers prefer to pay a subscription price rather than avail

4

DECL. OF SANFORD I. MILLAR IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION - CASE NO. C 3:07-CV-03236-BZ

themselves of the AMOE, all of these businesses run the risk of illegality because they may be found to be a "thinly disguised" lottery or gambling venture, notwithstanding the AMOE. If law enforcement in fact determines that the AMOE is illusory because it is more beneficial for the customer to pay to play then prohibition is likely. The AMOE must have "equal dignity" with the paid entry.

11. Therefore, one way to ensue legality is for playing the game of chance to be incidental to the promotion of a primary business. For example, if a fast-food restaurant offers a sweepstakes, whether a customer pays for the chance to play or not, this game will not be considered illegal because the payment is primarily for food and drink and not for the chance to play.

12. Our Company's products and services most definitely fall on the legal side of this distinction. Our Company's "Club" promotes our magazine, our television show and offers other services which our customers purchase for "Club" membership of $19.95 per month. Therefore, in addition to buying the opportunity to play in our online tournaments, our customers buy the magazine, obtain expert playing advice, learn about fun merchandise, learn about the results of our land based and television tournaments, follow our star players, and receive a newsletter. The opportunity to play in our online tournaments is also offered at no additional charge. Our business model emphasizes attracting viewers to our "Club" so that our Company can profit by the subscription price and then from the production of our television show. We do this through our integrated approach. We do not emphasize earning revenue by seeking payment in exchange for the opportunity to win by participating in an online game of chance.

13. Our Company's business is in sharp contrast to Plaintiff's website. Although Plaintiff offers an AMOE, it charges for tournament access only, and not for any club membership. Plaintiff's customers pay only for the opportunity to play a game of chance and to possibly win prizes. Plaintiff's customers do not pay for anything else. Plaintiff has no integrated or diverse product or services offering. Plaintiff has no magazine or television show. Plaintiff therefore has no primary business other than its game website. Plaintiff attempts to make money not from the sale of a product unrelated to its

///

///

///

5

DECL. OF SANFORD I. MILLAR IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION - CASE NO. C 3:07-CV-03236-BZ

"sweepstakes," but only from revenue generated from customers paying for the opportunity to play in an online game of chance and to possibly win prizes. Therefore, Plaintiff is likely operating an illegal gambling site.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration was executed this July __, 2007, day of July, 2007 at Los Angeles, California.

/S/
_____
SANFORD I. MILLAR

## CERTIFICATE OF SERVICE

I, hereby certify that on July 25, 2007, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to the e-mail addresses denoted below:

DERGOSITS & NOAH LLP
Todd A. Noah (SBN 152328) (tnoah@dergnoah.com)
Paul K. Tomita (SBN 188096) (ptomita@dergnoah.com)
Four Embarcadero Center, Suite 1450
San Francisco, California 94111
Telephone: (415) 705-6377
Facsimile: (415) 705-6383

DATED: July 25, 2007               GREENBERG TRAURIG, LLP


                                   By:____/S/_____
                                   MATTHEW S. STEINBERG
                                   Attorneys for Defendant
                                   Ultimate Blackjack Tour, LLC