1  GREENBERG TRAURIG, LLP
   MATTHEW S. STEINBERG (SBN 82969)
2  STEVE P. HASSID (SBN 219913)
   2450 Colorado Avenue, Suite 400 East
3  Santa Monica, California  90404
   Telephone: (310) 586-7700
4  Facsimile:  (310) 586-7800
   Email:  steinbergm@gtlaw.com; hassids@gtlaw.com
5
6  Attorneys for Defendants
   Ultimate Blackjack Tour, LLC
7
8              UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  MMJK, Inc.,                        CASE NO.  C 3:07-CV-03236-BZ

12              Plaintiff,             **DECLARATION OF L. KENNETH
                                       ROSENTHAL IN SUPPORT OF
13  vs.                                DEFENDANT'S OPPOSITION TO
                                       PLAINTIFF'S MOTION FOR
14  ULTIMATE BLACKJACK TOUR, LLC       PRELIMINARY INJUNCTION**

15              Defendant.             **[Filed Concurrently with Defendant's
                                       Opposition to Preliminary Injunction;
16                                     Declaration of Sanford I. Millar, Affidavit of
                                       Paul Forrest Hickman and Objections to
17                                     Evidence Proffered by Plaintiff]**

18
                                       DATE:        August 15, 2007
19                                     TIME:        10:00 a.m.
                                       LOCATION:  Courtroom G
20                                     JUDGE:       Hon. Bernard Zimmerman

21

22

23

24

25

26

27

28

I, L. Kenneth Rosenthal, do hereby declare as follows:

## QUALIFICATIONS

1.    I am the principal and sole owner of Strategic Innovation Services at 2173 San Tropez Court, Chino Hills, California 91709.  I attach as **Exhibit A**, a true and correct copy of my curriculum vitae.  This attachment accurately sets forth some of my training and experience as a patent agent, analyst, and licensing strategist in Intellectual Property matters.  I have over 25 years experience in this professional field.

2.    I am able to testify as to the matters set forth herein.  I make the following statements based on my own personal knowledge, unless expressly stated otherwise.

3.    This Declaration is submitted as evidence to assist this Court in identifying and analyzing issues that exist in the lawsuit filed by MMJK, Inc. alleging the www.playubt.com and www.clububt.com websites and systems infringe U.S. Patent No. 7,094,154 to Kellerman et al.

4.    I graduated Phi Beta Kappa with a bachelor's degree in physics from Massachusetts Institute of Technology (MIT) in 1975.  I was admitted to practice on patent matters before the U.S. Patent and Trademark Office in 1979, Registration No. 29,697.  I then attended graduate school at the University of Southern California (USC), obtaining my master's in business administration (MBA) in 1983.

5.    From 1975 to 1977, I worked at Rockwell International's space division on the space shuttle project as an electrical engineer and physicist.

6.    From 1978 to present, I have worked at Ametron Inc. (www.ametron.com) as an electronics buyer, installer, and salesperson.  In this capacity, I routinely evaluate up-and-coming or already available computer and internet games, and I make recommendations regarding the purchasing and selling of such products.

7.    From 1979 to 1981, I worked at Information International as an electrical engineer, computer graphics engineer, and as a patent agent.

8.    From 1980 to present, I have been the principal of Strategic Innovation Services (www.diamondipi.com), where I counsel clients on various aspects of patents, trademarks, and

1

copyrights, and render expert opinions on validity, infringement and enforceability, value, and business strategy.

9.      From 1983 to 1990, I was acting director of the Patent and Copyright Administration at USC. In this capacity, I was responsible for the administration, licensing, application, and litigation of nearly all intellectual property developed by the approximately 8,000 faculty and the approximately 30,000 students at the University. Specifically, I would routinely review patent applications, office actions, correspondence related to notices of allowance, and correspondence related to maintenance fees. I was responsible for identifying potential issues that needed to be corrected regarding the office actions, in order to safeguard the University's intellectual property interests. Accordingly, I evaluated thousands of patents and patent applications to ascertain their market and licensing potential, validity risk, infringement risk, and their potential for financial return and other benefits to the University and its surrounding community.

10.      Over the past twenty years, I have attended the Consumer Electronics Show (CES) more than a dozen times. CES is the largest consumer electronics show in the world and presents products, lectures, and the latest trends in electronics, including but not limited to computer games and internet games. I have also twice attended the E3 show, which specifically addresses the latest trends in computer and internet games.

11.      I have an extensive background in numerous areas of electronic gaming and gambling, and I attempt to stay current in those fields. As a teenager, I played all types of card games, including gambling games such as blackjack and poker. At MIT, I was an active member of the Blackjack Club. Since approximately 1971, I have held an intense personal interest in all types of computer games and gambling strategies, and have been active in both areas.

**PRIOR TESTIMONY**

12.      My prior testimony is listed in my curriculum vitae which is attached to this declaration as **Exhibit A**.

**SCOPE OF WORK**

2

13.     The aim of my work leading to this declaration was to analyze the teachings of the United States Patent No. 7,094,154 to Kellerman et al. ("the '154 patent") and the UBT websites and systems, and then analyze whether or not the claims of the '154 patent are infringed and whether or not the claims of the '154 patent are valid.

## DOCUMENTS AND INFORMATION CONSIDERED

14.     I have reviewed and analyzed the following in reaching my opinions and preparing this declaration:

a.     The www.playubt.com and www.clububt.com websites.

b.     United States Patent No. 7,094,154.  (Attached as **Exhibit B**).

c.     The file history of United States Patent No. 7,094,154.

d.     Webpages from a website that stores archived webpages, commonly referred to as the Way Back Machine.  The root or main webpage I reviewed and analyzed is located at: http://web.archive.org/web/20031002150501/http://www.bugsysclub.com/club/support/bugsyfaq.htm - dated October 10, 2003.  A true and correct copy is attached as **Exhibit C**.

e.     U.S. Patent Application Number 2004/0248634 filed on January 30, 2004.  A true and correct copy is attached as **Exhibit D**.

f.     The provisional patent application No 60/444,474 filed on February 3, 2003, which is the basis of Patent Application Number 2004/0248634 (Exhibit D).  A true and correct copy is attached as **Exhibit E**.

g.     U.S. Patent Application Number 2005/0086126, filed on October 20, 2003.  A true and correct copy is attached as **Exhibit F**.

## OVERALL CONCLUSIONS

15.     Based on my analysis, I have concluded that the websites and the systems of www.playubt.com and www.clububt.com do not infringe any of the claims of the '154 patent, either literally or under the doctrine of equivalents.

16.     Based on my analysis, I have concluded that the claims of the '154 patent are invalid in that the claims lack novelty and are obvious in the light of the prior art.

3

17.    I also believe that the '154 patent was secured through inequitable conduct by those who were procuring the '154 patent.

18.    This conclusion of invalidity is based on my analysis of the claims of the '154 patent in light of the following prior art: Exhibits C, D, E, and F.

