TODD A. NOAH (SBN 152328)
PAUL K. TOMITA (SBN 188096)
DERGOSITS & NOAH LLP
Four Embarcadero Center, Suite 1450
San Francisco, California 94111
Tel: (415) 705-6377
Fax: (415) 705-6383
E-mail:  tnoah@dergnoah.com
        ptomita@dergnoah.com

Attorneys for Plaintiff MMJK, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MMJK, INC. | Case No. C 07 03236 BZ |
| Plaintiff, | **PLAINTIFF MMJK, INC.'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| ULTIMATE BLACKJACK TOUR, LLC | **Date:  August 15, 2007** |
| Defendant. | **Time: 10:00 a.m.** |
| | **Location: Courtroom G** |
| | **Honorable Bernard Zimmerman** |

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................. 1

II.   ARGUMENT ........................................................................................ 3

   A.   DEFENDANT'S WEB SITES LITERALLY
        INFRINGE THE CLAIMS OF THE '154 PATENT ........................... 3

   B.   NONE OF THE PRIOR ART CITED BY DEFENDANT
        RENDERS THE CLAIMS OF THE '154 PATENT INVALID ............ 5

        1.   Each of the References Cited By Defendant
             Fails to Anticipate the claims of the '154 Patent ..................... 5

             a.   BugsysClub, PokerSchoolOnline and PokerPages ........... 6

                  i.    BugsysClub.com ...................................................... 6

                  ii.   Pokerschoolonline.com ........................................... 8

                  iii.  Pokerpages.com ....................................................... 8

             b.   Herrmann et al., '634 patent Publication ........................ 9

             c.   Patterson, '126 Patent Publication ................................. 11

        2.   None of the References Cited By Defendant Alone
             or in Combination With Other Prior Art Renders
             The Claims of the '154 Patent Invalid as Obvious .................. 14

             a.   Bugsysclub.com, Pokerschoolonline.com and
                  Pokerpages.com ........................................................... 15

             b.   Herrmann et al., '634 patent Publication ...................... 15

             c.   Patterson, '126 Patent Publication ............................... 16

   C.   PLAINTIFF HAS NOT COMMITTED INEQUITABLE CONDUCT ...... 16

   D.   NOT ONLY IS IRREPARABLE HARM PRESUMED
        HERE, BUT PLAINTIFF HAS ESTABLISHED THAT
        IT WILL SUFFER ACTUAL IRREPARABLE HARM
        IF AN INJUNCTION IS DENIED .................................................. 18

E.     PLAINTIFF DOES NOT HAVE UNCLEAN
       HANDS BECAUSE ITS WEB SITE IS LEGAL ................................18

F.     DEFENDANT'S BALANCE OF HARDSHIPS
       ARGUMENT IS INTERNALLY INCONSISTENT ..........................19

G.     A $15 MILLION BOND IS EXCESSIVE ........................................20

III.    CONCLUSION ........................................................................................20

1

# TABLE OF AUTHORITIES

2

**Cases**                                                                        **Page**

3

*Barahona-Gomez v. Reno,*
4     167 F.3d 1228 (9th Cir. 1999) ..................................................................20

5

*Fiskars, Inc. v. Hunt Manufacturing Co.,*
6     221 F. 3d 1318 (Fed. Cir. 2000) ...............................................................18

7

*Graham v. John Deere Co.,*
8     383 U.S. 1 (1966) .....................................................................................14

9

*Hybritech, inc. v. Abbott laboratories,*
10     849 F.2d 1446 (Fed. Cir. 1988) ................................................................18

11

*Juicy Whip, Inc. v. Orange Bang, Inc.,*
12     292 F.3d 728 (Fed. Cir. 2002) ..................................................................16

13

*KSR Int'l Co. v. Teleflex Inc.,*
14     550 U.S. ___, 127 S. Ct. 1727 (2007) ...........................................14, 15, 16

15

*Oakley, Inc. v. Sunglass Hut International,*
16     316 F.3d 1331 (Fed. Cir. 2003) ............................................................5, 6, 18

17

*New Eng. Braiding Co. v. A.W. Chesterson Co.,*
18     970 F.2d 878 (Fed.Cir. 1992) .....................................................................5

19

*Schering Corporation v. Geneva Pharmaceuticals, Inc.,*
20     348 F.3d 992 (Fed. Cir. 2003) ..................................................................11

21

*Tec Air, Inc. v. Denso Manufacturing Michigan Inc.,*
22     192 F.3d 1353 (Fed. Cir. 1999) ................................................................15

23

24

25

26

27

28

## I.    INTRODUCTION

Defendant Ultimate Blackjack Tour, LLC's has failed to meet its burden of establishing a substantial question of non-infringement, invalidity or unenforceability.  As properly construed, Defendant admits that every limitation of the '154 patent claims is present in the game tournaments hosted on Defendant's Web sites.  Defendant's flawed non-infringement argument is based upon an unsupported interpretation that rewrites the claim, in part, and ignores other key terms of the claim.  It is also based upon an intentional concealment and mischaracterization about the operation of its Web sites. Once the Court properly concludes that Defendant's claim construction lacks substantial merit and fully understands how Defendant's Web sites truly operate, the Court will undoubtedly agree that Defendant's Web sites infringe the claims of the '154 patent.  Because of its indisputable infringement, Defendant is left to create unsupported defenses of invalidity, inequitable conduct and unclean hands.  As explained below, all of these defenses lack substantial merit.

Regarding Defendant's invalidity defenses, all of the references relied upon by Defendant fail to render any of the claims invalid, by anticipation or obviousness.  It is indisputable that each reference cited by Defendant fails to individually disclose all of the limitations of the '154 patent claims. Therefore, they cannot anticipate the claims of the '154 patent as a matter of law.  Defendant's obviousness defense also lacks substantial merit.  Defendant's expert, Mr. Rosenthal, fails to compare the differences between the prior art and the '154 patent claims or to explain how the references could be combined.  Instead, Mr. Rosenthal simply concludes that the references "are so related" that there is a clear motivation to combine them.  Mr. Rosenthal is wrong.  The references actually teach away from their combination.

