TODD A. NOAH (SBN 152328)
PAUL K. TOMITA (SBN 188096)
DERGOSITS & NOAH LLP
Four Embarcadero Center, Suite 1450
San Francisco, California 94111
Tel: (415) 705-6377
Fax: (415) 705-6383
E-mail:  tnoah@dergnoah.com
         ptomita@dergnoah.com

Attorneys for Plaintiff MMJK, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MMJK, INC.<br><br>    Plaintiff,<br><br>vs.<br><br>ULTIMATE BLACKJACK TOUR, LLC | Case No. C 07 03236 BZ<br><br>**SUPPLEMENTAL DECLARATION OF JASON KELLERMAN IN SUPPORT OF PLAINTIFF MMJK, INC.'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:  August 15, 2007<br>Time: 10:00 a.m.<br>Location: Courtroom G<br>Honorable Bernard Zimmerman |

I, Jason Kellerman, declare under penalty of perjury that the following is true and correct:

1.     I submit this supplemental declaration in support of MMJK, Inc.'s ("MMJK") motion for preliminary injunction, and in rebuttal to statements made in Defendant UBT's declarations. I have personal knowledge of the facts contained herein and, if called as a witness, I could and would testify competently thereto.

2.     As I noted in my first declaration at Paragraph 2, I am the President and Chief Executive Officer of MMJK and have been in that capacity since November, 2004. Prior to co-founding MMJK, I served in a variety of senior management roles from 1999 until 2004 at LookSmart, Ltd. (NASD: LOOK), then a publicly traded internet search engine with over $150MM in annual revenue. Most recently, I was Chief Executive Officer of LookSmart and, prior to that, I was Chief Operating Officer of

-1-

1  LookSmart, the internet search engine for Microsoft's MSN, Netscape, Alta Vista, Lycos, Ask Jeeves, and approximately 200 other web properties. LookSmart's business model was very similar to Google's and Overture's (acquired by Yahoo!). I personally played a significant role in building LookSmart's online search advertising revenue from zero to nearly $150MM annually in a period of less than three years. As most people now know, search advertising represents approximately 40% of all online advertising on the internet, and expertise in this area is critical to any online business' ability to acquire customers. Prior to my experience at LookSmart, I was a management consultant at Mercer Management Consulting from 1990-1999, most recently as a Partner in their strategy practice. I graduated with high honors from Princeton University in 1990 with a degree in Civil Engineering and Operations Research.

3. I will discuss three topics in this declaration: First, I will discuss MMJK's understanding of the conditions in the current market for online poker. Then, I will discuss MMJK's ability to capture market share. Finally, I will discuss the process that MMJK has pursued to ensure the legality of its business model.

4. The business of MMJK is to market, operate and support its Web site www.betzip.com, now known as www.pureplay.com. This site employs the invention described and claimed in the '154 patent. The revenue generated at our website is all derived from player participation through the patented methodology, and advertising revenue related to the number of players who frequent the site. MMJK does not offer any products or services other than those that are covered by the '154 patent.

5. Plaintiff and Defendant compete head to head in the market for on-line poker. MMJK has come up against UBT in the market on several occasions.

6. In my first declaration (see Paragraphs 6-8), I explained how the enactment and enforcement of the UIGEA in late 2006 had substantially changed the nature of the market for online poker because one of the largest market participants, www.partypoker.com (operated by PartyGaming plc) had to exit the U.S. market because of questions concerning the legality of their operation. Other online poker sites were similarly affected causing a tremendous amount of flux and uncertainty in the market about which providers would continue to host gaming sites for U.S. customers in the United States.

7.  MMJK believes that this market uncertainty provides it with a unique and time-limited opportunity to capture market share. These players are now looking for a new site to replace their previous affiliation. This migration will not last indefinitely and MMJK is well positioned to capture market share with its site.

8.  In my explanation of the market in my first declaration, I introduced the concept of "critical mass" – the notion that once a gaming site had obtained a large number of players, this would translate into larger prize pools and more games and tournaments, features that would make the site more attractive to existing users and new users. If there are a large number of players, then the user has the opportunity to play for larger prizes, to select from a larger number of available games and tournaments, and to be able to play against other players at any time of the day or night. Once a site achieves this critical mass making it attractive to both existing and new players, the site's market share increases rapidly because of its critical mass ("snowball effect".) My views on this phenomenon are widely held by leaders in our market. As support for this, I have attached as Exhibit H a portion of the initial public stock offering prospectus prepared in 2006 by PartyGaming plc, the corporation that owns and operates www.partypoker.com, the site that exited the U.S. market after the passage of the UIGEA. A "market overview" is provided at pages 21-27 of the prospectus. Of particular relevance to my earlier declaration about "critical mass" and the "snowball effect" is a discussion of "player liquidity." The pertinent section reads:

> The Directors believe that the key features of a large, successful online poker business, which are not easily achieved, are:
>
> Player liquidity: a large number of players are required in order to provide customers with opposing players for the game and a stake type of their choice at a time of their choosing. In addition, player liquidity means that the larger sites can offer a greater variety of tournaments with larger cash prizes which in turn tends to attract more customers. (Exhibit H , p 25.) (Emphasis in original.)

