# EXHIBIT J

I. NELSON ROSE
PROFESSOR OF LAW, WHITTIER LAW SCHOOL
HOME OFFICE: 17031 ENCINO HILLS DRIVE
ENCINO, CALIFORNIA 91436
(818) 788-8509
FAX (818) 788-3104
Internet: GamblingAndTheLaw.com
Email: rose@sprintmail.com

ADMITTED
CALIFORNIA & HAWAII BARS

October 13, 2006

MMJK LLC
120 26th Avenue
San Francisco, CA 94121

## LEGAL OPINION

**NOTE** - This Legal Opinion is not complete without the attached Statement of Limitation and Biography.

## Question Presented

Is the Internet game site BetZip (www.betzip.com), which offers poker tournaments that pay out prizes of value with a subscription option and an alternative method of entry and therefore no obligation for players to spend any money, legal in general under United States federal law and in general under the applicable laws of the various states of the United States?

## Short Answer

Federal courts, including the United States Supreme Court and the highest courts of appeals of most if not all states have adopted the nearly universal definition that gambling must have three elements: prize, chance and consideration. BetZip, an internet game site where the winner of a valuable prize is chosen by skill or chance or both and players may enter by a free alternative means of entry ("FAME"), such as by registering by first class mail, is not gambling – it is a no-purchase-necessary sweepstakes. A poker tournament should be found to be a game of predominantly skill, although no court has looked at this question. More importantly, there is no consideration because contestants are not required to purchase anything or spend any money, other than incidental costs for stamps, making this game identical to promotional sweepstakes. Contestants who utilize a FAME have exactly the same chances of winning prizes equal to contestants who pay to subscribe enter via the Internet. The U.S. Supreme Court held in the leading case interpreting federal law that there is no consideration in a game even though players were required to expend a nominal amount of money on postage and time sending on postcards. State courts have also declared that a game lacks consideration if players may enter for free and have equal chances of winning. A poker tournament conducted over the Internet with a FAME thus lacks consideration and is not gambling and is legal in general under federal and state laws. A new federal law, the Unlawful Internet Gambling Enforcement Act of 2006, whose operative parts will be codified at 31 U.S.C. §§5361-67, does not change this conclusion: It expressly exempts games where participants do not risk losing anything of value, and it requires that there be a bet or wager that violates

some other federal or state law. There is no other federal law that could apply and BetZip is not offered in states where it would be illegal.

## Analysis

### I. Factual Assumptions

BetZip offers poker tournaments which players may enter through paid subscriptions of one month duration (or more) or by a free alternative means of entry ("FAME"). The specific terms and conditions of the FAME are shown below:

1.     OFFLINE, NO-PURCHASE-NECESSARY, METHOD OF ENTRY:

As an alternate means of entry into Daily Cash tournaments or Qualifying tournaments, a player must:

a.     Register at BETZIP.COM as a free player and download and install the poker software; and

b.     For each three day period that you want to participate in Qualifying Tournaments (PMTTs, PSTTs, and PSQs) and Daily Cash Tournaments, send a 3 inch x 5 inch card on which the player has legibly handwritten the player's BETZIP screen name, First and Last Name, Complete Mailing Address (e.g. Street, City, State, ZIP code), Email Address, Date of Birth, and the three day period beginning at 12:01 a.m. Eastern time on the first day and ending at midnight on the third day in which the player would like to participate (one three day period per card) in mm/dd/yyyy format. The card must be placed in a #10 envelope, and mailed to P.O. Box 293, 660 4th Street, San Francisco, CA 94107. No photocopies, reproductions or facsimiles of the 3 inch x 5 inch card are allowed. Limit: 10 cards per envelope.

c.     Entries must be received no earlier than fourteen (14) calendar days prior to the three day period in which entry is requested and no later than seven (7) calendar days prior to the three day period in which entry is requested. BETZIP.COM will post a schedule of all tournaments. BETZIP.COM shall not be responsible for late, lost, illegible, incomplete, stolen, misdirected, mutilated or postage-due mail.

d.     Approved mail-in entries will receive poker points per section 2e.

e.     The odds of winning any prize will be the same by mail in entry as by online membership in the Player's Club. The odds of qualifying through a qualifying tournament will be the same by mail in entry as by online membership in the Player's Club, and all participants entering through this means will be accorded equal opportunities to participate and win in events held at BETZIP.COM, and will depend on the number of entrants.

In the future, other free means of registration may also be provided. Upcoming tournaments are posted on the game website. Subscription contestants pay for their monthly subscription and register online.

FAME contestants are treated exactly the same as subscription contestants, in terms of entry into the tournaments and their chances of winning. Subscription contestants may register only once for any tournament played in that month. FAME contestants are given instructions on how to register at no cost online. FAME contestants may also register once for any tournament. There are various levels of prizes available, but FAME contestants are allowed to win the highest levels by registering at no charge. At the beginning of each tournament, every contestant receives an identical number of chips. If rebuys are permitted, FAME contestants may register in advance at no cost for those rebuys.

Distribution of prizes is based solely on the contestants' performance in the poker tournaments. It is anticipated that players will eventually be ranked based on their past performance and placed into appropriate skill levels. Prizes will go to a limited number of the top performers in each category as well as overall.

The tournaments and website are in complete compliance with all applicable federal and state laws that would apply to any online operation.

## II. Legal Analysis

### A. Federal Law

#### 1. General Federal Statutes and Regulations

The federal government has left much of the regulation of gambling up to the individual states. Federal law may be involved in this game site because it is involved in interstate commerce using interstate wires and other facilities of interstate commerce, such as incidental use of the U.S. mails. The Federal Communications Commission ("FCC") and the Federal Trade Commission ("FTC") have so far shown little interest in regulating the Internet. But these agencies, the U.S. Postal Commission and their law enforcement officers, the U.S. Department of Justice ("DOJ") have taken enforcement actions against operators within their jurisdiction. The triggers are usually consumer fraud, large-scale illegal gambling or the perceived involvement of organized crime. But occasionally federal agencies go after high- and even low-profile companies for political reasons. For example, the DOJ filed well-publicized criminal complaints against licensed Internet gambling operations because it opposed proposed legislation and wanted to demonstrate that the current laws impacting the Internet were adequate. In 2005, the DOJ orchestrated federal grand jury subpoenas against magazines and Internet companies which took advertising from online gaming operators to intimidate those companies into discontinuing taking that type of ads. In 2006, the DOJ arrested the chief executive of the Internet gaming company BetOnSports, who made the mistake of changing planes in Dallas. It appears the federal government has never gone after an Internet gaming site offering free-to-enter games, even though many are operated from the United States.