## THE UBT WEBSITES AND SYSTEMS DO NOT INFRINGE THE CLAIMS OF THE '154 PATENT

19.    Both of the independent claims of the '154 patent (claims 1 and 5) require the procedure of:

> disbursing the prize pool to the winning player **and any eligible runner-up players** in the form of prizes that have immediate value, **subsequent to  completion of the tournament.** (emphasis added)

20.    I understand that the prizes claimed in the invention as set out particularly in claims 1 and 5 are prizes that **both** the winning player **and any** eligible runner up **players** win, and that these prizes are only **subsequent to completion of the tournament.**

21.    I note that the term **"runner-up players" is plural**.  It is clear to me that **the claims exclude coverage where there is disbursement of prizes to only a single runner-up player subsequent to the completion of the tournament**.  Accordingly, if a prize is disbursed to only a single runner-up player subsequent to completion of the tournament, such a system would not infringe the claims of the '154 patent.

22.    I do not consider that the UBT websites and their systems have the disbursement feature of the '154 patent either literally or under the doctrine of equivalents.  **UBT does not disburse prizes to more than one runner up player subsequent to completion of the tournament**.  Indeed the UBT system and websites function just oppositely.

23.    I have been provided with screen shots from UBT which outline its system for awarding prizes to runner-up players. (Attached as **Exhibit G**).  The UBT screen shots show that there is only one runner-up player who is awarded points subsequent to completion of the tournament.  All other runner-up players obtain their points during the ongoing tournament- prior to the completion of the tournament.

24.    Screen shot #1 of Exhibit G shows the tournament lobby for tournament ID# 1387328.  It shows that the tournament started at 6:30 pm on July 24th and lasted for 2 hours, 26 minutes.  The top 22

4

finishing players are listed on the right side.  Screen shot #2 shows the transaction detail for the winner, who was credited 250 tournament points at 8:57:31 pm, subsequent to the completion of the tournament. Screen shot #3 shows the transaction detail for the 2nd place player, who was credited 225 tournament points at 8:57:31 pm, subsequent to the completion of the tournament.  Screen shot #4 shows the transaction detail for the 3rd place player, who was credited 200 points at 8:35:10 pm- 22 minutes and 21 seconds earlier than the 1st and 2nd place players.  Screen shot #5 shows the transaction detail for the 12th place player, who was credited points at 7:54:30 pm, more than one hour earlier than the 1st and 2nd place players.  Screen shot #6 shows the transaction detail for the 22nd place player, who was credited points at 7:39:03 pm, approximately one and a half hours earlier than the 1st and 2nd place players. **Therefore, <u>only one</u> runner-up player, 2nd place, received his points subsequent to the completion of the tournament.  All other runner-up players, namely 3rd place to 22nd place and beyond, received their points prior to the completion of the tournament**.

25.    This would be consistent with a system to maximize game play on the UBT sites. Namely, as soon as runner-up players have placed in a tournament, it is beneficial to UBT to have these runner-up players earn their points immediately, so that they may enter another game or tournament without delay.  Thus, reentry into another game is possible for the 3rd place player, 4th place player, etc., even though the initial tournament is ongoing.  This creates an efficient gaming system with more players, more games, more prizes, and ultimately, more business for UBT.

26.    The UBT system functions and operates in a way which is different and creates different results, than the system of the '154 patent and claims 1 and 5.  A different methodology underlies the system under claims 1 and 5, where the runner-up players must wait until the completion of the tournament to obtain their prizes.  Indeed, I did not see that the '154 patent even considers the issuance of points in the midst of a tournament to facilitate immediate entry into another game or tournament.

27.    When the patentees of the '154 patent formulated their patent claims, it would have been clearly foreseeable to them to provide for a disbursement structure where multiple runners-up receive prizes prior to the completion of the tournament.  However, they chose not to claim this disbursement format.  Instead, they claimed the structure with disbursements to any runner-up players subsequent to completion of the tournament.

5

28.    The UBT system is significantly different from the system of the '154 patent and the claims of the '154 patent. In the UBT system, there is only a single runner-up player who receives the prize subsequent to the completion of the tournament; therefore the requirement of multiple runner-up players receiving their prizes subsequent to the completion of the tournament in claims 1 and 5 is missing.

29.    Because the independent claims 1 and 5 contain the limitation that any eligible runner-up players obtain their prizes only subsequent to completion of the tournament, there is no infringement of the '154 patent claims. There is no claim coverage of prizes to runners-up before the completion of the tournament. There is no infringement by UBT of independent claims 1 and 5.

30.    It is axiomatic in patent law that if an independent claim is not infringed, then the claims dependent on the independent claim cannot be infringed. Hence, there is also no infringement of the dependent claims 2 to 4 and 6 to 9 of the '154 patent.

31.    There is no infringement literally or by equivalents of the '154 patent.

## THE '154 PATENT IS INVALID

32.    In my capacity as a patent agent and analyst, I reviewed and analyzed the '154 patent, and construed that claims 1 to 9 of the '154 patent are invalid. I conclude that these claims lack novelty and/or are obvious in view of Exhibits C, D, E and F.

33.    I used my experience, understanding, common knowledge, as well as my knowledge of what is commonly known in the field of games, games of skill, gaming, and internet and computer network technology to construe the language of the claims and the prior art of Exhibits C, D, E, and F. All these prior art references are indirectly related technology areas, and there is no ingenuity involved in combining elements from one prior art reference to the other. The results of any combination are predictable and I would expect them to be successful. I also performed independent research to get a sense of the level of ordinary skill for games, games of skill, gaming, and internet and computer network technology.

34.    As a result of my analysis, I have determined that the claims of the '154 patent are invalid. The '154 patent relates to a computer-implemented gaming system, which establishes a

6

1 subscription-based membership, and also that a non-subscription player be limited to one entry per

2 tournament. At the completion of the tournament, a prize pool is disbursed to the winning player and

3 eligible runner-up players, as prizes that have immediate value.

4    35.    Exhibits C, D, E, and F render all of the claims of the '154 patent invalid.

5    36.    Exhibits C and F prior date the effective filing date of the '154 patent by more than one

6 year.

7    37.    The contents of Exhibit D to which I refer are all supported and included in Exhibit E, its

8 provisional patent application, dated February 3, 2003. Note that the content of Exhibit E was

9 incorporated in its entirety into Exhibit D. (See Exhibit D, paragraph 0001 of the patent.) I assume that

10 the date of invention of the '154 patent is the effective filing date, namely, December 30, 2004. As

11 shown by Exhibits D and E, all the features of the claims of the '154 patent were known by others,

12 namely the inventors of the '634 patent, "Herrmann et al.," before December 30, 2004. Also, all the

13 features of the claims of the '154 patent were also described in an application for a patent by another,

14 namely the inventors "Herrmann et al.," before December 30, 2004.