Regarding Defendant's inequitable conduct defense, Mr. Rosenthal completely mischaracterizes the prosecution history of the '154 patent.   Both of the references that Defendant contends Plaintiff intentionally failed to disclose were indisputably submitted by Plaintiff to the Patent Office at the beginning of the prosecution of the '154 patent.  Indeed, Plaintiff submitted hard copies of every reference cited in its IDS, including the two references Defendant claims Plaintiff "purposefully prevent[ed] the Examiner from considering."  Moreover, the disclosure of one of the two references, which Defendant argued were not considered by the Examiner, was actually considered by the Examiner.

1   In fact, with respect to that reference Plaintiff submitted both the published application and the

2   corresponding issued patent, which the Examiner considered and concluded was immaterial. In its haste

3   to create this inequitable defense, Defendant blatantly overlooked this important detail. There was

4   absolutely no failure by the applicants to disclose material prior art to the Patent Office, let alone

5   intentional failure. In short, Defendant's inequitable conduct defense fails as a matter of law.

6         Like its inequitable conduct defense, Defendant's unclean hands defense amounts to nothing

7   more than a desperate attempt by Defendant to create a defense to counter Plaintiff's overwhelming

8   showing on the likelihood of success. As explained by its CEO, Mr. Kellerman, Plaintiff has spent

9   hundreds of thousands of dollars to obtain multiple opinions from several of the world's leading gaming

10  attorneys on the legality of its Web site. Plaintiff is submitting the opinion of one of these attorneys who

11  confirms the legality of Plaintiff's web site. Not surprisingly, Defendant has retained several of the same

12  attorneys to advise it on the legality of its Web sites.

13        In support of its argument that the balance of hardships weighs in its favor, Defendant relies upon

14  the Declaration of Sanford I. Millar, Defendant's Chief Operating Officer, Chief Financial Officer and

15  General Counsel. Surprisingly, Mr. Millar's declaration actually supports Plaintiff's conclusions that the

16  balance of hardships weigh in Plaintiff's favor. Mr. Millar vehemently argues that the online game

17  tournaments Defendant offers on its Web sites are "incidental" to the promotion of its primary business,

18  which is the sale of its magazine, provision of expert tips and promotion of its television show. In view

19  of these admissions, Defendant would not suffer undue harm to its business if its online tournaments that

20  are at issue in this case are enjoined. As Plaintiff explained in its opening brief, Defendant can still offer

21  its customers online tournaments that do not pay out cash or merchandise. Defendant's purported $15

22  million loss is illusory and unsupportable. Defendant also relies on this estimated loss as a basis for its

23  excessive bond request. Since this loss is pure speculation, this Court should not require a bond in this

24  excessive amount.

25        In short, Plaintiff has unequivocally demonstrated that Defendant's Web sites infringes the

26  claims of the '154 patent and that Defendant's invalidity, inequitable conduct and unclean hands

27  defenses lack substantial merit. Because of the high likelihood of success on the merits, irreparable

28  harm is presumed in this case. Even if not presumed, Plaintiff has demonstrated that it would be

irreparably harmed in this case since this is not a simple "loss of market share" case.  For these reasons, the Court should grant Plaintiff's motion for a preliminary injunction.

## II.    ARGUMENT

### A.    DEFENDANT'S WEB SITES LITERALLY INFRINGE THE CLAIMS OF THE '154 PATENT

Defendant argues that its Web sites do not infringe the claims of the '154 patent because they do not meet the claim limitation of "disbursing the prize pool to the winning player and any eligible runner-up players in the form of prizes that have immediate value, subsequent to completion of the tournament."  (Docket Item ["D.I."] 14, pp. 9-10 of 20.)   In making this argument, Defendant completely misconstrues the meaning of this claim limitation and, in fact, attempts to rewrite it in an attempt to create a non-infringement defense.

To that end, Defendant and its expert, Mr. Rosenthal, argue that this claim limitation requires that the winning player and "all" runner-up players must receive their prizes after the tournament is over. (D.I. 14, p. 10.)  However, the term "all" does not appear in the claim and the term "any" does not mean "all" as properly construed.  Indeed, according to Webster's Ninth new Collegiate Dictionary 10th Ed. 1988, "any" means "one or more – used to indicate an undetermined number or amount."

In addition to rewriting the claim to replace "any" with "all," Defendant ignores significant terms of claims 1 and 5.  Indeed, Defendant ignores the term "eligible," which further modifies "any."  As used in claims 1 and 5 of the '154 patent, "any eligible runner-up players" means any qualified runner-up player. This would include the scenario where there are no runner-up players that are qualified to receive a prize and only the winner receives a prize.  Defendant also ignores the terms "prizes that have immediate value."  (D.I. 9-2. p. 15, col. 11, lines 54-55.)  As properly construed in view of the specification, "prizes that have immediate value" means cash or merchandise.

Thus, as properly construed, the "disbursing the prize pool . . ." limitation recited in claims 1 and 5 of the '154 patent means paying out cash or merchandise to the winner and any runner-up player, if any qualify, after the tournament is over.

Defendant's entire non-infringement argument is based upon an incomplete and disingenuous description of the operation of its Web sites. Defendant would have this Court focus only on the "points" that are awarded to the runner-up players. (D.I. 14, pp. 9-10.) However, what Defendant fails to disclose to the Court is that for the tournaments at issue in this litigation, the winner, at the very least, receives a prize that has immediate value, i.e., cash or merchandise. Defendant's omission here is critical because the winner's cash prize is paid out after the tournament is over. According to the Frequently Asked Questions posted on Defendant's Web Sites:

> When you win cash and/or merchandise, we will send you an e-mail with instructions on how to claim your prize. . . When we receive all information that is needed we will ship your prize. You should expect this within 2-4 weeks. (Supplemental Noah Decl. ["Supp. Decl."], Exhibit D.)