9.  The fact that PartyGaming alone captured over 50% of the online poker market and never relinquished its stronghold on the market (until it was forced to exit the U.S. market) further demonstrates the massive value of achieving critical mass ahead of other competitors. Also, in

1  describing the impact of barriers to entry in the online poker market, such as player liquidity,
2  PartyGaming plc reported that, at that time in 2005, the top eight operators had captured 95% market
3  share, despite the existence of over 200 online poker sites.

4       10.    MMJK has a demonstrated track record in capturing market share. MMJK first launched
5  the website www.betzip.com in July 2005, as a "free play" poker site, and began offering its subscription
6  service in November 2005. To date, MMJK has invested approximately $8.5 Million in building its
7  business. As a measure of our own performance and ability to capture market share, MMJK's
8  management looks at several key metrics – firstly, the number of users who have downloaded our poker
9  software. Second, the number of paying subscribers we've attracted. Finally, we look at the total
10 number of active players who have played poker on our site in the last 6 months. Since we began
11 acquiring users, over 750,000 people have downloaded our poker software, over 42,000 people have
12 become paying subscribers, and approximately 200,000 people are active players. MMJK clearly has a
13 demonstrated track record in capturing market share, and has a management team that is highly
14 experienced in acquiring customers for an online business. See Exhibit I for the resumes of MMJK's
15 key senior management team members.

16      11.    Regarding MMJK's capacity to handle significant growth in its business, the company
17 has invested significant amounts of time and capital into ensuring its business is highly scale-able. In
18 2007 alone, MMJK invested millions of dollars upgrading virtually all of its technology platforms
19 (including its poker software, billing system, and customer relationship management system) in order to
20 have a scale-able technology base that can handle large numbers of subscribers. For example, in
21 December 2006, MMJK signed a multi-million dollar licensing deal with CyberArts Licensing, LLC to
22 license CyberArts' highly scale-able poker software, and has spent the past 6 months integrating this
23 software (the software launched on July 5, 2007).

24      12.    I have read the declaration of Sanford I. Millar submitted with UBT's opposition brief.
25 At Paragraph 5, Mr. Millar states that MMJK is in "no position realistically to capture any share of
26 market if Court enjoins our business." I respectfully disagree – MMJK has already built one of the
27 largest poker sites on the web and is well on its way to acquiring hundreds of thousands and eventually
28

-4-

millions of subscribers. In addition, based on our infrastructure investments previously discussed, we believe that our operation can scale to handle significant increases in our customer base.

13. MMJK has taken a very diligent approach to ensuring that its business model is a legal business model and does not violate any gambling laws, state or federal. In 2005, prior to raising capital and prior to launching its business, MMJK sought legal advice from several of the world's leading gaming attorneys, including both I. Nelson Rose and Anthony Cabot. In addition to these overall legal opinions, MMJK has twice commissioned Mr. Cabot's firm to conduct "50 state surveys" of all relevant statutes, attorney general opinions, and court opinions in all 50 states (once in 2005 and once in 2007). MMJK has used these surveys to carefully evaluate the relevant laws in each state and to identify states where free methods of entry do not eliminate the consideration element of gambling. MMJK does not operate in states in which it believes its service may be in violation of the law (as of this writing MMJK operates its subscription service in 34 U.S. states). MMJK has also commissioned several individual state legal opinions for states in which the 50 state surveys did not provide clear guidance. Because gaming laws are primarily state driven and are subject to change, MMJK regularly commissions updates to its opinions and its state by state surveys. Exhibit J is an October 2006 legal opinion from Professor I. Nelson Rose, one of the most respected gaming attorneys in the United States. Unfortunately, neither Professor Rose nor Mr. Cabot was able to provide declarations for these proceedings, because it is my understanding that both work for UBT as well and have provided it with similar advice concerning the legality of UBT's Web sites. MMJK also accepts customers from countries such as the UK and Canada, and has commissioned legal opinions for these countries as well. In all, MMJK has spent hundreds of thousands of dollars to ensure that its business model is not in violation of any relevant laws.

14. It is also worth noting that several of Mr. Millar's statements regarding our subscription model are inaccurate. Specifically, he indicated that our subscribers receive nothing for their subscription fees other than tournament access (See Millar Declaration, ¶ 13). As Exhibit K clearly shows, our subscribers receive several other valuable features, including:

- Proprietary ratings based on their actual performance in tournament play
- No advertisements during game play (non-subscribers view on average over 1,300 ads per week)

-5-

- "Level playing field" tournaments where they can play against players of similar skill levels
- A higher level of customer service than non-subscribers, including live chat.

Executed this 1ST day of August, 2007, at San Francisco, California.

_____
Jason Kellerman

SUPPLEMENTAL DECLARATION OF JASON KELLERMAN
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. C 07 03236 BZ