The federal government's interest in gambling dates back to the lottery scandals of the 19th century. See, Rose, I. Nelson *GAMBLING AND THE LAW* chs. 4 & 5 (1986). The

federal power lies primarily in restricting the use of the U.S. mails, federally regulated
financial institutions, interstate and international transportation of commercial goods, and
the regulation of broadcast media and interstate wire communications.

Federal and state restrictions on businesses involved in communications, such as
the Internet, raise questions of constitutionality under the First Amendment doctrine of
commercial free speech. However, the first step in any analysis is to find the actual
statute, ordinance or regulation that purports to limit the right to operate a business or
publish information about that business. Only if there is some governmental restriction
does the second step, a constitutional analysis, arise: to see whether that restriction is
limited enough to pass the tests laid down by the United States Supreme Court to be a
constitutional regulation of commercial speech.

Because the federal government has little interest in controlling gambling, there
are few federal statutes on point. The only federal statute dealing directly with gambling
and telephones wires, such as the Internet, is 18 U.S.C. §1084, the Interstate Wire Act,
which was designed to go after illegal bookmakers. The Act makes it a crime if anyone

> engaged in the business of betting or wagering knowingly uses a wire
> communication facility for the transmission in interstate or foreign
> commerce of bets or wagers or information assisting in the placing of bets
> or wagers on any sporting event or contest.

This statute was passed as part of the war on organized crime. Courts considering the
reach of the Wire Act have held that it only applies to sports betting. *In re MasterCard
Intern. Inc.*, 313 F.3d 257 (5th Cir. 2002). Therefore it would not apply to poker
tournaments, even if the games were considered to be predominantly chance and
consideration were found. Of course, if there is no consideration, there can be no bet or
wager at all, so the website cannot be in the business of gambling. Other federal statutes,
including the interstate wagering paraphernalia act, 18 U.S.C. §1953, also would not
apply to a game that has no consideration.

The tournament operation might be considered a lottery, which is sometimes
broadly defined. In this case players are not betting on sports events or going some place
to participate in live gaming and they are playing against each other for prizes. However,
lotteries under federal law usually require that there be no skill. This is often called the
English rule or the "pure chance" doctrine. It states that any element of skill will take the
game out of the prohibition on lotteries. It might still be predominantly chance and thus
gambling, but the federal anti-lottery statutes should not apply. This doctrine has been
accepted by a federal court of appeals interpreting the federal anti-lottery language.
"Gambling schemes where winning depends on skill or judgment are not like a lottery in
which success is determined by pure chance and is thus specially attractive to the
inexperienced and the ignorant." *Boasberg v. United States*, 60 F.2d 185, 186 (5th Cir.
1932); Annotation, Offenses Against the Mails: What is a Lottery or Similar Scheme, 96
L.Ed. 312, 314 (1952).

There are only a few federal statutes that explicitly purport to restrict the dissemination of information about gambling in the United States.  The United States Criminal Code sections entitled "Lotteries", 18 U.S.C. c.61, §§1301 to 1307; the Postal statute, 39 U.S.C. §3005; and other federal statutes dealing with federally insured financial institutions, 12 U.S.C. §§339, 1829a, 1730c, contain some broad language relating to lotteries.  The principal limit on broadcasting is found in Title 18 §1304 of the United States Code, which states:

> Whoever broadcasts by means of any radio or television station for which a license is required by any law of the United States, or whoever, operating any such station, knowingly permits the broadcasting of, any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance...[shall be subject to punishment].

The FCC has never extended the definition of "broadcast" to include the Internet.

The limits on mail advertising are found in 18 U.S.C. §1302:

> Whoever knowingly deposits in the mail, or sends or delivers by mail:
> Any letter, package, postal card, or circular containing any lottery, gift enterprise, or similar scheme offering prizes dependent in whole or in part upon lot or chance;
>
> Any lottery ticket...
>
> Any check, draft, bill, money, postal note, or money order, for the purchase of any ticket...
>
> Any newspaper, circular, pamphlet, or publication of any kind containing any advertisement of any lottery, gift enterprise, or scheme of any kind offering prizes dependent in whole or in part upon lot or chance...[shall be subject to punishment].

In practice, the Postal Service is severely limited in its ability to open mail and has almost no interest in restricting dissemination of lottery information, other than mail frauds and blatant use of the mails by foreign lottery sales agents.

The last regulator to be concerned about is the Federal Trade Commission ("FTC").  The FTC's domain is limited to unfair trade practices, particularly deceptive and unfair acts in commerce.  Federal Trade Commission Act 5.  The FTC found widespread abuses with commercial promotional games and sweepstakes, including "coercion of dealers, seeding of winners, non-random distribution for promotional purposes, and breaking of game security." Federal Trade Commission--Trade Rule on Games of Chance in the Food Retailing and Gasoline Industries--16 C.F.R. 419.1 (1969), 31 Ohio State L.J. 610, 612 (1970).  In practice the FTC has not brought any proceedings

Rose, Legal Opinion: BetZip
October 13, 2006

against commercial promoters in years. Kent, Advertising Law: Regulation of Sweepstakes, 193 N.Y.L.J. 1 (Sept. 27, 1985).

The FTC has eliminated the formal requirements listed below. However, it retains the power to go after an interstate enterprise that it feels is conducting an unfair trade practice. Any game would meet the FTC's unpublished standards if it did all of the following:

1) Advertising must not misrepresent participants' chances of winning any prize;
2) Advertising must clearly and conspicuously disclose:
   a) The exact number of prizes to be awarded and the odds of winning each prize [number of participants],
   b) The geographic area covered by the program.
   c) The total number of retail outlets participating in the program, if any;
   d) The scheduled dates of the drawings [in this cases the tournaments].
3) Information about winners must be made available and must be kept by the businesses involved for at least three years.
4) The drawings [games] cannot be held early.
5) Complete and accurate records must be kept.
6) The rules cannot be changed in the middle of the program.

Many of these regulations are routinely printed on the back of mail-in sweepstakes run by commercial firms. BetZip has made these rules available on its website and on each of its hard-copy advertisements, thus avoiding any possible problems from the FTC. It is also standard practice to include the following language in commercial sweepstakes, although their legal effect is questionable: "void where prohibited by law," "employees of [the sponsors, stations, retail stores, etc.] are not eligible for prizes." As Kraft, Inc., discovered, it is also a good idea to make it clear in the rules what happens if a mistake occurs. Kraft had not put conspicuously a notice that prizes would not be awarded in case of printing errors. Kraft faced a class action suit because an error allowed thousands of people to claim the grand prize.