15    38.    I refer to three claim charts attached (**Exhibits H, I, and J**). Exhibit H compares the

16 claimed features of the '154 patent to the prior art of Exhibit C. Exhibit I compares the claimed features

17 of the '154 patent to the prior art of Exhibits D and E. Exhibit J compares the claimed features of the

18 '154 patent to the prior art of Exhibit F.

19    39.    Exhibit C, the Bugsysclub site, deals with features of subscription and non-subscription

20 members for games which include poker. A card game, prizes, fees, chips, and poker are disclosed in

21 Exhibit C. Tokens in the form of chips are disclosed in Exhibit C. Exhibit C includes all the features of

22 the claims of the '154 patent. These features of Exhibit C are set out in the right-hand column of

23 Exhibit H. In particular, it discloses limiting a non-subscription member to one entry per tournament.

24    40.    Exhibits D and E (Patent Application '634, together with Provisional Application '474) is

25 a disclosure of computerized internet games of skill and chance, having rules, and includes card games

26 such as poker and blackjack. There are subscription members and non-subscription members who are

27 limited to one entry per game. There is a jackpot prize pool and a payout for winning the game. These

28 references disclose "loyalty points," which can obviously be the same as tokens and chips, with no

7

monetary value associated with such points.  A game can start with such loyalty points being deposited in an account.  Exhibits D and E include all the features of the claims of the '154 Patent.  These features in Exhibits D and E are set out in the right-hand column of Exhibit I.

41.     Exhibit F ('126 patent) describes a computer-networked gaming system for online gaming over the Internet, where there are subscribing members and non-subscribing members participating.  The non-subscribing members are limited to one session of play.  Exhibit F gives an example of working with game consoles, such as Sony Playstation, which is a system played over a computer network such as the Internet.  A person familiar with Sony Playstation 2 and 3 would know that card games are also played over computer networks and the Internet.  It would be obvious to one skilled in the art that all types of games of skill and chance, including card games, can be played through the computer game console, similar to other types of gaming played over the Internet.

42.     Even though '126 patent publication does not specifically address eliminating players, it is a known characteristics of such gaming consoles that players are eliminated.

43.     It is clear that the technology of Exhibit F could easily be applied to games having the characteristics of cards, poker, fees, tokens, and prizes.  It is clear that the technology of Exhibit F could adopt the subscription and non-subscription members features of Exhibit C for games having the characteristics of cards, poker, fees, tokens and prizes.

44.     Exhibit F should also be interpreted as disclosing limiting a non-subscription player to one entry per tournament.  Hence, Exhibit F covers both the subscription membership and a non-subscription player being limited to one entry per tournament.

45.     Exhibit F includes all the features of the claims of the '154 patent.  These features of Exhibit F are set out in the right-hand column of Exhibit J.

46.     The claims of the '154 patent also lack novelty based on the disclosure of Exhibit F.

47.     Exhibits C, D, E, and F are analogous art to each other and to the '154 patent.  Should anything in the language of the disclosures of Exhibits C, D, E, and F be missing relative to the exact verbiage of the claims of the '154 patent, it is clear that those "missing" features would be inherently disclosed in Exhibits C, D, E, and F.  In addition, it would be obvious to apply the features and

8

1  procedures of Exhibits C, D, E, and F interchangeably among them.  I do not consider that there is

2  anything new or unobvious in the subject matter of the claims of the '154 Patent.

3

4  ## COMPARISON OF THE '154 PATENT TO FREQUENTLY ASKED QUESTIONS FOR

5  ## BUGSYSCLUB, POKERSCHOOLONLINE, AND POKERPAGES

6  48.    I have performed a detailed comparison of the '154 patent claims to Exhibit C

7  (Frequently Asked Questions for BugsysClub, PokerSchoolOnline, and PokerPages). The following is a

8  claim-by-claim comparison of all the detailed features of the '154 patent to the disclosure of Exhibit C.

9  49.    Claim 1 of the '154 Patent requires a computer-implemented method of allowing a

10 plurality of players to play a game over a computer network, the method comprising the steps delineated

11 in the rest of Claim 1.  A computer-implemented method meeting this description is disclosed in the

12 system of Exhibit C.

13 50.    Claim 1 of the '154 Patent requires establishing a subscription-based membership for

14 each player of the plurality of players.  This requirement is disclosed on page 5 of Exhibit C in the

15 "Download Software and Register" section and on pages 10 and 11 in the "Register for a Game"

16 section.

17 51.    Claim 1 of the '154 Patent requires charging each player a fee for a pre-determined

18 membership time period.  This requirement is disclosed on page 9 of Exhibit C, under "My Credit Card

19 Charged - inherently means that a fee is charged;" page 11 under "Buy In;" page 15 under "Deposit

20 Methods - What Ways can I Fund my BugsysClub Poker Account;" and page 16 under "Currencies."

21 52.    Claim 1 of the '154 Patent requires hosting at least one game tournament for

22 subscription-based players for a game that has elements of both chance and skill during the membership

23 time period.  This requirement is disclosed in Exhibit C, in the text reading "Poker is a game involving

24 chance and skill."

25 53.    Claim 1 of the '154 Patent requires the tournament to consist of at least one game round.

26 This requirement is disclosed on pages 2, 11, 12, and 21 of Exhibit C.

27 54.    Claim 1 of the '154 Patent requires each game round to potentially eliminate one or more

28 participant players until a winning player and one or more runner-up players are determined.  This

9

requirement is disclosed in the text on page 21 of Exhibit C, under "How Does a Tournament Work - Players are removed."

55.    Claim 1 of the '154 Patent requires that each player is required to make playing choices throughout the game. This requirement is disclosed in Exhibit C on pages 1 to 29 and in the text reading "Poker requires playing choices throughout the game."

56.    Claim 1 of the '154 Patent requires establishing a prize pool for the tournament. This requirement is disclosed on page 21 of Exhibit C, under the section "Prize Money is Calculated."

57.    Claim 1 of the '154 Patent requires providing a means for allowing a non-subscription player to participate in the tournament without payment of the fee. This requirement is disclosed on pages 2, 14, and 18 of Exhibit C under the "Free Play" sections.

58.    Claim 1 of the '154 Patent requires the non-subscription player to submit information relating to him/herself prior to the hosting of the tournament. This requirement is disclosed on pages 18 and 19 of Exhibit C in the section "Free Play: How do I start playing for free right now? Registration information requested."

59.    Claim 1 of the '154 Patent requires that the non-subscription player is limited to one entry per tournament. This requirement is disclosed on page 3 of Exhibit C under, "Only one account at any time."

60.    Claim 1 of the '154 Patent requires disbursing the prize pool to the winning player and any eligible runner-up players in the form of prizes that have immediate value, subsequent to completion of the tournament. This requirement is disclosed on page 21 of Exhibit C under the section "How does a tournament work?" The text reads: "Over time in all tournaments, players who lose all their chips- or 'bust out'- are removed from the tables until only one person remains. Players are then awarded prize money based on their finishing position within the group."