In order to camouflage its infringement, Defendant provides a self-serving example from its Web site where there is only one cash-winner, i.e., the tournament winner, and all runner-up players only receive points. In Defendant's example, the winner receives $20 + 250 TPs (tournament points), the first runner-up player receives 225 TPs, the second runner-up player receives 200 TPs, the third runner-up player receives 175 TPs, and etc. (D.I. 17-13, p. 2.) There are no runner-up players "eligible" to receive cash in this example. As explained above, Defendant focuses only on the tournament points awarded to the runner-up players in its non-infringement analysis which is completely misleading. Conspicuously absent from Defendant's analysis of this example is any mention of the $20 cash prize the winner receives, which according to its FAQs, is awarded to the winner within 2-4 weeks after the tournament. Because the winner receives cash after the tournament is over, the tournament illustrated in this exhibit to Mr. Rosenthal's declaration infringes the claims of the '154 patent.

If Defendant truly wanted to be candid with the Court, it would have provided an example where multiple runner-up players were qualified to receive cash prizes. Attached as Exhibit E to the Supplemental Declaration of Todd Noah is an example of such a tournament from Defendant's Web site. As the Court can plainly see in the example, the cash pool prize is $200. The winner receives $75 + 2000 TPs, the first runner-up player receives $25 + 1500 TPs, the second runner-up player receives $25 + 1250 TPs, and the third runner-up player receives $20 + 1000 TPs. Thus, there is a winner and three qualified runner-up players that will receive cash prizes. (Supp. Noah Decl., Exhibit E.) As explained

in the FAQs on Defendant's Web site, the winner and these qualified runner-up players will receive their cash prizes within 2-4 weeks after the tournament.  This tournament infringes the claims of the '154 patent.

Once the Court understands that in the tournaments at issue in this case, the winners, and in many cases a runner-up player or players, receive cash or merchandise prizes in addition to tournament points, then it becomes clear that every tournament that pays out cash or merchandise to at least the winner supports a finding of infringement.  It also becomes clear that Defendant's deceptive statement that "UBT disburses prizes *to only one* runner-up player subsequent to the completion of the tournament" actually supports a finding of infringement since the winner and one runner-up player are admittedly paid out cash subsequent to the completion of the tournament.  (D.I. 14, p. 10.)  Defendant does not dispute that every other limitation of claims 1 and 5 is present its system.   (D.I. 14, pp. 9-11.) (D.I. 17, p. 7, ¶ 29.)  As a result, Plaintiff has demonstrated a likelihood of success on the issue of infringement.

### B.    NONE OF THE PRIOR ART CITED BY DEFENDANT RENDERS THE CLAIMS OF THE '154 PATENT INVALID

As the Court knows, "[i]n the context of a preliminary injunction, while 'the burden of proving invalidity is with the party attacking validity,' the party seeking the injunction 'retain[s] the burden of showing a reasonable likelihood that the attack on its patent's validity would fail." *Oakley, Inc. v. Sunglass Hut International*, 316 F.3d 1331, 1339 (Fed.Cir. 2003)(citations omitted).  "While it is not the patentee's burden to prove validity, the patentee must show that the alleged infringer's defense lacks substantial merit." *Oakley, Inc.*, 316 F.3d at 1340, quoting *New Eng. Braiding Co. v. A.W. Chesterson Co.*, 970 F.2d 878, 883 (Fed. Cir. 1992).  As set forth in detail below, Plaintiff has unequivocally established that the Defendant's invalidity defenses lack substantial merit.  In fact, they have no merit at all.  Thus, Plaintiff has met its burden of showing that Defendant's attack on the validity of the '154 patent will fail.

### 1.    Each of the References Cited By Defendant Fails to Anticipate the Claims of the '154 Patent

A determination that a claim is invalid as being anticipated or lacking novelty requires a finding

that each and every limitation of the claim is disclosed in a single prior art reference. *Oakley, Inc.*, 316 F.3d at 1339.   Thus, even if one of the limitations is not disclosed in the reference, the reference fails to anticipate as a matter of law.   *Id*.   None of the references cited by Defendant discloses each and every limitation of the '154 patent claims and therefore each of them fail to anticipate the claims of the '154 patent.

### a.    BugsysClub, PokerSchoolOnline and PokerPages

It is critical to note at the outset that Defendant has misled this Court by treating the BugsysClub, PokerSchoolOnline and PokerPages Web sites as a single reference.   They are not the same Web sites.   In fact, they are three very different product offerings.   As the Frequently Asked Questions for BugsysClub, PokerSchoolOnline and PokerPages reference expressly indicates, "Each site offers different promotions and has a distinct focus."   (D.I. 17-5, p. 4.)   Bugsysclub.com was a "play for money" only gambling site with no free play, Pokerpages.com was a free play site only and Pokerschoolonline.com was a subscription site with no free play.   Despite this clear delineation, Mr. Rosenthal has improperly selected features from each of these sites as if they were contained in a single Web site.   (*See* D.I. 17, p. 9, ¶¶ 42-88.)   As a result, Mr. Rosenthal's declaration is completely without merit regarding the disclosures of these three Web sites since he has improperly combined features of all three as if they were one.   Mr. Rosenthal violated a fundamental tenet of the law of anticipation which requires that each and every limitation of the claims be found in a single piece of prior art.   Once the Court recognizes that these were three distinct Web sites, it will unequivocally conclude that none of these Web sites anticipates the claims of the '154 patent.

### i.    BugsysClub.com

All of the claims of the '154 patent require the step of "establishing a subscription-based membership for each player of the plurality of players by charging each player a fee for a pre-determined membership time period."   The Bugsysclub.com Web site did not establish a subscription-based membership by charging a fee for a predetermined period of time.   Rather, players could register at the Bugsysclub.com Web site and create a deposit account to use for a buy-in.   There was no requirement on the amount of money that the user had to deposit into the account.   (D.I. 17-5. p. 5.)("Decide how much you want to deposit.   When your deposit transaction is complete, you're in the game.")

Once the player registered, there was no limit to the period of time in which he or she could play games at the Web site, as long as he or she replenished his or her deposit account.  (D.I. 17-5, p. 5.)  Mr. Rosenthal simply concludes that the subscription requirement of the claims is met because the reference discloses "Download Software and Register" and Register for a game."  (D.I. 17, p. 10, ¶ 50.)  Mr. Rosenthal ignores that the claim requires the subscription-based player be charged a membership fee for a predetermined period of time.