Complying with the FTC rules, even if not required, does more than just avoid entanglements with the FTC. Many of the states have passed "little FTC acts," which allow the individual state attorneys general to prosecute and close down operations committing unfair trade practices. The standards laid down by the FTC are usually accepted as the standards that must be met under these state statutes.

## 2. Consideration Under Federal Law

The legislative history of the federal restrictions and prohibitions on gambling, especially the anti-lottery statutes, indicate Congress was concerned with games in which contestants were required to pay money to enter and merchandising schemes where participants were forced to buy goods to obtain chances to play. 26 Cong. Record 4313 (1894) (Remarks of Mr. Gorman). Until recently, the federal government had no interest in games or contests where no payment or purchase was required to enter. Perceived

abuses in magazine subscription no-purchase-necessary sweepstakes led to Congress enacting the Deceptive Mail Prevention And Enforcement Act in 1999, amending the Postal Bill, 39 U.S.C. §3001, to regulate mailings of sweepstakes and contests. The statute eliminates any doubt that no-purchase-necessary sweepstakes are legal under federal law, so long as the sweepstakes follows the federal rules. The statute is concerned with mail order sweepstakes and should not apply to games conducted over the Internet.

The FCC and the DOJ have the power to enforce the 18 U.S.C. §1304 prohibitions on broadcast information related to lotteries. *Federal Communications Comm'n. v. American Broadcasting Co.*, 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699 (1954) ("*FCC v. ABC*").

The FCC defines a lottery as follows:

> [T]he Commission will in any event consider that a program [is a lottery] if in connection with such program a prize consisting of money or other thing of value is awarded to any person whose selection is dependent in whole or in part upon lot or chance, if as a condition of winning or competing for such prize, such winner or winners are required to furnish any money or other thing of value or are required to have in their possession any product sold, manufactured, furnished or distributed by a sponsor of a program broadcast on the station in question.

47 C.F.R §73.121 (2004).

> [I]t is well settled that the necessary elements of such a scheme are (1) the awarding of a prize, (2) upon a contingency determined by chance, (3) to a person who has paid or agreed to pay a valuable consideration for the chance to win the prize.

*Public Notice Concerning Lotteries and Sales Promotions*, 18 F.C.C.2d 52 (1969).

> Clearly, consideration is present when the contestant is **required** to pay money or give something of value for the chance to win a prize. Therefore, the promotional scheme must not **require** a purchase or the risking of money or other things of value. The mere acts of appearing, registering and securing free paraphernalia, standing alone, do not constitute sufficient consideration to support a finding of a lottery.

*Greater New Orleans Broadcasting Association*,10 F.C.C.R. 3804, 1995 WL 154867 (1995)(emphasis added).

> If persons may participate in the scheme "free of charge," if free chances are made available to them, then the element of consideration is not present and the scheme does not constitute a lottery within the meaning of Section 1304. However, to thereby eliminate the element of consideration

necessary to support a lottery finding, the free chances must be reasonably equally available to all participants in the contest.

*Commonwealth Broadcast of Northern California*, 7 F.C.C.R. 4951, 1992 WL 12010148 (1992).

The Postal Service and DOJ have the power to enforce those federal anti-lottery statutes that relate to material placed in the U.S. mail. The federal statutes are to be construed together, so that the same standard that applies to broadcast will apply to the mails. *FCC v. ABC, supra.*

Fortunately, the United States Supreme Court has rendered a decision on the issue of what is consideration under the federal anti-lottery laws. The high Court has sided with those jurisdictions that require more than any mere benefit or detriment for there to be consideration. The leading case, *FCC v. ABC, supra*, involved the prohibition on broadcasting, 18 U.S.C. §1304, and thus binds the FCC. The decision also specifically states that the broadcasting restrictions are based on the postal laws and thus should bind the Postal Service and the DOJ. The federal anti-gambling laws are required to be read together, so the decision would also bind the FTC and all other federal agencies.

The *FCC v. ABC* case resolved the question of whether broadcast "give-away" programs were legal. A typical program was "Stop the Music," which had home contestants selected at random from postcards mailed in at the contestants' expense. Contestants had to give the title to a musical selection just played on the air. The United States Supreme Court unanimously held that there was no consideration, even though contestants were required to purchase postage for a postcard, had to expend effort to fill out the card and listen to the shows, and the show received benefits in terms of a larger audience.

To be eligible for a prize on the "give-away" programs involved here, not a single home contestant is required to purchase anything or pay an admission price or leave his home to visit the promoter's place of business; the only effort required for participation is listening.

We believe that it would be stretching the statute to the breaking point to give it an interpretation that would make such programs a crime. Particularly is this true when through the years the Post Office Department and the Department of Justice have consistently given the words "lottery, gift enterprise or similar schemes" a contrary administrative interpretation. Thus the Solicitor of the Post Office Department has repeatedly ruled that the postal lottery laws do not preclude the mailing of circulars advertising the type of "give-away" program here under attack.

347 U.S. at 294.

The fact that some FAME participants may have to travel to a library to obtain free Internet service is irrelevant. Florida was the last state to find consideration in such a situation. In October 1999 the Florida Department of State announced that the State of Florida had reevaluated its position and would no longer require a free offline method of entry provided no other consideration is required in order to participate. Promotion Marketing Association, Inc., "Law Bulletin," Special Bulletin (Oct. 26, 1999). See Collins, Jennifer L., "Internet Sweepstakes: Marketing Tool or Minefield?" at <http://www.commlaw.com/FSL5CS/news%20bites/news%20bites1346.asp>.

The United States Supreme Court reiterated the standard to be applied in deciding whether something is a lottery under the federal law: The lottery prohibitions are criminal statutes and thus must be strictly construed, and the definition must be uniform across all departments of the federal government. 347 U.S. at 296. Uniform application should prevent the federal government from trying to stretch any other statute, such as the prohibition on interstate transmission of wagering information, 18 U.S.C. §1084, or the prohibition on interstate transportation of wagering paraphernalia, 18 U.S.C. §1953, to reach a lottery-like promotion which lacks consideration. These and similar statutes only apply to individual and companies in the business of gambling. The statutes should also be construed as narrowly as possible to preserve their constitutionality under the First Amendment. *Greater New Orleans Broadcasting Association, Inc. v. United States*, 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999). They thus would not apply to poker tournaments where players may enter without paying any fee or making any purchase.