61.    Claim 2 of the '154 Patent requires that the game tournament is managed by a game administrator operating a game server computer coupled to one or more client computers operated by the participating players. This requirement is disclosed in text that is inherent throughout Exhibit C.

62.    Claim 3 of the '154 Patent requires that the computer network comprises the Internet. This requirement is disclosed throughout Exhibit C.

10

63.    Claim 4 of the '154 Patent requires that the game comprises a card game. This requirement is disclosed throughout Exhibit C.

64.    Claim 5 of the '154 Patent requires a computer-implemented method of allowing a plurality of players to play a game over a computer network. This requirement is disclosed throughout Exhibit C.

65.    Claim 5 of the '154 Patent requires establishing a subscription-based membership for each player of the plurality of players. This requirement is disclosed on page 5 of Exhibit C under the section "Download Software and Register" and on pages 10 and 11 under the section "Register for a Game."

66.    Claim 5 of the '154 Patent requires charging each player a fee for a pre-determined membership time period. This requirement is disclosed in on page 9 of Exhibit C under "My Credit Card Charged - inherently means that a fee is charged;" page 11 under "Buy In;" page 15 under "Deposit Methods - What Ways can I Fund my BugsysClub Poker Account;" and page 16 under "Currencies and Funding."

67.    Claim 5 of the '154 Patent requires hosting at least one game tournament for subscription-based players for a game that has elements of both chance and skill during the membership time period. This requirement is disclosed on page 5 of Exhibit C in the text reading "Poker is a game involving chance and skill."

68.    Claim 5 of the '154 Patent requires the tournament to consist of at least one game round. This requirement is disclosed on pages 2, 11, and 12 of Exhibit C in the sections relating to tournaments and games, and on page 21 in the section "How Does a Tournament Work?"

69.    Claim 5 of the '154 Patent requires each game round to potentially eliminate one or more participant players until a winning player and one or more runner-up players are determined. This requirement is disclosed on page 21 of Exhibit C, under "How Does a Tournament Work - Players who lose are removed from the table."

70.    Claim 5 of the '154 Patent requires that each player is required to make playing choices throughout the game. This requirement is disclosed throughout Exhibit C, in the text reading "Poker requires playing choices throughout the game."

11

71.    Claim 5 of the '154 Patent requires establishing a prize pool for the tournament. This requirement is disclosed on page 21 of Exhibit C under, "How is the amount of Prize Money Calculated?"

72.    Claim 5 of the '154 Patent requires distributing a fixed number of tokens to each player participating in the tournament for betting in the tournament. This requirement is disclosed on page 19 of Exhibit C, under "Chips are essentially tokens."

73.    Claim 5 of the '154 Patent requires that the fixed number of tokens not be dependent upon any consideration provided by the player. This requirement is disclosed on page 19 of Exhibit C under, "Play-Money chips are not dependent upon any consideration and are deposited in a free account."

74.    Claim 5 of the '154 Patent requires providing a means for allowing a non-subscription player to participate in the tournament without payment of the fee. This requirement is disclosed on page 2 of Exhibit C under "Free Play," on page 14 under "Free Play Games," and on page 18 under "Free Play."

75.    Claim 5 of the '154 Patent requires the non-subscription player to submit information relating to him/herself prior to the hosting of the tournament. This requirement is disclosed on pages 18 and 19 of Exhibit C under "Free Play: How do I start playing for free right now?  Registration information requested."

76.    Claim 5 of the '154 Patent requires that the non-subscription player be limited to one entry per tournament. This requirement is disclosed on page 3 of Exhibit C under "I would like to play under different names; can I have more than one account? User may have only one account at a time."

77.    Claim 5 of the '154 Patent requires distributing at least the same number of tokens to each non-subscription player participating in the tournament as each subscription player participating in the tournament, for betting in the tournament. This requirement is disclosed on page 19 of Exhibit C under, "Play money chips deposited."

78.    Claim 5 of the '154 Patent requires disbursing the prize pool to the winning player and any eligible runner-up players in the form of prizes that have immediate value, subsequent to completion of the tournament. This requirement is disclosed on page 21 of Exhibit C under the section "How does a

12

tournament work?" The text reads: "Over time in all tournaments, players who lose all their chips- or 'bust out'- are removed from the tables until only one person remains. Players are then awarded prize money based on their finishing position within the group."

79.    Claim 6 of the '154 Patent requires that the game tournament is managed by a game administrator operating a game server computer coupled to one or more client computers operated by the participating players. This requirement is disclosed throughout Exhibit C.

80.    Claim 7 of the '154 Patent requires that the computer network comprises the Internet. This requirement is disclosed throughout Exhibit C.

81.    Claim 8 of the '154 Patent requires that the game is a card game. This requirement is disclosed throughout Exhibit C.

82.    Claim 9 of the '154 Patent requires that the card game comprises poker. This requirement is disclosed throughout Exhibit C and throughout PokerSchoolOnline and Poker Pages.

## COMPARISON OF THE '154 PATENT TO THE NON-CONSIDERED PROVISIONAL APPLICATION PUBLICATION '474 OF THE '634 PUBLICATION

83.    I have considered the prior art effect of Exhibit D in detail above, especially in view of its accompanying and incorporated provisional application (Exhibit E), also discussed above. I understand Exhibits D and E to teach all the elements of the claims of the '154 patent and/or render those claims unpatentable as being obvious. The following is a claim-by-claim comparison of all the detailed features of the '154 patent to Exhibits D and E.

84.    I have compared the '154 Patent to Exhibits D and E. Claim 1 of the '154 Patent relates to a computer-implemented method of allowing a plurality of players to play a game over a computer network. This computer implementation of game playing is disclosed throughout the specifications of both Exhibits D and E, for instance in Figures 5, 6, and 7 .

85.    Claim 1 of the '154 Patent requires establishing a subscription-based membership for each player of the plurality of players. This requirement is disclosed in Exhibits D and E, as players create a subscription to play multiple games, and the subscription can automatically be renewed. See Exhibit D, paragraph 0021; and Exhibit E, page 5, lines 26-29.

13

86.     Claim 1 of the '154 Patent requires charging each player a fee for a pre-determined membership time period. This requirement is disclosed in the specifications of both Exhibits D and E, as players pay via cash or credit card etc., and subscriptions can be renewed. This presupposes a predetermined time period. See Exhibit D, paragraph 0021; and Exhibit E, page 5, lines 26-69.

87.     Claim 1 of the '154 Patent requires hosting at least one game tournament for subscription-based players for a game that has elements of both chance and skill during the membership time period. This requirement is disclosed in the entire specifications of both Exhibits D and E in that blackjack and poker are such games. In particular, note Exhibit D, paragraph 0017; and Exhibit E, page 5, lines 9-16; and page 14, lines 7-8.

88.     Claim 1 of the '154 Patent requires the tournament to consist of at least one game round. Many examples of games having more than one game round are disclosed throughout the specifications of Exhibits D and E.