Mr. Rosenthal further speculates that the "charging each player a fee for a pre-determined membership time period" limitation is met because the reference, e.g., mentions "My Credit Card Charged" and that this "inherently means that a fee is charged." (D.I. 17. p. 10, ¶ 51.)  Clearly, Mr. Rosenthal has taken this disclosure out of context because all that it means is that a player could use a credit card to pay the deposit account amount.  (*See* D.I. 17-6, p. 4)("In BugsysClub: you will be asked for your credit card details every time you make a deposit.").  Despite Mr. Rosenthal's conclusions to the contrary, the deposit amount is not a subscription fee for a pre-determined membership period.

All of the claims of the '154 patent also require the step of "hosting at least one game tournament for subscription-based players . . . during the membership time period."  Since the Bugsysclub.com Web site did not have "subscription-based players" and there was no "predetermined membership time period," the Bugsysclub.com Web site did not host "at least one game tournament for subscription-based players . . . during the membership time period."  Mr. Rosenthal ignores the majority of the terms in this limitation and concludes that the Bugsysclub.com Web site disclosed this step because "Poker is a game of chance and skill." (D.I. 17, p. 10, ¶ 52.)  Clearly, Mr. Rosenthal has left out some significant detail.

All of the claims of the '154 patent further require the step of "providing a means for allowing a non-subscription player to participate in the tournament without payment of the fee."  Again, because there was no subscription fee to play Real Money games at the Bugsysclub.com Web site, this step is not disclosed.  All players had to pay a buy-in. (D.I. 17-5, p. 5.)("You need to deposit money into your BugsysClub account to play in any BugsysClub games.").  Thus, contrary to Mr. Rosenthal's conclusion, there was no "Free Play" at the Bugsysclub.com Web site. (D.I. 17, p. 11, ¶ 57.)  Because Mr. Rosenthal treats all three Web sites as one, he neglects to inform the Court that the "Free Play" disclosure in the

reference only applied to playing at the www.pokerpages.com Web site, a completely different Web site. (*See* D.I. 17-8, pp. 3-5.) The only Web site out of the three that offered "Free Play" was www.pokerpages.com. (D.I. 17-8, pp. 3-5.) *See also* Supp. Noah Decl., Exhibit F.

Finally, even if the foregoing limitation of the '154 patent claim was disclosed in Bugsysclub.com, Defendant has provided no evidence that the Bugsysclub.com Web site described the feature that the "non-subscription player was limited to one entry per tournament." Mr. Rosenthal contends that this limitation is met because the reference he submits, which discusses all three Web sites, discloses: "Only one account at any time." (D.I. 17, p. 11, ¶ 59; 17-5, p. 3.) However, all that this statement means is that a player can only have one account at a time. This statement indicates nothing about any player being limited to "one entry per tournament."

### ii.    Pokerschoolonline.com

The pokerschoolonline.com Web site also fails to anticipate the claims of the '154 patent. Only registered players who paid a monthly or annual membership could play on this Web site. (Supp. Noah Decl., Exhibit F.) In other words, a non-subscriber could not play in the same games as the subscribers "by submitting information relating to the player." Thus, the pokerschoolonline.com Web site does not provide a "means for allowing a non-subscription player to participate in the tournament without payment of the fee by submitting information relating to the non-subscription player." Because there were no non-subscribers, the pokerschoolonline.com Web site did not have the feature that a "non-subscription player is limited to one entry per tournament." Because these limitations were not present on the pokerschoolonline.com Web site, it fails to anticipate the claims of the '154 patent.

### iii.    Pokerpages.com

Like Bugsysclub.com and pokerscoolonline.com, the pokerpages.com Web site also fails to anticipate the claims of the '154 patent. The pokerpages.com Web site did not offer a subscription-based membership. (D.I. 17-8, pp. 3-5.) (Supp. Noah Decl., Exhibit F.) ("PokerPages is the freeplay section of the software. . .") Therefore, the Web site did not charge "a fee for a predetermined membership time period." Further, because there were no subscribers, the pokerpages.com Web site did not host "at least one game tournament for subscription-based players." Defendant has also failed to provide any evidence that the pokerpages.com Web site had the feature that a "non-subscription player"

1  is limited to one entry per tournament.  Because these limitations were not present on the

2  pokerpages.com Web site, it fails to anticipate the claims of the '154 patent.

3          **b.**        **Herrmann et al., '634 patent Publication**

4        The Herrmann et al, '634 patent publication ("Herrmann") attached as Exhibit D to Mr.

5  Rosenthal's declaration fails to anticipate any of the claims of the '154 patent.  All of the claims of the

6  '154 patent expressly require "a game that has elements of chance and skill."  (D.I. 9-2, p. 15, col. 11,

7  lines 38-39 and col. 12, lines 17-18.)  The specification of the '154 patent expressly distinguishes

8  between games of chance and games of both chance and skill.  (D.I. 9-2, p. 12, col. 6, lines 14-16.)

9  Further, all of the claims of the '154 patent expressly require that the "player is required to make choices

10  throughout the game."  (D.I. 9-2, p. 15, col. 11, lines 44-45 and col. 12, lines 23-24.)

11        Herrmann is completely inapposite since it is expressly limited to games of chance that were

12  adapted from games of chance and skill.  As disclosed in Herrmann:

> According to various embodiments of the invention, **games that
> ordinarily involve skill of a player are converted to games of chance**.
> These games may be, for example, blackjack, poker, dominoes and other
> games of skill and chance. **By eliminating skill** involved in playing the
> game, the game becomes more accessible to others who are unfamiliar
> with the rules, and the game play becomes faster, as **decision
> components by the player are removed**. . . These games may also be
> automatically played and/or betted by computer on behalf of a player. As
> discussed, such games may be played in a legal manner outside of a legal
> jurisdiction (e.g., in a casino) **if the player's skill is removed** from
> impacting the odds of winning. (D.I. 17-11, p. 17, ¶ 0051.)(Emphasis
> added.)

21        Thus, Herrmann clearly discloses that it does not apply to games of chance and skill that require

22  the player to make decisions throughout the game as is recited in the claims of the '154 patent.

23        Mr. Rosenthal's declaration completely glosses over these important distinctions.  According to

24  Mr. Rosenthal, the requirement of games of chance and skill "is disclosed in the entire specification of

25  both Exhibits D and E in that blackjack and poker are such games."  (D.I. 17, p. 15, ¶ 87.)  Mr.