In *Caples Company v. United States*, 243 F.2d 232 (D.C.Cir. 1957), the majority rejected the arguments raised in the dissent that consideration could be found in the effort expended by contestants to pick up entry forms at selected stores or in the fund created by advertisers. The *Caples* court went on to discuss the issue of participants' spending incidental money to enter in light of the *FCC v. ABC* case.

> The give-away program involved in the *American Broadcasting* case required the home contestant to answer his telephone and, in some instances, to have sent his name to the station in advance of the broadcast. Since the Court did not refer to those required activities, it apparently viewed them as insignificant for decisional purposes.

*Id.*, at 233 n. 4.

In addition, the general acceptance of "no purchase necessary, send in a self-addressed stamped envelope" sweepstakes over the last five decades would make it impossible for the DOJ, FCC or Postal Service to argue that there was consideration, under the federal laws, for a game which had a FAME. See for example *Haskell v. Time, Inc.*, 965 F.Supp. 1398 (E.D. Cal. 1997).

The FCC is the leading federal agency in deciding whether an activity is a lottery. Due to the statutory scheme, it is usually the broadcaster who is at risk; thus most of the cases involve the question of whether fines should be imposed on broadcasters. The

standard for imposition of a fine is by a preponderance of the evidence, and the FCC puts the burden on the broadcaster to investigate how a contest is actually conducted, not merely how it is advertised. _Metromedia, Inc._, 60 F.C.C.2d 1075 (1976).

Since the federal anti-lottery statutes contain no definition of the elements of a lottery, let alone what constitutes consideration, the FCC has developed its own body of law, based primarily upon the case decisions of the state from which the broadcast originates. The FCC is in the minority of jurisdictions that require that the consideration not only be money expended by contestants, but that the money flows directly or indirectly to the contest promoter. Cf., _Greater Indianapolis Broadcasting Co., Inc._, 44 F.C.C.2d 37, 39 (1973); _Smith Broadcast Company, Inc._, 87 F.C.C.2d 1132(1981); _Greater New Orleans Broadcasting Association_,10 F.C.C.R. 3804, 1995 WL 154867 (1995). Because BetZip does not receive any of the money expended on paper or postage, the games do not have consideration under the decisions of the FCC.

The FCC looks for guidance to state decisions because of the controlling language of the United States Supreme Court in the _FCC v. ABC_ case: "we must look primarily to American decisions, both judicial and administrative, construing comparable anti-lottery legislation." 347 U.S. 284, 292. _The Noble Broadcasting Corp._, 1 F.C.C.2d 161, 179 (1964).

The FCC has stated that whether a promotion is a lottery "must be made in light of all of the surrounding conditions." _Keith L. Reising et al._, 3 F.C.C.2d 904, 905 (1966). The regulators have thus found contests to be lotteries where it was improbable that anyone would enter a contest without making a purchase. _Id._ In that particular case the advertisement stated that a purchase was necessary to participate, efforts were made to have all registrants purchase merchandise, and no statement directed to the public indicated how one might participate without a purchase. _Id._ "No purchase required" contests have also been found to be lotteries by the FCC when participants could obtain additional entries by making purchases, thus giving those who made purchases greater chances of winning. _WBRE-TV, Inc._, 18 F.C.C.2d 96 (1969); _Taft Broadcasting Co._, 18 F.C.C.2d 186, 1969 WL 16256 (1969). BetZip ensures that information about the FAME is given to all potential contestants. The fact that players have entered for free proves that the offering of the FAME is not a scam. To increase the percentage of players entering for free BetZip is making the availability of the FAME even more prominent on its website and in advertisements.

### 3. Unlawful Internet Gambling Enforcement Act

On September 23, 2006, Congress approved a new federal law, the Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA), as title VIII of the unrelated SAFE Port Act, H.R. 4954 (109th U.S. Congress (2005-2006). The operative parts of the UIGEA will be codified at 31 U.S.C. §§5361-67. It creates a new crime, accepting funds for illegal gambling, and calls upon federal regulators to make regulations requiring money transferors to identify and block transactions to unlawful gambling websites.

The UIGEA does not affect BetZip.  BetZip is obviously not a financial institution or other money transferor, so the only potential liability would be for being in the business of betting or wagering.  The UIGEA expressly exempts games where the players have no risk of losing any money:

> The term "bet or wager"... does not include... participation in any game or contest in which participants do not stake or risk anything of value other than --
> (I)  personal efforts of the participants in playing the game or contest or obtaining access to the Internet; or
> (II) points or credits that the sponsor of the game or contest provides to participants free of charge and that can be used or redeemed only for participation in games or contests offered by the sponsor...

52 U.S.C. §5362(1)(E)(viii).

It is important to note that this does not mean a game must have no consideration to avoid this statute.  A game can consist of prize, chance and consideration and still not be a bet or wager under this definition, if participants do not make bets or risk losing something of value.  So, even if a game required every player to pay a monthly fee to enter, so that there was consideration, it would not fall under this statute if players could not then make bets of real money or points or credits.

BetZip does not allow players to make bets with real money, nor with points or credits.  Participants cannot stake or risk anything of value.  BetZip supplies players with play money that is not redeemable.  The points that successful players can accumulate for prizes cannot be used as a stake or risked.  Players who participate using a FAME obviously are not risking anything of value.  But so are players who pay a monthly membership fee, since that fee remains the same and is non-refundable whether a player wins, loses or does not play a single game.

The UIGEA also requires that the Internet gambling violate some other federal or state law:

> The term "unlawful Internet gambling" means to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made.

52 U.S.C. §5362(10).

As discussed above, BetZip does not directly violate any other federal law, such as the Wire Act, 18 U.S.C. §1084, and the anti-lottery statutes, 18 U.S.C. §§1301-1307, because some of the statutes are limited in their reach and would not apply to poker, and

Rose, Legal Opinion: BetZip
October 13, 2006

Page 12

all require that there be consideration. There is no consideration for the BetZip games under United States Supreme Court precedents.

There are additional federal statutes that make illegal gambling a federal offense. These include The Travel Act, 18 U.S.C. §1952; Interstate Transportation of Wagering Paraphernalia, 18 U.S.C. §1953; Illegal Gambling Business under The Organized Crime Control Act, 18 U.S.C. §1955; and, Racketeer Influenced and Corrupt Organizations, 18 U.S.C. §§1961-1968. All these statutes require that there be one or more predicate crimes, such as violations of state anti-gambling laws. BetZip is not violating any state anti-gambling laws, because it is only offered in a state where its FAME eliminates the element of consideration required by that state's anti-gambling statutes.