89.     Claim 1 of the '154 Patent requires each game round to potentially eliminate one or more participant players until a winning player and one or more runner-up players are determined. The rules of poker potentially eliminate players until there is a winner and runner-up players, and poker is disclosed in the specifications of Exhibits D and E. See Exhibit D, paragraph 0036; and Exhibit E, page 8, line 5.

90.     Claim 1 of the '154 Patent requires that each player is required to make playing choices throughout the game. Games inherently require choices throughout the game and thus this requirement is disclosed throughout the specifications of Exhibits D and E.

91.     Claim 1 of the '154 Patent requires establishing a prize pool for the tournament. This requirement is disclosed in the specifications of Exhibits D and E in that there is a progressive or rolling jackpot. See Exhibit D, paragraphs 0027 and 0062; and Exhibit E, page 19, lines 10-15.

92.     Claim 1 of the '154 Patent requires providing a means for allowing a non-subscription player to participate in the tournament without payment of the fee. This requirement is disclosed in the specifications of Exhibits D and E in that there is an alternative method of entry (AMOE). See Exhibit D, paragraphs 0029 and 0056; and Exhibit E, page 7, line 13; page 17, line 27 to page 18, line 2; and page 18, lines 14-19.

LA 126867988v1 7/17/2007

93.    Claim 1 of the '154 Patent requires the non-subscription player to submit information relating to him/herself prior to the hosting of the tournament. This requirement is disclosed in the specifications of Exhibits D and E. Individuals can enter as an AMOE by submitting a postcard with information or by signing up on a free internet site. See Exhibit D, paragraphs 0056 and 0058; and Exhibit E, page 17, line 27 to page 18, line 2; and Page 18, lines 14-19.

94.    Claim 1 of the '154 Patent requires that the non-subscription player is limited to one entry per tournament. This requirement is disclosed in the specifications of Exhibits D and E. AMOE entry may be limited to one game in a period of one year. See Exhibit D, paragraph 0057; and Exhibit E, page 18, lines 10-12.

95.    Claim 1 of the '154 Patent requires disbursing the prize pool to the winning player and any eligible runner-up players in the form of prizes that have immediate value, subsequent to completion of the tournament. This requirement is disclosed in the specifications of Exhibits D and E, as the computer automatically notifies players of their winnings, and prizes can be won. Payout to the winner is automatic. See Exhibit D, paragraphs 0018, 0028, and 0055; and Exhibit E, page 7, lines 22-24; page 9, lines 17-19; and page 17, lines 24 -26.

96.    Claim 2 of the '154 Patent requires that the game tournament is managed by a game administrator operating a game server computer coupled to one or more client computers operated by the participating players. This requirement is disclosed in the specifications of Exhibits D and E. See Figures 3a, 3b, 5, 6, and 7.

97.    Claim 3 of the '154 Patent requires that the computer network comprises the Internet. This requirement is disclosed in the specifications of Exhibits D and E. See Figures 5, 6, and 7.

98.    Claim 4 of the '154 Patent requires that the game comprises a card game. This requirement is disclosed throughout the specifications of Exhibits D and E, as they contain poker, five-card stud, and many other games. For instance, see Exhibit D, paragraph 0019; and Exhibit E, page 5, lines 6-18.

99.    Claim 5 of the '154 Patent requires a computer-implemented method of allowing a plurality of players to play a game over a computer network. This requirement is disclosed throughout

15

Exhibits D and E, as there are computer readable signals and remote access is obtainable through kiosks, telephones, handheld devices, or computers. See Figures 5, 6 and 7.

100.    Claim 5 of the '154 Patent requires establishing a subscription-based membership for each player of the plurality of players. Players are allowed to create a subscription to play multiple games and players are allowed to automatically renew the subscription. This requirement is disclosed in Exhibit D, page 5, lines 26-29, and Exhibit E, page 5, line 30 to page 6, line 1.

101.    Claim 5 of the '154 Patent requires charging each player a fee for a pre-determined membership time period. This requirement is disclosed in the specifications of Exhibits D and E, as players pay through cash, debit or credit card, or account credit. See Exhibit D, paragraph 0021; and Exhibit E, page 5, lines 26-69.

102.    Claim 5 of the '154 Patent requires the hosting of at least one game tournament for subscription-based players for a game that has elements of both chance and skill during the membership time period. This requirement is disclosed in the specifications of Exhibits D and E, as they describe games of skill and chance, such as blackjack and poker. See Exhibit D, paragraph 0017; Exhibit E, page 5, lines 9-16; and page 14, lines 7-8.

103.    Claim 5 of the '154 Patent requires that the tournament consist of at least one game round. This requirement is disclosed in the specifications of Exhibits D and E, as many of the example games have multiple game rounds.

104.    Claim 5 of the '154 Patent requires each game round to potentially eliminate one or more participant players until a winning player and one or more runner-up players are determined. This requirement is disclosed in the specifications of Exhibits D and E, as the rules of poker potentially eliminate players until there is a winner and runner-up players. Numerous games have similar rules. See Exhibit D, paragraph 0036; and Exhibit E, page 8, line 5.

105.    Claim 5 of the '154 Patent requires that each player is required to make playing choices throughout the game. This requirement is disclosed in the specifications of Exhibits D and E, as games inherently require choices throughout the game.

106.    Claim 5 of the '154 Patent requires establishing a prize pool for the tournament. This requirement is disclosed in the specifications of Exhibits D and E, as a progressive or rolling jackpot is

developed within the game. See Exhibit D, paragraphs 0027 and 0062; and Exhibit E, page 6, line 9; page 9, line 5; and page 19, lines 10-15.

107.    Claim 5 of the '154 Patent requires distributing a fixed number of tokens to each player participating in the tournament for betting in the tournament. This requirement is disclosed in the specifications of Exhibits D and E. Points such as "loyalty points" are used to participate, and these are essentially tokens. See Exhibit D, paragraph 0026; and Exhibit E, page 8, lines 17-20.

108.    Claim 5 of the '154 Patent requires that the fixed number of tokens not be dependent upon any consideration provided by the player. This requirement is disclosed in the specifications of Exhibits D and E. Points such as "loyalty points" do not require consideration. Points such as "loyalty points" are used to participate. See Exhibit D, paragraph 0026; and Exhibit E, page 8, lines 17-20.

109.    Claim 5 of the '154 Patent requires providing a means for allowing a non-subscription player to participate in the tournament without payment of the fee. This requirement is disclosed in the specifications of Exhibits D and E, as an alternative method of entry (AMOE) is available. See Exhibit D, paragraphs 0029 and 0056; and Exhibit E, page 7, line 13; page 17, line 27 to page 18, line 2; and page 18, lines 14-19.

110.    Claim 5 of the '154 Patent requires the non-subscription player to submit information relating to him/herself prior to the hosting of the tournament. This requirement is disclosed in the specifications of Exhibits D and E. Individuals can enter as an AMOE by submitting a postcard with information or signing up on a free internet site. See Exhibit D, paragraphs 0056 and 0058; and Exhibit E, page 17, line 27 to page 18, line 2; and page 18, lines 14-19.