26  Rosenthal further states that "[g]ames inherently require choices throughout the game and thus this

27  requirement is disclosed throughout the specification" despite Herrmann's clear teachings that it is <u>not</u>

28  directed to games that require a player to make choices.  (D.I. 17, p. 15, ¶ 90.)  Had Mr. Rosenthal read

Herrmann carefully, he would have learned that these two limitations of the '154 patent claims are not disclosed and that Herrmann is expressly limited to games of chance as opposed to games of chance and skill.

All of the claims of the '154 patent further require the step of "establishing a subscription-based membership for each player of the plurality of players by charging each player a fee for a pre-determined membership time period." As properly interpreted, the "fee for a pre-determined membership time period" means that a player is charged a fee that enables the player to play for a fixed period of time regardless of the number of games played during that period. (D.I. 9-2, p. 12, col. 6, lines 31-35.) According to the specification of the '154 patent, this is different than a fee that is paid for a particular number of games. (D.I. 9-2, p. 12, col. 6, lines 35-37.) Because of this difference, the '154 patent claims specifically recite that the fee is for a predetermined membership period, not for a particular number of games.

In distinction, Herrmann discloses creating a "subscription to play a number of games." (D.I. 17-11, p. 13, ¶ 0021 and p. 17, ¶ 0053.) Mr. Rosenthal makes the broad leap that this disclosure "presupposes a predetermined time period." (D.I. 17, pp. 14-15.) However, as explained in the '154 patent, a subscription to play a number of games is not the same thing as a subscription for a fixed period of time, regardless of the number of games played during that period.

Because there is no "predetermined membership time period" disclosed in Herrmann, there is no disclosure of "hosting at least one game tournament for subscription-based players . . . during the membership time period." In other words, there are no "subscription-based players" and there are no tournaments "during the membership time period." According to the claims of the '154 patent, the game tournaments that the subscribers can play in must correlate to the subscriber's membership period.

The claims of the '154 patent further require that the "non-subscription player is limited to one entry per tournament." Herrmann does not disclose this limitation. According to Mr. Rosenthal, the reference discloses that "AMOE entry may be limited to one game in a period of one year." (D.I. 17, p. 16, ¶ 94.) However, this statement by Mr. Rosenthal does not translate into a disclosure that the non-subscription player is limited to one entry per tournament. Simply because the AMOE in Herrmann may

1   be limited to one game, does not mean the AMOE cannot make more than one entry into that game. A

2   single entry into a game, and entry into a single game, are two very different concepts.

3         Finally, all of the claims of the '154 patent require that the prize pool be disbursed to "the

4   winning player and any eligible runner-up players . . . subsequent to the completion of the tournament."

5   Herrmann is completely silent with respect to disbursing the prize pool to any eligible runner-up players.

6   Herrmann only mentions paying out to the "winners." Mr. Rosenthal in his declaration overlooks this

7   limitation of the claims and merely concludes that "[p]ayout to the winner is automatic." (D.I. 17, p. 16,

8   ¶ 95.) This statement selected by Mr. Rosenthal fails to establish that the claim limitation is disclosed in

9   Herrmann.

10        In short, because Herrmann fails to disclose many of the limitations of the '154 patents,

11  Defendant's defense that Herrmann anticipates the '154 patent claims lacks substantial merit.

### c.      Patterson, '126 Patent Publication

13        The only similarity between the Patterson, '126 patent publication ("Patterson") and the claims of

14  the '154 patent is that they both relate to online gaming over a computer network for subscribers.

15  However, that is where the similarity ends. In distinction, Patterson is directed to a system and method

16  for managing and linking network accounts to share access privileges.

17        There is no disclosure in Patterson of "hosting at least one game tournament for subscription-

18  based players that has elements of both chance and skill." Indeed, there are no particular games

19  disclosed in Patterson. Mr. Rosenthal simply concludes that a "gaming environment typically with

20  consoles, such as the Sony PlayStation, has games and tournaments, and these games have

21  characteristics of chance and skill." (D.I. 17, p. 20, ¶ 122.) This does not constitute a disclosure of

22  hosting games of chance and skill, expressly or inherently. To establish inherency, the extrinsic

23  evidence "must make clear that the missing descriptive matter is necessarily present in the thing

24  described in the reference, and that it would be so recognized by persons of ordinary skill in the art."

25  *Schering Corporation v. Geneva Pharmaceuticals, Inc.*, 348 F.3d 992, 995 (Fed. Cir. 2003)(Citation

26  omitted).

27        Mr. Rosenthal has failed to establish that the missing games of chance and skill are necessarily

28  present in Patterson. Notably, this lack of inherency is confirmed by Mr. Millar in his declaration

wherein he indicates that online games that involve elements of chance have to meet certain requirements in order to be legal.  (D.I. 15, pp. 5-6, ¶¶ 10-11.)  There is no disclosure in Patterson that would necessarily lead to the inescapable conclusion that the gaming environment described therein included games of chance and skill because the reference discloses nothing about the legality of any online games.  Thus, Defendant has failed to demonstrate that this limitation is inherently disclosed in Patterson.

Patterson also fails to disclose the step of establishing "a prize pool for the tournament." Remarkably, Mr. Rosenthal concludes that this limitation of the '154 patent claims is disclosed in Patterson because "games played on consoles establish prize pools for tournaments." (D.I. 17, p. 21, ¶ 126.)  Again, Mr. Rosenthal has provided no evidence that games played on consoles necessarily established prize pools for tournaments.  Therefore, contrary to Mr. Rosenthal's speculation, this limitation is not disclosed in Patterson expressly or inherently.

The '154 patent claims further require the step of allowing a non-subscription player to participate in the tournament without payment of the fee "by submitting information related to the non-subscription player."  Patterson fails to disclose this step.   According to Mr. Rosenthal, "the online environment permits users to create non-member accounts if they do not have a subscription.  This limited member access allows the non-member (non-subscriber) to participate in the same game or tournament as the subscribing members." (D.I. 17, p. 21, ¶ 127.)  Mr. Rosenthal is wrong and has self-servingly selected portions of Patterson in attempt to support his position.  Set forth below, is an excerpt from Patterson from which Mr. Rosenthal clearly derived his conclusion:

> The online environment permits users to create non-member accounts if they do not have subscriptions. A non-member account provides a user with general access, but does not provide member access. The second user creates a non-member account in the online environment. <u>Because the second user has a non-member account and does not have member access, the second user cannot immediately participate in an ordinary online game.</u>  (D.I. 17-12, pp. 71-72, ¶ 0016.)(Emphasis added.)