There is also a presumption that a state criminal statute does not extend beyond the borders of that state unless it expressly says so. For example, the Model Penal Code, which has been adopted by a majority of states, delineates the subject matter jurisdiction of a state's criminal laws in great detail. Significantly absent is a provision that allows a state to prohibit acts occurring outside its borders merely because the alleged perpetrator or victim is a resident of that state.

Interestingly, one of the section's principal authors, Herbert Wechsler, used gambling as an example of the need for legislatures to be particularly explicit if they intend a criminal statute will apply to extraterritorial conduct:

> . . . if this state attempts to reach conduct outside the state or conduct involving the result which is going to occur in another jurisdiction where it would not be an offense, it is only where the legislative purpose plainly appears to reach conduct in this state, regardless of where the result is to occur, that the statute is to apply . . . If the state wants to make gambling criminal, for example, when the wager is to be placed in another state – which it may want to do – it may do so, so far as that is constitutional; but you read the statute carefully to see that the legislature really meant to do that and was not only dealing with wagers within the state.

Proceedings, 39th Annual Meeting of ALI (1962) at 63-64.

Even if a state anti-gambling statute appears to apply to BetZip's operations, they probably do not. Dormant Commerce Clause jurisprudence forbids individual states from regulating within their borders commerce that is essentially national or international in character in such a way as to "burden" interstate or international commerce.

The dormant Commerce Clause issue arises when Congress has not spoken clearly on a particular issue. This is the case with Internet gambling. In their constitutional law treatise, Professor John Nowak and Professor Ronald Rotunda summarize this area of jurisprudence by stating "that local legislation that thwarts the operation of the common market of the United States exceeds the permissible limits of the dormant Commerce Clause."

Rose, Legal Opinion: BetZip
October 13, 2006

Page 13

Because some states might opt to legalize on-line gambling, legislation in other states aimed at prohibiting on-line gambling undoubtedly would disrupt the common market of the United States and violate the dormant Commerce Clause.

Michael P. Kailus, Note, Do Not Bet on Unilateral Prohibition of Internet Gambling to Eliminate Cyber-Casinos, 1999 U.Ill.L.R. 1045, 1076 (1999).

The UIGEA does not apply to BetZip because it expressly exempts games where participants do not risk losing anything of value, and because it requires that there be a bet or wager that violates some other federal or state law. There is no other federal law that could apply and BetZip is not offered in states where it would be illegal.

## 4. Skill Under Federal Law

The amount of luck or skill involved in any game has always been important in determining whether or not the game is a form of gambling. Some courts have gone further and looked at the amount of skill and luck to determine whether the game was a lottery. The poker tournaments in question should be considered contests of skill. This cannot be stated to a legal certainty since no federal court has issued a published opinion on whether poker or poker tournaments are games where skill predominates over chance.

As noted earlier, federal laws prohibiting lotteries have been held to only apply to games in which no skill is present. *Boasberg v. United States, supra*, Annotation, Offenses Against the Mails: What is a Lottery or Similar Scheme, *supra*. Federal statutes are often limited to "lotteries" rather than all forms of gambling. See, e.g. 18 U.S.C. §1304; Applicability of Lottery Statutes to Contests and Sales Promotions, 18 F.C.C.2d 52 (1969). Under federal law as it now exists, any significant amount of skill takes the game out of the category of "lottery." Many statutes do not prohibit all forms of gambling; by their own wording they are limited to lotteries and thus would not apply even to the underlying poker games, let alone to the tournaments themselves.

No federal statute or regulation explicitly prohibits Americans from playing games of any type. Because the Internet is so new, there are very few federal laws of any kind dealing with on-line activities. No federal law or regulation explicitly mentions Internet gambling, gaming, lotteries, games of chance or contests of skill. Congress has very little interest in gambling, whether legal or illegal, so there are relatively few federal statutes dealing with gambling of any type. Congress has passed laws to attack organized crime, which make it a federal crime for a business to be involved in gambling, under some circumstances. The federal anti-gambling statutes and regulations would not apply to contests of skill that are not gambling. The Wire Act, 18 U.S.C. §1084, for example, applies only to persons who are in the "business of betting or wagering." Because the contest is a game of skill, the operator should not be found to be in the "business of betting or wagering" even if a court found there was consideration.

## B. State Law

Rose, Legal Opinion: BetZip
October 13, 2006

States are free to define gambling and its three elements – prize, consideration and chance – in any manner they wish. BetZip offers prizes of value. However the overwhelming majority of, if not all, states would find that there is no consideration present. States should also find that the poker tournaments are predominantly skill, although no court has looked at this issue.

### 1. **Consideration Under State Law**

In the last 100 years there has been a tidal change in the way states define consideration for gambling. Early in American history states defined consideration for gambling the same as consideration for contracts, meaning any expenditure of money or effort or any benefit gained. A completely different definition of what is consideration developed when commercial promotions became common. See, Volner, The Game Consumers Play: "Giveaway" and The Law -- A Conflict of Policies, 25 Fed. Communications B.J. 121, 129 (1972). The split in the lines of cases began in 1890 with the case of *Yellow-Stone Kit v. State*, 88 Ala. 196, 7 So. 338 (1890). In that case, the Alabama Supreme Court held that a promoter did not conduct an illegal lottery because he did not require those participating in the drawing to purchase tickets. There was no consideration because the payment of money was not a condition precedent (a requirement) for obtaining a chance to win.

This definition of consideration is followed today by virtually all the states, as well as the federal government. According to the laws of these jurisdictions, for there to be consideration the player must pay money to participate. A few jurisdictions indicate the money must be paid to the promoter; however, the majority look only at whether the participants are required to expend money, not who receives the funds. Incidental expenses, such as the cost of postage stamps, have so far been ignored by courts in deciding whether consideration is present. See, e.g., Federal Communications Comm'n. v. American Broadcasting Co., 347 U.S. 284 (1954).

A minority of states originally rejected this definition of consideration for defining what is gambling. In these states consideration was found if there was any benefit to the lottery operators or any detriment to the player. In one of the leading cases for this definition of consideration, *State ex rel. Schillberg v. Safeway Stores, Inc.*, 75 Wash.2d 351, 450 P.2d 949 (1969), the Washington Supreme Court held a "bonus bingo" game was illegal where participants had to visit the store to obtain a booklet of game cards, pick up prize slip numbers, and present the winning card. Although no purchase was required, the Court found consideration in the benefit Safeway obtained by having people visit its stores and in the time and effort participants had to expend in filling out forms.