111.    Claim 5 of the '154 Patent requires that the non-subscription player be limited to one entry per tournament. This requirement is disclosed in the specifications of Exhibits D and E, as AMOE entry may be limited to one game in a period of one year. See Exhibit D, paragraph 0057; and Exhibit E, page 18, lines 10-12.

112.    Claim 5 of the '154 Patent requires distributing at least the same number of tokens to each non-subscription player participating in the tournament as each subscription player participating in the tournament, for betting in the tournament. This requirement is disclosed in the specifications of Exhibits D and E. Points such as "loyalty points" are used to participate, and these are essentially

17

tokens.  Rules for any game can be set as needed, and it would be an obvious choice to have all players on equal footing at the start of a game.  See Exhibit D, paragraph 0026; and Exhibit E, page 8, lines 17-20.

113.    Claim 5 of the '154 Patent requires disbursing the prize pool to the winning player and any eligible runner-up players in the form of prizes that have immediate value, subsequent to completion of the tournament.  This requirement is disclosed in the specifications of Exhibits D and E, as the computer automatically notifies players of their winnings, and prizes can be won.  Payout to the winner is automatic.  See Exhibit D, paragraphs 0018, 0028, and 0055; and Exhibit E, page 7, lines 22-24; page 9, lines 17-19; and page 17, lines 24 -26.

114.    Claim 6 of the '154 Patent requires that the game tournament is managed by a game administrator operating a game server computer coupled to one or more client computers operated by the participating players. This requirement is disclosed in the specification of Exhibits D and E. Figures 3a, 3b, 5, 6 and 7.

115.    Claim 7 of the '154 Patent requires that the computer network comprises the Internet. This requirement is disclosed throughout the specifications of Exhibits D and E.  For instance, see Figures 5, 6 and 7.

116.    Claim 8 of the '154 Patent requires that the game is a card game.  This requirement is disclosed throughout the specifications of Exhibits D and E, as they contain poker, five-card stud, and many other card games.  See Exhibit D, paragraph 0019; and Exhibit E, page 5, lines 6-18.

117.    Claim 9 of the '154 Patent requires that the card game comprises poker.  This requirement is disclosed throughout the specifications of Exhibits D and E, as they contain poker, five-card stud, and many other games.  See Exhibit D, paragraph 0019; and Exhibit E, page 5, lines 6-18.

## COMPARISON OF THE '154 PATENT TO '126 PUBLICATION

118.    I have compared the '154 patent to U.S. Patent Publication No. 2005/0086126 ('126 patent) (Exhibit F).  I find that Exhibit F teaches all the elements of the claims of the '154 patent.  The following is a claim-by-claim comparison of all the detailed features of the '154 patent to Exhibit F.

LA 126867988v1 7/17/2007

119.    Claim 1 of the '154 Patent relates to a computer-implemented method of allowing a plurality of players to play a game over a computer network. This computer implementation of game playing is disclosed throughout the specification of Exhibit F, as it discloses an online gaming environment using game consoles with a network connection. See Exhibit F, paragraphs 0015, 0016, and 0020; and all Figures.

120.    Claim 1 of the '154 Patent requires establishing a subscription-based membership for each player of the plurality of players. This requirement is disclosed in Exhibit F, in that players create a subscription to play multiple games, and the subscription can be renewed automatically. Specifically, a first user purchases a subscription for the online gaming and creates a member account. See Exhibit F, paragraph 0015; and drawings, pages 1 and 3.

121.    Claim 1 of the '154 Patent requires charging each player a fee for a pre-determined membership time period. This requirement is disclosed in Exhibit F, as a first user purchases a subscription for the online gaming environment. Different or overlapping sets of privileges are available for some or all of the account types. There can be different types of accounts, and different types of subscriptions, with different fees. See Exhibit F, paragraphs 0015, 0019, and 0041.

122.    Claim 1 of the '154 Patent requires the hosting of at least one game tournament for subscription-based players for a game that has elements of both chance and skill during the membership time period. This requirement is disclosed in the specification of Exhibits F. A gaming environment typically with consoles, such as the Sony PlayStation, has games and tournaments, and these games have characteristics of chance and skill. Such games are available to a user who has purchased a subscription. Also, there are online game tournaments. See Exhibit F, paragraphs 0015, 0017, and 0072.

123.    Claim 1 of the '154 Patent requires that the tournament consist of at least one game round. This requirement is disclosed in the specification of Exhibits F. The implementation includes challenges to play a game. Also, there are online game tournaments. See Exhibit F, paragraphs 0015, 0017, 0059, and 0072.

124.    Claim 1 of the '154 Patent requires each game round to potentially eliminate one or more participant players until a winning player and one or more runner-up players are determined. This

19

requirement is disclosed in the specification of Exhibit F. Console games, such as those played on Sony PlayStation, have game rounds that eliminate players.

125.    Claim 1 of the '154 Patent requires that each player is required to make playing choices throughout the game. This requirement is disclosed in the specification of Exhibit F, as games inherently require choices throughout the game. See Exhibit F, pages 1 to 15.

126.    Claim 1 of the '154 Patent requires establishing a prize pool for the tournament. This requirement is disclosed in the specification of Exhibit F, as games played on consoles establish prize pools for tournaments.

127.    Claim 1 of the '154 Patent requires providing a means for allowing a non-subscription player to participate in the tournament without payment of the fee. This requirement is disclosed in the specification of Exhibit F. A second user with a game console and network connection, but without a subscription, may access the online gaming environment. The online environment permits users to create non-member accounts if they do not have a subscription. This limited member access allows the non-member (non-subscriber) to participate in the same game or tournament as the subscribing members. See Exhibit F, paragraphs 0016, 0017, and 0025.

128.    Claim 1 of the '154 Patent requires the non-subscription player to submit information relating to him/herself prior to the hosting of the tournament. This requirement is disclosed in the specification of Exhibit F, as the second user has a non-member account and clearly submits information to create that account. See Exhibit F, paragraph 0016.

129.    Claim 1 of the '154 Patent requires that the non-subscription player is limited to one entry per tournament. This requirement is disclosed in the specification of Exhibit F. An account is permitted to link to only one account at a time, and one limited use link allows only one use. See Exhibit F, paragraphs 0017, 0064, and 0075.

130.    Claim 1 of the '154 Patent requires disbursing the prize pool to the winning player and any eligible runner-up players in the form of prizes that have immediate value, subsequent to completion of the tournament. This requirement is disclosed in the specification of Exhibit F. In console game competitions and tournaments, the prize pool is disbursed as a prize that has immediate value subsequent to the completion of a tournament. There are paths between a server and first user systems

20

and second user systems, and there is an account database which administrates the system.  See Exhibit F, paragraphs 0023 and 0024.