The portion that Mr. Rosenthal conveniently failed to mention to the Court is that the second user "cannot immediately participate in an ordinary game" once the user creates a "non-member account." Unlike the claims of the '154 patent, which enable a non-subscription player to participate in a

1   tournament by submitting information relating to the player, the second user must find another user that

2   is willing to let the second user "link" to his account before the second user can participate in on online

3   game. (D.I. 17-12, p. 72, ¶¶ 0017-0019.) Once the accounts are linked, the second user can play in an

4   online game. *Id.* Therefore, in Patterson a non-subscription player cannot participate in the tournament

5   without paying a fee by submitting information only as required by the claims of the '154 patent. It is

6   indisputable that Patterson does not disclose this limitation of the claims of the '154 patent.

7        The claims of the '154 patent further require that the "non-subscription player is limited to one

8   entry per tournament." Mr. Rosenthal again makes the broad leap that the disclosure in Patterson that

9   "one limited use link allows only one use" is a disclosure of this limitation. (D.I. 17, p. 21, ¶ 129.) As

10  described in Patterson, a limited use link is a link that enables the non-member user to request a set

11  number of services. (D.I. 17-12, p. 76, ¶ 0075.) An example of a service is "participating in an online

12  game." (D.I. 17-12, p. 73, ¶¶ 0026-0040.) However, as explained above in connection with Herrmann,

13  this disclosure does not translate into a disclosure that the non-member player is limited to one entry into

14  that online game.

15       Lastly, the '154 patent claims require disbursing the prize pool to the winning player and any

16  eligible runner-up players in the form of prizes that have immediate value. According to Mr. Rosenthal,

17  this limitation is disclosed in Patterson because "[i]n console game competitions and tournaments, the

18  prize pool is disbursed as a prize that has immediate value subsequent to the completion of the

19  tournament. (D.I. 17, p. 21, ¶ 130.) Mr. Rosenthal's conclusion fails for a number of reasons. First,

20  Patterson is silent with respect to establishing a prize pool and, therefore, is necessarily silent with

21  respect to disbursing prizes that have immediate value. Again, Mr. Rosenthal has provided no evidence

22  that console game tournaments played over a network necessarily establish a prize pool. Second, Mr.

23  Rosenthal neglects to mention prizes for "eligible runner-up players." There is absolutely no disclosure

24  in Patterson of prizes for eligible runner-up players. It is worth noting that Mr. Rosenthal did not

25  overlook the significance of the runner-up players when he needed them to try and support his

26  conclusions on the issue of infringement. Now, when the runner-up players do not support his

27  conclusion on the issue of validity, he conveniently ignores them.

28

Patterson fails to anticipate the claims of the '154 patent since it fails to disclose all of the limitations of the claims. Defendant's conjecture that the technology of Patterson "could be applied to games having characteristics of cards, poker, fees, tokens and prizes" does not satisfy the requirements of anticipation. (D.I. 14, p. 11.)

### 2.  None of the References Cited By Defendant Alone or in Combination With Other Prior Art Renders The Claims of the '154 Patent Invalid as Obvious

A general methodology for conducting the obviousness analysis was described by the Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966) as follows:

> Under § 103, the scope and content of the prior art are to be determined;
> differences between the prior art and the claims at issue are to be
> ascertained; and the level of ordinary skill in the pertinent art resolved.
> Against this background, the obviousness or nonobviousness of the subject
> matter is determined.

The Supreme Court has recently held that these *Graham* factors "continue to define the inquiry that controls. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. ___, 127 S. Ct. 1727, 1734 (2007).

Mr. Rosenthal failed to perform this required inquiry. Mr. Rosenthal merely concludes that "I consider that the disclosures of Exhibits C, D, E and F are so related that any person skilled in the art would have combined them for their respective teachings, that there is a clear motivation and suggestion to combine them, and that overall, the results of these teachings are clearly predictable." (D.I. 17. pp. 25-26, ¶ 156.) However, Mr. Rosenthal never addresses why these references would be combinable or even how they would be combined. Mr. Rosenthal's broad-brush approach should be rejected by the Court as an improper obviousness analysis.

Moreover, Mr. Rosenthal concludes that the '154 patent "is merely a standard game recipe" and a "common formula for games." (D.I. 17, p. 26, ¶ 158.) Mr. Rosenthal would have this Court believe that it can simply ignore that the claims are directed to a method of allowing a plurality of players to play a game over a computer network, which contain certain features and characteristics. To this end, Mr. Rosenthal believes that the claims of the '154 patent would have been obvious over a bowling, golf or tennis league as well as a Little League baseball game. (D.I. 17, p. 26, ¶ 159; D.I. 17-6, pp. 21-22.) This proposition demonstrates Mr. Rosenthal's lack of a thorough and reasoned analysis of the scope and

content of the prior art and the differences between the prior art and the claims of the '154 patent.

Further, Mr. Rosenthal's conclusion that there was a "clear" motivation or suggestion to combine the references he cited in Exhibits C-F of his declaration is wrong. For the reasons explained below, the references actually teach away from their combination. *Tec Air, Inc. v. Denso Manufacturing Michigan Inc.*, 192 F.3d 1353, 1360 (Fed. Cir. 1999)("There is no suggestion to combine . . . if a reference teaches away from its combination with another source.")