Every state seems to have now realized the futility of trying to limit such free promotional sweepstakes. The Washington Legislature, for example, reacted to the Safeway Bonus Bingo case by passing a statute specifically allowing grocery stores, and others, to conduct "promotional contests of chance," so long as certain requirements are met. The Legislature then expanded the exemption of free entries to include other games.

A few states found consideration if some of the participants paid something to enter, such as purchasing merchandise, even if no purchase was required. See, e.g., *Kroger Co. v. Cook*, 24 Ohio St.2d 170, 265 N.E.2d 780 (1970). In *Idea Research and Development Corp. v. Hultman*, 131 N.W.2d 496 (Iowa 1964), the court found "There is consideration for all participants [in a television bingo game] when some pay or buy merchandise and others do not." Id., at 499. This reasoning is clearly wrong, and, in fact, irrational. The states that find consideration from any expenditure of effort or benefit have some basis in law: they are applying the standard for what is adequate consideration for a contract to the question of what is adequate consideration for gambling. But there is no basis for finding consideration for a person who pays nothing from the fact that some other person voluntarily pays something. Id., 265 N.E.2d at 783 (Duncan, dissenting). The idea that consideration can somehow be created by looking at the total received by the distributor has been rejected by virtually every jurisdiction that has considered the question, including California. *California Gasoline Retailer v. Regal Petroleum Corporation of Fresno*, 50 Cal.2d 844, 330 P.2d 778, 784 (1958).

Most of the cases defining what is consideration for gambling were decided during the Depression and involve "bank nights." Movie theaters offered drawings for dishes and other valuables. To avoid being declared a lottery, the theaters would give away free raffle tickets before the show to anyone who asked for one at the box office, and participants did not have to be present to win. The purpose of the bank nights was to draw people into the theaters, since most people would not want to wait around for hours on the streets to hear the results of the drawing. Most of the states that decided the issue found that there was no consideration, since no purchase was necessary.

All jurisdictions agree that consideration is present if any participant is required to give the promoters money to enter the game. This would include requiring participants to purchase merchandise or services. If anyone is required to make a purchase to participate, the game technically becomes a "gift enterprise," which is legally equivalent to a lottery in all respects. This is true even if the price of the goods or services required to be purchased is the same with or without the right to participate in a game. Similarly, giving additional entries to customers who make purchases would create consideration. At least one court has ruled that where the number of players entering for free was infinitesimal, the FAME was a sham and the game was a lottery. *F.A.C.E. Trading, Inc. v. State of Michigan*, No. 01-94308-CZ (Michigan, Ingham County Circuit Court) (adopting the position of the author, Prof. I. Nelson Rose), affirmed on slightly different grounds, *Face Trading Inc. v. Department of Consumer*, 270 Mich.App. 653, 717 N.W.2d 377 (2006). If the percentage of players entering for free does becomes too small, relative to the percentage of players entering through paid memberships, BetZip will make the availability of the FAME even easier. BetZip has ensured, and will continue to make efforts to ensure that no expenditure of money is required to participate in the poker tournaments and that no advantage in the tournaments is received by any participant who buys a subscription.

One of the leading opponents of lotteries and sweepstakes, Judge Francis Emmett Williams, has argued that there are actually three distinct classes of lotteries: "closed

participation," "open participation," and "flexible participation." WILLIAMS, FLEXIBLE
PARTICIPATION LOTTERIES 192-195 (1938); cf., Williams, LOTTERIES, LAWS AND
MORALS (1958). A "closed participation" lottery is the traditional lottery in which
purchase of goods or services or of a lottery ticket is required to enter. In an "open
participation" lottery, none of the participants are required to do anything to participate
and no offer of any kind is extended as an inducement to enter. Under Williams'
definition it would be practically impossible to have an "open participation" lottery, since
there would be no incentive to run one, even by a sponsor willing to pay for all of the
costs of participation. In his view, the "flexible participation" lottery professes to be free,
because some can enter for free; but in reality this lottery is closer to the "closed
participation" type since restrictive conditions make the scheme much more favorable to
paying participants than non-paying. These classifications have been raised in many
cases, but are now almost always rejected.

       This language of "closed participation" and "flexible participation" was raised by
the California Attorney General in that state's leading lottery case and the distinctions
explicitly rejected by the California Supreme Court. *California Gasoline Retailer v.
Regal Petroleum Corporation of Fresno*, 50 Cal.2d 844, 330 P.2d 778, 786 (1958).
Having lost the argument that the promotional contest was a "flexible participation"
lottery, the Attorney General argued that the case of *People v. Gonzales*, 62 Cal.App.2d
274, 144 P.2d 605 (1944), laid down the rule in California that a "closed participation"
lottery exists where the distribution of tickets to persons who have not made purchase is
not substantial or is negligible in comparison with those distributed to customers. The
Supreme Court rejected any numerical or proportionality test

       [I]t would appear that this argument is without merit. If any person could
       receive a ticket or tickets without paying anything therefore, it would
       appear that the question of consideration should not rest on the percentage
       of those receiving tickets with purchases as opposed to those receiving
       tickets without such purchases.

*Id.*, 330 P.2d at 787.

       The case is worthy of detailed analysis both because the state Attorney General
raised almost every argument that has ever been tried against a game where players may
enter for free and he failed to convince the Court that this was a lottery.

       Free game pieces were distributed at gas stations. In some cases participants were
required to register at the stations; in some cases the price of gasoline was increased to
cover the cost of the contests; one dealer testified that he gave more tickets for larger
purchases, while another gave tickets both before and after purchases. The Court found
there was no consideration and thus no lottery under California law.

       The Court rejected the Attorney General's argument that "patronage from the ticket
holders as a whole constituted consideration for the distribution of the prizes, even though
the individual holders of tickets had not parted with consideration for the individual

tickets held by them." 330 P.2d at 784. This argument had previously been rejected in the bank night case of *People v. Cardas*, 137 Cal.App.Supp. 788, 28 P.2d 99 (1933). (Bank nights were popular during the Depression. Theaters had drawing awarding prizes like dishes to the winners. Cases throughout the nation held these were not lotteries if participants were not required to buy theater tickets to enter the drawings.) Quoting that case, the Supreme Court specifically held

> The question of consideration is not to be determined from the standpoint of the defendant, but from that of the holders of the prize tickets. The question is: Did the holders of prize tickets pay a valuable consideration for the chance? Certainly those who received prize tickets without buying an admission ticket did not pay anything for the chance of getting the prize. They did not hazard anything of value. It would then seem to follow that those who purchased admission tickets and received prize tickets, not at the box office, but from another employee, could not be said to have paid a consideration for the prize tickets since they could have received them free.