131.    Claim 2 of the '154 Patent requires that the game tournament is managed by a game administrator operating a game server computer coupled to one or more client computers operated by the participating players.  This requirement is disclosed in the specification of Exhibit F at paragraph 0023.

132.    Claim 3 of the '154 Patent requires that the computer network comprises the Internet.  This requirement is disclosed in the specification of Exhibit F.  There are paths between a server and first user systems and second user systems and there is an account database which administers the system.  See Exhibit F, paragraphs 0023 and 0024.  The network is an intermediary network including the Internet.  See paragraphs 0015 and 0023.

133.    Claim 4 of the '154 Patent requires that the game comprises a card game.  This requirement is disclosed in the specification of Exhibit F, as it is well known that console games may have cards associated with them or be related to games with cards.

134.    Claim 5 of the '154 Patent requires a computer-implemented method of allowing a plurality of players to play a game over a computer network.  This requirement is disclosed in the specification of Exhibit F, as it discloses an online gaming environment using game consoles with a network connection.  See Exhibit F, paragraphs 0015, 0016 and 0020; and all Figures.

135.    Claim 5 of the '154 Patent requires establishing a subscription-based membership for each player of the plurality of players.  This requirement is disclosed in the specification of Exhibit F, as a first user purchases a subscription for the online gaming and creates a member account.  See Exhibit F, paragraph 0015; and drawings, pages 1 and 3.

136.    Claim 5 of the '154 Patent requires charging each player a fee for a pre-determined membership time period.  This requirement is disclosed in the specification of Exhibit F.  A first user purchases a subscription for the online gaming environment.  Different or overlapping sets of privileges are available for some or all of the account types.  There can be different types of accounts, and different types of subscriptions, with different fees.  See Exhibit F, paragraphs 0015, 0019, and 0041.

21

137.    Claim 5 of the '154 Patent requires the hosting of at least one game tournament for subscription-based players for a game that has elements of both chance and skill during the membership time period. This requirement is disclosed in the specification of Exhibit F. A gaming environment typically with consoles, such as the Sony PlayStation, has games and tournaments, and these games have characteristics of chance and skill. Such games are available to the user who has purchased the subscription. Also, there are online game tournaments. See Exhibit F, paragraphs 0015, 0017, and 0072.

138.    Claim 5 of the '154 Patent requires the tournament to consist of at least one game round. This requirement is disclosed in the specification of Exhibit F, as the implementation includes challenges to play a game and there are online game tournaments. See Exhibit F, paragraphs 0015, 0017, 0059 and 0072.

139.    Claim 5 of the '154 Patent requires each game round to potentially eliminate one or more participant players until a winning player and one or more runner-up players are determined. This requirement is disclosed in the specification of Exhibit F, as  console games, such as those played on Sony PlayStation, have game rounds that eliminate players.

140.    Claim 5 of the '154 Patent requires that each player is required to make playing choices throughout the game. This requirement is disclosed in the specification of Exhibit F, as games inherently require choices throughout the game.

141.    Claim 5 of the '154 Patent requires establishing a prize pool for the tournament. This requirement is disclosed in the specification of Exhibit F, as it is well known that games played on consoles establish prize pools for tournaments.

142.    Claim 5 of the '154 Patent requires distributing a fixed number of tokens to each player participating in the tournament for betting in the tournament. This requirement is disclosed in the specification of Exhibit F. Console games can start with a fixed number of tokens, chips, or points, all of which are forms of tokens.

143.    Claim 5 of the '154 Patent requires that the fixed number of tokens not be dependent upon any consideration provided by the player. This requirement is disclosed in the specification of

LA 126867988v1 7/17/2007

Exhibit F. It is well known that this feature can usually be set up according to the rules of any of numerous games.

144. Claim 5 of the '154 Patent requires providing a means for allowing a non-subscription player to participate in the tournament without payment of the fee. This requirement is disclosed in the specification of Exhibit F. A second user with a game console and network connection, but without a subscription, may access the online gaming environment. The online environment permits users to create non-member accounts if they do not have a subscription. The limited member access allows the non-member (non-subscriber) to participate in the same game or tournament as the subscribing member. See Exhibit F, paragraphs 0016, 0017, and 0025.

145. Claim 5 of the '154 Patent requires the non-subscription player to submit information relating to him/herself prior to the hosting of the tournament. This requirement is disclosed in the specification of Exhibit F. The second user has a non-member account and clearly submits information to create that account. See Exhibit F, paragraph 0016.

146. Claim 5 of the '154 Patent requires that the non-subscription player be limited to one entry per tournament. This requirement is disclosed in the specification of Exhibit F, as an account is permitted to link to only one account at a time and one limited use link allows only one use. See Exhibit F, paragraphs 0017, 0064, and 0075.

147. Claim 5 of the '154 Patent requires distributing at least the same number of tokens to each non-subscription player participating in the tournament as each subscription player participating in the tournament, for betting in the tournament. This requirement is disclosed in the specification of Exhibit F, as console games can start with a fixed number of tokens, chips, or points, all of which are a form of token.

148. Claim 5 of the '154 Patent requires disbursing the prize pool to the winning player and any eligible runner-up players in the form of prizes that have immediate value, subsequent to completion of the tournament. This requirement is disclosed in the specification of Exhibit F. In console game competitions and tournaments, the prize pool is disbursed as a prize that has immediate value subsequent to the completion of a tournament.

149. Claim 6 of the 154 Patent requires that the game tournament is managed by a game administrator operating a game server computer coupled to one or more client computers operated by the participating players. This requirement is disclosed in the specification of Exhibit F. There are paths between a server and first user systems and second user systems and there is an account database which administers the system. See Exhibit F, paragraphs 0023 and 0024.

150. Claim 7 of the '154 Patent requires that the computer network comprises the Internet. This requirement is disclosed in the specification of Exhibit F. The network is an intermediary network including the Internet. See Exhibit F, paragraphs 0015 and 0023.

151. Claim 8 of the '154 Patent requires that the game is a card game. This requirement is disclosed in the specification of Exhibit F. It is well known that console games may have cards associated with them or be related to games with cards.

152. Claim 9 of the '154 Patent requires that the card game comprises poker. This requirement is disclosed in the specification of Exhibit F. Poker is a type of card game with its own set of rules which can have correspondence to many card games.

## THE '154 CLAIMS ARE OBVIOUS

153. At the time when the '154 patent was examined in the Patent Office, the test of obviousness was that patentability was determined by whether there was sufficient "motivation to combine" the prior art.

154. I know that this rigid application of the "motivation to combine" test has recently been rejected by the Supreme Court in the *KSR* case, and that there should also be a consideration of whether a combination of familiar elements according to known methods is likely to be obvious when it does no more than yield a predictable result.

155. In my view, the Examiner should have found that the claims of the '154 patent are non-patentable as being obvious under the prior test for obviousness, and certainly under the broader test for obviousness. Had the Examiner applied the *KSR* test, the claims of the '154 patent would have been found to be obvious and the '154 patent would not have issued.