### a.    Bugsysclub.com, Pokerschoolonline.com and Pokerpages.com

For example, the Bugsysclub.com, pokerschoolonline.com and pokerpages.com Web sites actually teach away from their combination. These three Web sites, although accessible by using the same software, are three distinct Web sites with three distinct product offerings and each have a different focus. If there was a "clear" motivation or suggestion to combine the features of these Web sites, then there would not have been three separate Web sites that were accessible using the same software; there would have only been one. There would have been no benefit to modifying any of these three Web sites to include features from the others since the whole intent was to have different Web sites each having a different focus. *KSR Int'l*, 127 S. Ct. at 1794. The purpose of the Bugsysclub.com Web site was to enable players to play for real money by buying into tournaments. The purpose of the pokerschoolonlone.com Web site was for players to pay a subscription fee so that they can play online and improve their skills. The purpose of pokerpages.com was to enable players to play for free and risk no money. There would have been no reason to modify any of these Web sites to include features from the others. In fact, all three of these Web sites exist today in essentially the same configuration as they did in 2003.

### b.    Herrmann et al., '634 Patent Publication

Herrmann also teaches away from modifying it or combining it with any one of the other cited references to arrive at the invention claimed in the '154 patent. Indeed, Herrmann expressly teaches adapting a game of chance from a game of chance and skill so as to eliminate the element of skill from the game. (D.I. 17-11, p. 12, ¶ 0015.) The computer automatically plays the game according to a predetermined set of rules. (D.I. 17-11, p. 13, ¶ 0024.) To combine the teachings of Herrmann with any of the other references cited by Defendant or to modify the reference itself to include games of chance

and skill, would require completely changing the system and method described in Herrmann. There would be no benefit to modifying Hermann to include games of chance and skill since the computer actually plays the game according to a predetermined set of rules. Likewise, there would be no benefit to removing the element of skill from the games played on Bugsysclub.com, pokerscoolonline.com, pokerpages.com or Patterson. *KSR Int'l*, 127 S. Ct. at 1744. Thus, Herrmann actually teaches away from combining it with any of the other references.

### c.    Patterson, '126 Patent Publication

Finally, with respect to Patterson, the account linking and management features described in this reference are so completely different from those in the other references cited by Defendant that the reference is not properly combinable with any of the other references cited by Defendant. The whole purpose of the methods and apparatus disclosed in Patterson is to manage and link network accounts to share access privileges among accounts. There would have been no benefit to modify the access methodologies employed by any of the other references to include the ability to manage and link network accounts to share privileges. Modifying the system to allow players to share access privileges is contrary to the purpose of the access procedures described in those references. Indeed, in Herrmann both subscription and non-subscription players already can enter the same game.

In short, Mr. Rosenthal's conclusory, unsupported statements and flawed analysis fail to establish a substantial question of invalidity based upon obviousness. To that end, Plaintiff has shown that Defendant's obviousness assertions lack substantial merit and that Plaintiff is likely to succeed on the issue of validity of the '154 patent.

### C.    PLAINTIFF HAS NOT COMMITTED INEQUITABLE CONDUCT

To show inequitable conduct, one must prove by clear and convincing evidence that the patentee failed to disclose material information to the PTO and that the patentee did so with the intent to deceive the PTO. *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 744 (Fed. Cir. 2002)(citations omitted).

Plaintiff did not fail to disclose any information to the Patent Office during the prosecution of the '154 patent. Remarkably, Defendant contends that Plaintiff "purposefully prevent[ed] the Examiner from considering material prior art submitted by the Applicants." (D.I. 14, p. 14.) In other words,

1    Defendant acknowledges that Plaintiff submitted the prior art, yet it claims that Plaintiff somehow

2    "prevented" the Examiner from considering the art. This makes no sense.

3        In brief, during the prosecution, applicants submitted an Information Disclosure Statement

4    ("IDS") and a Form PTO-1449, which simply listed the prior art being submitted. Two of the citations

5    on the Form PTO-1449 contained typographical errors. Specifically, the Document Number for

6    Reference A6 read "200400248634 A1" instead of "2004/0248634 A1." Likewise, the Document

7    Number for Reference A15 read "2001/000469 A1" instead of "2001/0004609." (D.I. 17-17, p. 6.)

8    However, it is indisputable that Plaintiff submitted copies of each one of the references cited on the

9    Form PTO-1449 to the Patent Office as expressly indicated on the IDS itself. (Supp. Noah Decl.,

10   Exhibit L.) In fact, the Examiner apparently used the hard copies of the references submitted by

11   applicants to determine that there were typographical errors on the Form PTO-1449. (D.I. 17-17, p.

12   3.)("the information provided for reference A6 and A15 . . . does not match . . . information reported

13   thereon") It is disingenuous for Defendant to contend that applicants intended to deceive the Patent

14   Office when it indisputably provided the Patent Office with a copy of all the references listed on the

15   Form PTO-1449.

16       More importantly, in its haste to find some basis for an inequitable conduct defense, Defendant

17   overlooked the fact that the Examiner did, in fact, consider the Walker reference attached as Exhibit N to

18   Mr. Rosenthal's declaration. Applicants submitted, and the Examiner considered, U.S. Patent No.

19   6,425,828 ("Walker '828"), which is the patent that ultimately issued from the application cited by Mr.

20   Rosenthal in his declaration. (Supp. Noah Decl., Exhibit G.) In addition, the Examiner cited U.S. Patent

21   No. 5,779,459 ("Walker '459"), which is the great-grandparent application to the application cited by

22   Mr. Rosenthal in his declaration and Walker '828 and contains the same specification. (D.I. 17-17, p. 7.)

23   In view of these facts Defendant did not investigate, Defendant cannot deny that the Walker reference

24   cited by Mr. Rosenthal was disclosed and considered by the Examiner. Incidentally, the Examiner

25   expressly stated in the Notice of Allowability that Walker '459 was not material to the claims of the '154

26   patent. (D.I. 17-17, p. 4.)

27       In short, Defendant's inequitable conduct allegations are a woefully inadequate attempt to create

28   a defense to its infringement when no such defense exists. It is indisputable that Plaintiff disclosed

copies of the two references to the Patent Office and thus, as a matter of law, did not commit inequitable conduct. *Fiskars, Inc. v. Hunt manufacturing Co.*, 221 F. 3d 1318, 1327-28 (Fed. Cir. 2000).

### D. NOT ONLY IS IRREPARABLE HARM PRESUMED HERE, BUT PLAINTIFF HAS ESTABLISHED THAT IT WILL SUFFER ACTUAL IRREPARABLE HARM IF AN INJUNCTION IS DENIED.