*Id.*, 330 P.2d at 784.

The Court specifically rejected the argument that consideration could be found in the increased patronage to the gas stations. Quoting a Colorado case, *Cross v. People*, 18 Colo. 321, 32 P. 821 (1893), holding a promotional game not a lottery, the California Supreme Court stated

> The fact that such cards or chances were given away to induce persons to visit their store with the expectation that they might purchase goods, and thereby increase their trade, is a benefit too remote to constitute a consideration for the chances. Persons holding these cards, although not present, were, equally with those visiting their store, entitled to draw the prize. The element of gambling that is necessary to constitute this a lottery within the purview of the statute, to wit, the paying of money, directly or indirectly, for the chance of drawing the piano, is lacking . . .

*Id.*, 330 P.2d at 785.

The Court held that registration alone is not consideration. Quoting another California case, *People v. Carpenter*, 141 Cal.App.2d 884, 297 P.2d 498 (1956), the Court stated

> Certainly those who registered upon request of a solicitor without attending the theater did not pay for the chance of getting the prize; neither did those who later registered without purchasing an admission ticket. Those, who purchased admission tickets and then registered while they were at the theater as patrons, cannot be said to have paid a consideration for the privilege of registering, as they could have done so without buying an admission ticket. Once a person's name was registered, it might be drawn at

any bank night thereafter, and it was not necessary that he purchase an admission ticket either to listen to or see the bank night drawing or to claim the award if his name was called.

*Id.*, 330 P.2d at 785.

## 2. Skill v. Chance Under State Law

Every state has statutes and case law stating that even if a game costs a player money to enter and therefore has "consideration," and the winner will receive a thing of value, a "prize," the contest is technically not gambling if skill predominates over chance in determining the winner. The test is stated in different ways by different courts. At a minimum, the outcome of a game must be determined by chance for it to be gambling.

A game has been defined as a "contest for success or superiority in a trial of chance, skill, or endurance." When used in connection with gambling, a game is anything that is used as a means of playing for money or other stakes, with the result depending more on chance than on skill.

19 Am.Jur.POF 647.

[W]e construed the phrase "the award of which is determined by chance, even though accompanied by some skill," an element in the definition of lottery, see §945.01(5)(a), Stats., to mean that "[c]hance ... rather than skill must ... be the dominant factor controlling the award...."

*State v. Hahn*, 221 Wis.2d 670, 679, 586 N.W.2d 5, 10 (1998).

See also *Hotel Employees and Restaurant Employees International Union v. Davis*, 21 Cal.4th 585, 981 P.2d 990, 88 Cal.Rptr.2d 56 (1999), where the California Supreme Court cited GAMBLING AND THE LAW (1986), written by the author of this Legal Opinion.

It is important to note that there is no "house" and that no individual can place a wager on a contest between other players in these poker tournaments. As the official commentator to the New York anti-gambling laws put it:

"Gambling" is not defined purely in terms of betting or risking something of value upon a contest of chance. The point may be illustrated by considering a chess game between A and B, with A and B betting against each other and X and Y making a side bet. Despite the character of the game itself as one of pure skill, X and Y are "gambling" because, from their standpoints, the outcome depends upon "chance" in the sense that neither has any control or influence over it. The same is not true of A and B, who are pitting their skills against each other; they, therefore, are not "gambling." It is this feature that requires a definition of "gambling" to embrace not only a person who wagers or stakes something upon a game of

chance but also one who wagers on "a future contingent event [whether involving chance or skill] not under his control or influence."

William C. Donnino, Practice Commentary McKinney's Penal Law Ch. 40, Pt. 3, T. M, Art. 225, Refs & Annos. (1999).

There are few specific state statutes dealing with gambling on the Internet, and even fewer that might include contests of skill. Still, many state attorneys general have taken the position that any gambling offered on the Internet and available to residents of their particular states is a violation of that state's laws. Entry fees for contests of skill are rarely considered gambling under state laws. A case involving a contest which was not even predominantly skill contains typical language:

> With respect to [one Defendant], its "Presidential Skill Contest" requires listing presidents in order of date of service, answering an essay question, and a "wordfind." In order to qualify as a contest under the statute, the game must require some combination of skill and chance, but skill need not dominate the game. See Cal.Bus. & Prof.Code §17539.3(e). In considering whether a game requires skill, the court looks to whether the players "exercise some control over the outcome." [This] game requires skill. The rules explain how entries are judged and players can improve their responses and, thus, their chances of winning. These contests include both skill and consideration and are not, therefore, illegal lotteries. Plaintiff's claim that [this] skill contest is an illegal lottery is dismissed.

_Haskell v. Time, Inc._, 857 F.Supp. 1392, 1404 (E.D. Calif. 1994).

Even if there is a prohibition on betting on games of skill, these laws usually exempt the actual participants. In practice, law enforcement is not concerned with legitimate contests of skill, where the participants have to pay an entry fee, and no one is allowed to place a bet on another person.

It would take a detailed examination of each state's statutes, regulations, case law and attorney general opinions to ensure that any particular manner of operating a game of skill was not in technical violation of a state's laws. Nevada, for example, was the first state to explicitly outlaw Internet gambling. NRS §§465.091-465.094. Naturally, Nevada's own licensed casinos and race and sports books are exempt. The statute makes it illegal to accept a wager from a person physically in Nevada. "Wager" is defined separately as "a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain." NRS 463.0192. This does not mean that contests of skill cannot be conducted on the Internet with participants from Nevada. The Nevada Supreme Court held in _Las Vegas Hacienda, Inc. v. Gibson_, 77 Nev. 25, 359 P.2d 85 (1961), that a wager does not include an entry fee paid by a participant in a contest, where the prize must be given by the operator of the contest if a participant meets the contest's requirements. In that particular case, the owner of a golf course offered to pay $5,000 to any person who, having paid 50 cents for the opportunity to do so, shot a hole in one.

The Court held that is contest of skill was legal, because the prize was not created out of entry fees. So in states like Nevada, the contest winner would have to receive an award of a fixed amount, announced in advance.

Any state law which would completely outlaw games of skill, and therefore these poker tournaments, is probably unconstitutional. The Commerce Clause of the United States Constitution has been construed by the United States Supreme Court as barring states from interfering with interstate and international commerce under certain circumstances. This constitutional barrier to a state attempting to infringe on commerce from other states and foreign nations is known as the Dormant Commerce Clause. Dormant Commerce Clause jurisprudence forbids individual states from regulating within their borders commerce that is essentially national or international in character in such a way as to "burden" interstate or international commerce.