156. I consider that the disclosures of Exhibits C, D, E, and F are so related that any person skilled in the art would have combined them for their respective teachings, that there is a clear

24

motivation and suggestion to combine them, and that overall, the results of these teachings are clearly predictable. Thus, in addition to my finding all the elements of the claims of the '154 patent present in Exhibits C, D, E, and F, I also consider additionally that the elements and the subject matter of these claims are so clearly predictable in view of Exhibits C, D, E, and F that the claims of the '154 Patent are unpatentable as being obvious.

157.    In my view, the fact that the '154 Patent game is played on a computer platform and a network or internet structure adds nothing to the patentability of the claims of the '154 patent.

158.    After reviewing the '154 Patent and its file wrapper, I conclude that the patent is merely a standard game recipe. This standard game recipe has been known for decades, lacks novelty, and is void of any patentable subject matter. In essence, it is a common formula for games, which includes the following features:

> A group of players
>
> Some players pay a fee, some do not
>
> A tournament or game period of a certain length
>
> Players are eliminated at different points throughout the game or tournament
>
> Players make choices
>
> Outcome of game determined both by skill and by chance
>
> Prizes awarded to the top player and runner-up players

There are countless games that follow these procedures, such as a Casino Night event at a school; a bowling, golf, or tennis league; a chess tournament; a billiard league; and little league baseball and other children's sports. Each of these games demonstrate that the game methodology which the '154 Patent claims to have ownership of is conventional, obvious, and unexceptional. The '154 Patent is no more innovative or inventive than any of the above games.

159.    By way of example, I can compare the '154 Patent with my own childhood experiences in little league baseball. This is dramatically illustrated in **Exhibit K**, which is attached. It shows an essentially identical system for playing games among players.

160.    I refer to the reasons for allowance of this patent by the Examiner: "The following is an examiner's statement of reasons for allowance: claimed steps including in part establishing a

25

subscription-based membership for each player by charging each player a fee for a time period, hosting tournament for subscription-based players, establishing a prize pool, providing means for allowing a non-subscription player to participate without payment of the fee where the non-subscription player is limited to one entry and disbursing the prize pool to winning players appears allowable, as claimed, as best understood since prior art appears not to teach or suggest either a mixed pool of paying and non-paying players or limiting non-subscription (non-paying) players to one entry per tournament." (See **Exhibit L** attached, paragraph 3).

161.    I note that the Examiner allowed Claims 1-9 of the Patent, premised on the above concept, **which is unrelated to a concept based on a computer or computer network**.  As Exhibit L illustrates, this concept is obvious to one skilled in the art, and in fact, is common knowledge.  Anyone with computer skills would readily realize that systems which exist manually can be implemented on a computer platform in a straightforward manner without inventiveness.  Many procedures, strategies, and methods of doing business have been computerized in a routine and straightforward manner as computers have become prolific.

162.    If I had encountered the '154 Patent application in my experience at USC, I would have advised the Applicant to go back to the drawing board and add something distinctive, such as a unique feature or a twist to the game.  I would have warned the Applicant that this application was unlikely to be granted, as it clearly fails to meet the requirements of Title 35 regarding patentable subject matter.

163.    In my expert opinion, the invalidity of the '154 patent is clear as the claims are obvious.  I find that the technology of the claims of the '154 patent is lacking in patentable merit for the reasons stated and analyzed in detail above.

### THE EXAMINER DID NOT CONSIDER ALL THE PRIOR ART

164.    By way of background, and as detailed above, I had the lead responsibility at USC of analyzing the office actions, to ensure the correctness of the patent application process.

165.    In my review of the first Office Action of the '154 Patent, which was a Notice of Allowability, I noticed that the Patent Examiner stated that the Information Disclosure Statement (IDS) was defective.  (Attached as **Exhibit M**).

166.    The Applicants were required to provide additional information so that certain prior art on the IDS could be evaluated based on their merits. (Attached as Exhibit L). This prior art consisted of two patent applications—the '634 Patent (Exhibit D) and US 2001/0004609 (Attached as **Exhibit N**). The Examiner explicitly stated that *no consideration* of the contents of these prior patents (Exhibits D and N) had been made by the Examiner. See Exhibit L.

167.    To my surprise, not only did the Applicants *not* respond with the needed corrections, but furthermore, the Examiner later allowed all of the patent claims *without the required corrections* of the IDS. As a consequence, the allowance of the '154 patent is not subject to any presumption of validity over those prior art patents of Exhibits D and N. In fact, an analysis of those prior art patents can even further lead to questions of invalidity. I have analyzed Exhibit D above and find that it does teach the subject matter of the claims of the '154 patent. In short, the Applicants' failure to make the required corrections rises to the level of inequitable conduct.

168.    It is baffling that this glaring issue was not addressed, given that correcting such issue was critical to the patent's viability. In my position at USC, this conspicuous omission would have raised red flags, including the real possibilities that the patent would be invalid, valueless, or impossible to license (for reasons including but not limited to the prior art never being evaluated on their merits). Again, the Applicants' failure to supply the Examiner with all of the prior art rises to the level of inequitable conduct and I would believe render the patent unenforceable.

169.    After consideration of all the issues detailed above, I think it is appropriate to consider the most recent homepage of the www.uspto.gov site is attached as **Exhibit O**. The homepage contains 4 leading articles, one of which details the problems concerning applications and issued patents in the computer arts area. More specifically, since June 15, 2007, the PTO has instituted a pilot project to raise the quality and accuracy of computer arts patents. Obviously, the US Patent Office has been deeply concerned over the past few years over the lack of quality or poorly issued computer arts patents. In my view, the '154 patent is an example of the poor quality of subject matter and examination of a patent in the computer arts area.

///

///

27

1    I declare under penalty of perjury that the contents herein are true and correct.

2

3   DATED:  July 24, 2007                    _____/S/_____

4                                            **L. Kenneth Rosenthal**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA 126876588v1 7/25/2007

1  **CERTIFICATE OF SERVICE**

2       I, hereby certify that on July 25, 2007, I electronically filed the foregoing with the Clerk of the

3  Court using CM/ECF system which will send notification of such filing to the e-mail addresses denoted

4  below:

5  DERGOSITS & NOAH LLP
   Todd A. Noah (SBN 152328) (tnoah@dergnoah.com)
6  Paul K. Tomita (SBN 188096) (ptomita@dergnoah.com)
   Four Embarcadero Center, Suite 1450
7  San Francisco, California 94111
   Telephone: (415) 705-6377
8  Facsimile: (415) 705-6383

9

10  DATED: July 25, 2007                    GREENBERG TRAURIG, LLP

11

12                                          By:_____/S/_____
                                            MATTHEW S. STEINBERG
13                                          Attorneys for Defendant
                                            Ultimate Blackjack Tour, Inc.

14
    *LA 126876663v1 102741010300*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1