As set forth above, Plaintiff has established a strong likelihood of success on the merits, which gives rise to the presumption of irreparable harm. *Oakley, Inc.*, 316 F.3d at 1345. In addition to the presumption, Plaintiff would suffer actual irreparable harm if Defendant is not enjoined. Predictably, the thrust of Defendant's opposition is that Plaintiff's damages from Defendant's infringement are easily calculable by "using generally accepted accounting principles" and thus compensable by an adequate remedy at law. (D.I. 15, p. 3, ¶ 6). However, Defendant's simplistic argument ignores the unique conditions extant in the market, a factor that Courts have long recognized as giving rise to uncertain injury, the hallmark of irreparable harm. *Hybritech Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1456 (Fed. Cir. 1988). Since there can be no doubt that Plaintiff and Defendant are competing for the same customers in the same market, the unique market conditions present in this case provide a compelling basis for the issuance of the preliminary injunction.

As explained in its opening brief, Plaintiff's ability to succeed in the online poker market requires that Plaintiff achieve "critical mass" or "player liquidity" before the other market entrants, a key factor confirmed by the extremely relevant experiences of www.partypoker.com, the prior market leader. (Supp. Kellerman Decl., ¶¶ 8-9, Exhibit H, p. 25.) In fact, if not enjoined, Defendant's millions of dollars of impending advertising and marketing expenditures that are specifically designed to drive players to Defendant's Web sites would deprive Plaintiff of the opportunity to achieve critical mass at this unique and important juncture in the market, an opportunity permanently lost to Defendant once the market matures. (D.I. 8, pp. 2-3, ¶ 7.) This harm cannot be adequately compensated with money damages.

### E. PLAINTIFF DOES NOT HAVE UNCLEAN HANDS BECAUSE ITS WEB SITE IS LEGAL

Plaintiff has spent hundreds of thousands of dollars in attorneys fees in making sure that its Web site is legal. (Supp. Kellerman Decl., ¶ 13.) To that end, Plaintiff obtained the advice and

recommendations from two of the world's leading gaming attorneys. (Supp. Kellerman Decl., ¶ 13.)
Unfortunately, these attorneys cannot submit a declaration on Plaintiff's behalf to contradict Mr. Millar
because both of them represent Defendant and have advised Mr. Millar concerning the legality of
Defendant's Web sites. (Supp. Kellerman Decl., ¶ 13.) However, Plaintiff submits herewith the legal
opinion from one of these attorneys who confirms that Plaintiff's Web site is legal. (Supp. Kellerman
Decl., Exhibit J.)

### F.    DEFENDANT'S BALANCE OF HARDSHIPS ARGUMENT IS INTERNALLY INCONSISTENT

Defendant goes to great lengths to try and demonstrate to the Court why its Web sites are legal
and Plaintiff's are not. In doing so, Mr. Millar, Defendant's COO, CFO and General Counsel, describes
in no uncertain terms that the principal source of its revenue is from its "Club" membership and its
television show. (D.I. 15, pp. 3-4, ¶ 7.) According to Mr. Millar, Defendant does not "emphasize
earning revenue by seeking payment in exchange for the opportunity to win by participating in an online
game of chance." (D.I. 15, p. 6, ¶ 12.) Mr. Millar also says "The 'Club' promotes the magazine, the
television show and offers other services which in the aggregate exceed the price charged for 'Club'
membership which is $19.95 per month. Therefore, it is the 'Club' membership that is valued at $19.95,
not the playing of our games." (D.I. 15, pp. 3-4, ¶ 7.)

Nevertheless, Mr. Millar contends that if Defendant was enjoined, it would suffer $15 million in
losses composed of "television production and related expenses of $6 million, lost advertising revenue
and barter value, overhead cost, marketing and redesigning totaling an additional $9 million." (D.I. 15,
p. 5, ¶ 9.) Mr. Millar has failed to provide any correlation between an injunction and this alleged
potential loss. This is not surprising given Mr. Millar's admission that the value to Defendant's
customers is not in the opportunity to play in online tournaments. (D.I. 15, pp. 3-4, ¶ 7.) In view of Mr.
Millar's admission, it is disingenuous for Defendant to argue that the hardship it would suffer if enjoined
would "vastly outweigh any hardships MMJK would suffer." (D.I. 14, p. 17.)

It is important to note that Plaintiff is not asking the Court to shut down Defendant's web sites.
Rather, Plaintiff is only seeking to enjoin Defendant from hosting online game tournaments that pay out
prizes that have immediate value (i.e., cash, cash-equivalent notes and objects) to the winners and

require entrants to either pay a subscription fee or utilize an "alternative means of entry" to enter. Defendant would certainly be able to continue to promote its magazine and television show and offer its "other services." In addition, Defendant would still be able to host online game tournaments that did not pay out prizes having immediate value. It is interesting to note that in the estimation of the $15 million in losses it claims justifies the bond amount, Defendant does not include any lost revenue from not being able to host the tournaments at issue in this litigation. (D.I. 15, p. 5, ¶ 9.) Again, since Defendant's business model does not emphasize attracting viewers to its "Club" for the opportunity to win by participating in an online game of chance, then any harm to Defendant as a result of not be able to host these particular types of tournaments should logically not outweigh the harm to Plaintiff if an injunction was denied.

### G.    A $15 MILLION BOND IS EXCESSIVE

In granting a motion for preliminary injunction, the district court has wide discretion as to the amount of security required, if any. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). Defendant's request for $15 million bond is excessive and inappropriate. Mr. Millar provides no evidence why Defendant would lose $6 million of the $15 million for television costs or $9 million in television revenue and overhead marketing and redesigning costs if it could not host the particular online game tournaments at issue in this case. (D.I. 15, p. 5, ¶ 9.) Plaintiff believes that a bond in the amount of $1 million or less would be appropriate in this case.

### III.    CONCLUSION

For the reasons discussed above, this Court should grant Plaintiff's motion for preliminary injunction.

Dated: August 1, 2007                                    DERGOSITS & NOAH LLP


                                                         By:  /s/ Todd A. Noah
                                                         Todd A. Noah
                                                         Attorneys for Plaintiff MMJK, INC.