The dormant Commerce Clause issue arises when Congress has not spoken clearly on a particular issue. This is the case with Internet gambling. In their constitutional law treatise, Professor John Nowak and Professor Ronald Rotunda summarize this area of jurisprudence by stating "that local legislation that thwarts the operation of the common market of the United States exceeds the permissible limits of the dormant Commerce Clause." Because some states might opt to legalize on-line gambling [as Nevada now has done] legislation in other states aimed at prohibiting on-line gambling undoubtedly would disrupt the common market of the United States and violate the dormant Commerce Clause.

Michael P. Kailus, Note, Do Not Bet on Unilateral Prohibition of Internet Gambling to Eliminate Cyber-Casinos, 1999 U.Ill.L.R. 1045, 1076 (1999).

Applying state law to Internet gambling risks the Internet activities being subjected to conflicting laws, imposed by different states with different priorities. A related concern is the risk that a tiny, conservative state or country, or even county or city, could effectively impose its standards of morality on the rest of the planet. This threat materialized in 1995, when CompuServe temporarily blocked access worldwide to over 200 Internet sites, after a single prosecutor in Munich, Germany, alleged that the sites contained sexual and other material that violated German law.

A few states have begun regulating contest of skill, to ensure the games give fair notice, are not rigged and the winner is paid. California, for example, has detailed requirements for skill contests, focusing mainly on giving adequate notice to all participants. Calif. Bus. & Prof. §§17539-17539.3. The operators of these poker tournaments should have no trouble meeting these requirements. It must be noted, however, that the requirements must be met or the operators would be violating this law, even though the contest is not gambling.

Arizona enacted a stricter statute, limiting the size of prizes that may be awarded in skill contests. A game is legal as "amusement gambling" if, among other requirements:

Rose, Legal Opinion: BetZip
October 13, 2006

Page 21

Skill and not chance is clearly the predominant factor in the game and the odds of winning the game based upon chance cannot be altered, provided the game complies with any licensing or regulatory requirements by the jurisdiction in which it is operated, no benefit for a single win is given to the player or players other than a merchandise prize which has a wholesale fair market value of less than four dollars or coupons which are redeemable only at the place of play and only for a merchandise prize which has a fair market value of less than four dollars and, regardless of the number of wins, no aggregate of coupons may be redeemed for a merchandise prize with a wholesale fair market value of greater than thirty-five dollars.

ARS §13-3301 (Enacted March 15, 2000).

In practice, a court's determination of what is a game of skill often depends on the individual judge hearing the case. If a court wants to find something is a game of skill it can look to how skillful players prevail over non-skillful ones, in the long run. If, however, the court wants to declare the exact same game one of chance it will look only at the very short run, where even a novice might beat an expert due to chance results.

It is impossible to completely eliminate all chance factors. But because the prize is given to the winners of tournaments, most chance factors have been minimized. The chance distribution of the cards becomes of much less importance with the playing of numerous hands. There is no short run; even the most lucky unskilled player will find it difficult to beat the most unlucky skilled player, because the outcome is not decided by one hand of cards. Even if an unskilled player should win a few games through luck, he will then have to continue play against the winners of other games in the tournaments to obtain a prize. Of course, it takes skill to maximize your winnings and minimize your loses playing poker against players of less skill, but to minimize even this element of chance, the tournament will divide players into classes so that they will be competing against other players of roughly equal skill.

## CONCLUSION

These poker tournaments may be easily entered for free by a Free Alternative Means of Entry. These players are at no disadvantage in the playing of the individual games nor of the tournaments as a whole. There is therefore no consideration for these games under federal law or the laws of virtually every state. Even if consideration were found, it is doubtful that a federal or state court would find a poker tournament to be predominantly chance.

I. Nelson Rose

## STATEMENT OF LIMITATION AND BIOGRAPHY

This Opinion is a legal analysis based on the state of the law and the information available as of this date. It is limited to the specific question asked and the specific set of assumed facts given in the Opinion, and is not meant to apply to any other set of facts. It is limited to federal and general state gambling laws. It is not meant to be an Opinion as to the laws of any particularly state. The views expressed herein are entirely those of the author, Professor I. Nelson Rose. This Opinion may only be relied upon by MMJK LLC and any of its subsidiaries and principals, and may not be provided to or relied upon by any other person, or quoted from, or reproduced in whole or in part without the prior written permission of the author, Professor I. Nelson Rose.

Prof. I. Nelson Rose is an internationally known public speaker, writer and scholar and is recognized as one of the world's leading authorities on gambling law. He is the author of more than 1,000 books, articles and chapters on the subject. He is on the editorial boards or boards of advisors of the *Journal of Gambling Studies, Gaming Law Review*, Harvard Medical School's BASIS (Brief Addiction Science Information Source), and McGill University*'s Centre International d'étude sur le jeu et les comportement à risque chez les jeunes* (International Centre for Youth Gambling Problems and High Risk Behaviors). He is best known for his internationally syndicated column, "*Gambling and the Law®,*" and his landmark 1986 book of the same name, the first book ever written on the subject. He coauthored INTERNET GAMING LAW published in 2005.

Prof. Rose received his B.A. degree from U.C.L.A. in 1973 and his J.D. in 1979 from Harvard Law School. He is a tenured full Professor of Law and teaches one of the first law school classes on gaming law. He has been admitted to practice in California, Hawaii and federal courts, including the United States Supreme Court.

Prof. Rose has taught classes on the subject of legal gambling, including providing training to casino regulators and to the Federal Bureau of Investigation. He has made numerous public presentations, including before the National Association of Gambling Regulatory Agencies, the National Conference of State Legislatures, the European Association of State Lotteries (AELLE) (translated into French, Spanish, Portuguese, and German) and the Federal Reserve Bank of Boston; seminars on the law of lotteries for the North American Association of State and Provincial Lotteries' and its attorneys; and continuing education programs for the District Attorneys of Wisconsin, the State Bar of South Dakota and the Certified Public Accountants of Nevada and Colorado.

Prof. Rose has testified in numerous administrative, civil and criminal cases on the regulation of gambling and has been recognized by courts as an expert witness on gambling, including lotteries and sweepstakes. His work has been cited by federal and state courts including the Supreme Courts of California, Mississippi and North Dakota. He has been retained to testify as an expert on gambling for governments and industry, including the states of Arizona, California, Florida, Illinois, Michigan, New Jersey, New Mexico, Texas and Washington; the province of Ontario; and the federal governments of Canada, Mexico and the United States.