1  GREENBERG TRAURIG, LLP
   MATTHEW S. STEINBERG (SBN 82969)
2  STEVE P. HASSID (SBN 219913)
   2450 Colorado Avenue, Suite 400 East
3  Santa Monica, California  90404
   Telephone: (310) 586-7700
4  Facsimile:  (310) 586-7800
   Email:  steinbergm@gtlaw.com; hassids@gtlaw.com
5
   Attorneys for Defendant
6  Ultimate Blackjack Tour, LLC

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  MMJK, Inc.,                          CASE NO.  C 3:07-CV-03236-BZ

12              Plaintiff,               **DECLARATION OF L. KENNETH
                                         ROSENTHAL IN SUPPORT OF
13  vs.                                  DEFENDANT'S SURREPLY**

14  ULTIMATE BLACKJACK TOUR, LLC         **[Filed Concurrently with Defendant's
                                         Surreply and Affidavit of Paul Forrest
15              Defendant.               Hickman in Support thereof]**

16
                                         DATE:       August 15, 2007
17                                       TIME:       10:00 a.m.
                                         LOCATION:  Courtroom G
18                                       JUDGE:     Hon. Bernard Zimmerman

19

20

21

22

23

24

25

26

27

28

I, L. Kenneth Rosenthal, do hereby declare as follows:

1.    I have read the Reply filed by the Plaintiff MMJK, Inc. in this matter and in particular have focused on the allegations made by them and against the statements that I made in my Declaration of July 24, 2007 ("July Declaration").

2.    I respond to those allegations in this Declaration.

3.    Throughout this Declaration, I refer to Exhibits A through O from my July Declaration. Any Exhibits that have not yet been filed with the Court in this case are lettered consecutively starting from the letter P.

4.    At the outset, I incorporate the statements I made in my July Declaration herein and confirm that the statements I made in my July declaration, where appropriate, would also apply to what one of ordinary skill in the relevant art would understand and conclude. Prior statements that I made regarding the disclosure or teaching in a prior art reference refer to what I believe the prior art reference discloses or teaches to one of ordinary skill in the art.

5.    One of ordinary skill in the art would understand the prior art discussed herein and in my July declaration to teach, independently and in combination, all of the limitations of the claims of United States Patent No. 7,094,154 to Kellerman et al. ("the '154 patent").

6.    After considering the relevant prior art and the *Graham* factors and what the prior art teaches to one of ordinary skill in the art, including any teachings away from the alleged inventions claimed in the '154 patent, I have concluded the '154 patent is invalid for lack of novelty and/or obviousness for all the reasons set out in this and in my July declaration.

7.    Based on a correct interpretation of the claims of the '154 patent, the UBT websites and systems do not infringe any claims of the '154 patent, for all the reasons set out in my July declaration, and as further clarified in this Declaration.

## THE UBT WEBSITES AND SYSTEMS DO NOT INFRINGE
## THE CLAIMS OF THE '154 PATENT

8.    I have considered the issues raised in MMJK's Reply ("Reply") regarding infringement.

1

9.    Attached hereto as **Exhibit P** is a detailed claim chart summarizing why UBT's websites do not infringe any claims of the '154 patent.

10.    Both of the independent claims of the '154 patent (claims 1 and 5) require "disbursing the prize pool to the winning player and any eligible runner-up players in the form of prizes that have immediate value, subsequent to completion of the tournament."

11.    MMJK asserts that "[a]s properly construed, the 'disbursing the prize pool…' limitation recited in claims 1 and 5 of the '154 patent means paying out cash or merchandise…"

12.    Based on the assertion in paragraph 11, MMJK concludes that the limitation requiring "disbursing the prize pool" is met by UBT's websites.

13.    MMJK's proposed construction in paragraph 11 is wrong.  MMJK's proposed construction is contrary to the ordinary meaning of "prize pool" and the intrinsic record.

14.    The ordinary meaning of "prize pool" in the context of the '154 patent is every prize awarded in a tournament.  Attached hereto as **Exhibit Q and Exhibit R** are dictionary definitions of "pool" from the Compact Oxford English Dictionary and The American Heritage Dictionary of the English Language, respectively.

15.    The specification of the '154 patent defines "prize pool" in the same way as the dictionary definition referenced in the preceding paragraph 15, or every prize awarded in a tournament.  Figure 3 of the '154 patent shows "an illustrative prize pool for a hypothetical monthly tournament" where the prize pool includes every prize awarded as part of the tournament.  (Exh. B, Fig. 3).

16.    The "prize pool" of a tournament is every prize awarded in the tournament, and it should not be limited to cash and merchandise.

17.    For every tournament played on the UBT websites, the prize pools always include multiple prizes that are tournament points and/or play chips.

18.    As discussed in greater detail below, because UBT's prize pools always include multiple prizes that are tournament points and/or play chips, which MMJK admits are not "prizes that have immediate value," UBT's websites do not satisfy the "immediate value" limitation of the '154 patent claims.

2

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY

19.    As discussed in greater detail below, because UBT's prize pools always include multiple prizes that are tournament points and/or play chips that are disbursed prior to completion of the tournament, UBT's websites do not satisfy the "subsequent to completion of the tournament" limitation of the '154 patent claims.

20.    A person of ordinary skill in the art, having read the '154 patent and having understood how the UBT's websites operate, would understand that UBT's tournaments do not infringe upon the '154 patent because the disbursed prize pools (which include tournament points and/or play chips) do not have immediate value, and are not disbursed subsequent to completion of the tournament.

21.    MMJK asserts that the limitation "…to the winning player and any eligible runner-up players…" "means paying out cash or merchandise to the winner **and any runner-up player**, if any qualify." (Reply, p.3, emphasis added.)

22.    MMJK's proposed construction in paragraph 20 is wrong.  The specification is clear that "any eligible runner-up players" means all of the players of a tournament who receive prizes, excluding the ultimate winner.  (Exh. B, Fig. 3).

23.    MMJK asserts that infringement would occur in "the scenario where there are no runner-up players that are qualified to receive a prize and only the winner receives a prize." (Reply, p.3).  This scenario is irrelevant because it does not occur in any of the games played on the UBT websites.

24.    MMJK's proposed construction in paragraph 20 results in infringement if there is only one eligible runner-up player (out of many eligible runner-up players) who receives a prize of immediate value after the tournament is completed.  Such a construction is contrary to the specification of the '154 patent, which never discloses such a scenario.

25.    A person of ordinary skill in the art, having read the '154 patent and having understood UBT's websites, would understand that no UBT tournament infringes upon the '154 patent because its claim terms require the prize pool to be disbursed to the winner and any eligible runner-up players, subsequent to completion of the tournament.

///

3

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY

26.     Next, MMJK asserts that "as properly construed in view of the specification, 'prizes that have immediate value' means cash or merchandise.  Thus, as properly construed, the 'disbursing the prize pool...' limitation recited in claims 1 and 5 of the '154 patent means paying out cash or merchandise to the winner and any runner-up player..."  (Reply, p.3).

27.     As noted above, the "prize pool" is every prize provided as part of the tournament- not just some of the prizes.

28.     As noted above, UBT's prize pools always include multiple prizes that are tournament points and/or play chips.

29.     MMJK has noted, "'prizes that have immediate value' means cash or merchandise." (Reply, p. 3).

30.     Tournament points and play chips are not cash or merchandise.

31.     Therefore, because UBT's prize pools always include multiple prizes that are tournament points and/or play chips, which MMJK admits are not "prizes that have immediate value," UBT's websites do not satisfy this limitation of the '154 patent claims.

32.     I have studied UBT's websites and understand that UBT's cash and merchandise prizes do not have immediate value, as UBT players must first claim the prizes and must then verify eligibility, and only receive their prizes within 30 days of claiming and validating the prizes.

33.     Attached hereto as **Exhibit S** are dictionary definitions of "immediate." Dictionary.com Unabridged defines "immediate" as "occurring or accomplished without delay; instant."  The American Heritage Dictionary defines "immediate" as "occurring at once; instant."

34.     There is no "immediate value" to UBT's cash or merchandise, and there may never be any value if the prizes are not claimed or if players do not meet the eligibility or validation requirements.

35.     A person of ordinary skill in the art, having read the '154 patent and having understood UBT's websites, would understand that UBT tournaments do not infringe upon the '154 patent because UBT's prize pools include tournament points and/or play chips, and potential prizes of cash, and/or merchandise, none of which are "prizes of immediate value."

///

4

LA 126893289v2 8/8/2007

36.    Next, MMJK asserts that "every tournament that pays out cash or merchandise to at least the winner supports a finding of infringement." (Reply, p.5).

37.    MMJK's assertion in paragraph 35 is wrong. It is of no consequence whether the winner receives cash after the tournament is over or whether the winner and multiple runner-up players receive cash after the tournament is over.

38.    As I have stated above, the "prize pool" is every prize provided as part of the tournament, and the UBT prize pool always includes multiple prizes that are tournament points and/or play chips.

39.    As described in the July Declaration, when a UBT runner-up player is eliminated from a tournament and his prize is tournament points or play chips, he receives the tournament points or play chips immediately. That is, as soon as a runner-up player is eliminated, UBT credits his account with tournament points, even though the tournament is still ongoing.

40.    As such, only one eligible runner-up player-- 2nd place-- could ever receive his tournament points or play chips prize subsequent to completion of the tournament, as tournament points are disbursed to all other eligible runner-up players prior to completion of the tournament.

41.    Therefore, there is no infringement of the '154 patent, the claims of which all require the prize pool to be disbursed subsequent to the completion of the tournament.

42.    As detailed in the July Declaration, because prizes are disbursed to runner-up players during an ongoing tournament, UBT's websites operate differently and create different results than the systems and methods described and claimed in the '154 patent. This and other differences between the UBT website and the systems and methods described and claimed in the '154 patent provide benefits and advantages, some of which I discussed in my July Declaration.

43.    A different methodology underlies the system of the '154 patent, wherein runner-up players must wait until the completion of a tournament to obtain their prizes.

44.    When the patentees of the '154 patent formulated their patent specification and claims, it would have been clearly foreseeable to them to teach, disclose and/or claim a disbursement structure wherein multiple runners-up receive prizes prior to the completion of the tournament. However, they chose not to teach, disclose or claim this disbursement format. Instead, they chose to

5

LA 126893289v2 8/8/2007

1   teach, disclose and claim only methods and systems where the prize pool is disbursed to any

2   runner-up players who receive a prize after completion of the tournament.

3       45.     To respond directly to MMJK's argument in its Reply, it is of no consequence whether

4   the winner receives cash after the tournament is over or whether the winner and multiple runner-up

5   players receive cash prizes after the tournament is over.  Prize pools in the UBT websites always

6   include tournament points and/or play chips, and those prizes are not disbursed subsequent to

7   completion of the tournament.

8       46.     The UBT websites do not infringe any claims of the '154 patent, literally or under the

9   Doctrine of Equivalents.  None of the limitations (that are not literally satisfied) are satisfied by using

10  the same function, in the same way, to achieve the same result.

11  ## THE '154 PATENT IS INVALID

12      47.     I have further reviewed and analyzed the same documents as previously considered in

13  the July Declaration, and in addition, have reviewed and analyzed the following in reaching my

14  opinions and preparing this declaration:

15          a.      Webpages from a website that stores archived webpages, commonly referred to

16          as the Way Back Machine.  The webpages I reviewed and analyzed are located at:

17          1.  http://web.archive.org/web/20030417162806/www.bugsysclub.com/club/poker/basics_pok

18          er_intro.htm

19          2.  http://web.archive.org/web/20030811094204/bugsysclub.com/club/poker/basics_tourname

20  nts.htm

21          3.  http://web.archive.org/web/20030801092716/bugsysclub.com/club/real/banking.htm

22          4.  http://web.archive.org/web/20030607164709/http://www.pokerschoolonline.com/

23          5.  http://web.archive.org/web/20031123002850/http://www.pokerschoolonline.com/

24          A true and correct copy is attached as **Exhibit A to the Affidavit of Paul Forrest**

25      **Hickman** ("Exhibit A to the Hickman Affidavit"), filed concurrently with this Surreply.

26      48.     I have analyzed Exhibit C, which is a prior art publication entitled "Frequently Asked

27  Questions for: BugsysClub, PokerSchoolOnline and PokerPages" for what it teaches to one of

28  ordinary skill in the art.

6

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY

49.     BugsysClub, PokerSchoolOnline, and PokerPages are interrelated websites and are contained and referred to within a single reference- Exhibit C.

50.     When I view Exhibit C, it is apparent that when one is in the Main Lobby of BugsysClub, there are 3 tabs at the top of the Lobby, as the website says- "so you can easily move between any of the following areas [i.e. the 3 sites]."

51.     Further, in Exhibit C, there is a question under "General" that says, "What are the 3 Tabs for on the Lobby of the Poker Software?" The answer indicated on the website is the following: The Tabs at the top of the Lobby Screen are for **3 sites you can play on from within the Poker Software**, for your convenience. Each site offers different promotions and has a distinct **focus**…[References to BugsysClub, PokerSchoolOnline, and PokerPages]…**You can even use the same UserName and Password across all 3 sites if you want to. So once you register at each site, you can access any of the 3 sites using the same Poker Software**. (Exh. C, pp. 4-5.)

52.     It is clear to me that the BugsysClub, PokerSchoolOnline, and PokerPages websites are an integrated system of websites that all employ the same software, referred to as "the Poker Software."

53.     Exhibit C is a single prior art document which interrelates the features of the BugsysClub, PokerSchoolOnline, and PokerPages websites.

54.     In my opinion, one of ordinary skill in the art reading Exhibit C would find that the majority of Exhibit C refers to and applies to all three websites and does not refer to them as stand-alone, unrelated systems. They are provided as a group offering, they are interrelated, and each site provides access to the others, as they all use "the same Poker Software." For example, in at least some games, the winners from PokerPages receive one, two or three month memberships to play at PokerSchoolOnline.

55.     Based on this and the further analysis below, I reaffirm that Exhibit C anticipates and renders invalid all the claims of the '154 patent.

///

///

///

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY

56.     First, however, I analyze in greater detail the contents of PokerSchoolOnline and BugsysClub and show that each of them, on their own, satisfy the limitation of the claims of the '154 patent.

### PokerSchoolOnline

57.     I have considered the issues raised by MMJK in its Reply regarding PokerSchoolOnline.

58.     Attached hereto as **Exhibit T** is a detailed claim chart showing how certain claim limitations, which MMJK's reply alleges are not taught by PokerSchoolOnline, are in fact taught by PokerSchoolOnline. As support for why the limitations are taught, the claim chart contains only direct quotes from the PokerSchoolOnline website (Exh. A to the Hickman Affidavit) and relevant portions of Exhibit C.

59.     Attached hereto as **Exhibit U** is a detailed claim chart showing how each claim limitation of the '154 patent is literally satisfied by PokerSchoolOnline. The right column of Exhibit U includes direct quotes from Exhibit A to the Hickman Affidavit and from Exhibit C, as they relate directly to PokerSchoolOnline, which teach the limitation from the '154 patent indicated in the left column to one of ordinary skill in the art. Accordingly, one of ordinary skill in the art, having read Exhibit C and having understood PokerSchoolOnline.com, would understand the references to teach all the limitations of the claims of the '154 patent, thereby rendering the '154 patent invalid.

60.     I have reviewed Exhibit C, and Exhibit A to the Hickman Affidavit referenced above, for the teaching they provide regarding PokerSchoolOnline.com and find the following.

61.     MMJK asserts that "only registered players who paid a monthly or annual membership could play on this Web site." (Reply, p.8).

62.     Based on the assertion in paragraph 61, MMJK concludes that the limitation requiring a "means for allowing a non-subscription player to participate in the tournament without payment of the fee by submitting information relating to the non-subscription player," is not met.

63.     MMJK's assertion is wrong. Through PokerPages, a player who does not pay any membership fee, can win a 1, 2, or 3 month membership to play in PokerSchoolOnline.

64.     Exhibit C discloses the following: "What are Poker Dollars? (PokerPages Free Play only)- Play free tournaments online to win PokerPages Poker Dollars and be rewarded for your online

8

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY

1  Poker Tournament skill. **The top 3 monthly ranked players receive respectively 3, 2, and 1**

2  **months towards membership fees for PokerSchoolOnline.**" (Exh. C, p. 19., emphasis added.)

3       65.    Exhibit C also discloses the following: "Is it really FREE to play at the Play-Money

4  tables? PokerPages: It sure is Free. Not only does it cost you nothing to play, but **at PokerPages**

5  **you can play in the many freeroll tournaments for free membership to the first totally online**

6  **Poker School: PokerSchoolOnline.com when you play in PokerPages free-rolls.**" (Exh. C, p. 19,

7  emphasis added). It is inherent that PokerSchoolOnline receives some information relating to the

8  non-subscription player who receives a prize that allows him or her to play for free on the

9  PokerSchoolOnline.com site (e.g., name, login or user related information or information indicating

10  the non-subscriber is the recipient of the prize allowing free membership to PokerSchoolOnline.com).

11       66.    A person of ordinary skill in the art, having read the statements in paragraphs 64 and

12  65 above, in the context of the entire document, would understand Exhibit C to teach providing a

13  "means for allowing a non-subscription player to participate in the tournament without payment of

14  the fee by submitting information relating to the non-subscription player," as disclosed in the '154

15  patent.

16       67.    Next, MMJK asserts that "there were no non-subscribers." (Reply, p.8).

17       68.    Based on the assertion in paragraph 67, MMJK concludes that the limitation requiring

18  that the "non-subscription player is limited to one entry per tournament," is not met.

19       69.    MMJK's assertion is wrong. Based on paragraphs 64, 65, and 66 above, Exhibit C

20  teaches a "non-subscription player." Further, the non-subscription player is limited to one entry per

21  tournament, as shown below.

22       70.    Exhibit C discloses the following: "I would like to play under different names; can I

23  have more than one account? **Users may only have one Account at the same site at any time**,

24  which is part of preventing Collusion. BUT- you can play at up to three games at the same time

25  using that one account." (Exh. C, p. 3, emphasis added).

26       71.    Exhibit C also discloses the following: "Can I Play More Than One Table at the Same

27  Time? We recommend that you play no more than three different games. **But you cannot be seated**

28  **at different tables in a single Tournament, because of the collusion that might occur as the**

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY

1  **tables collapse**. So, for example, you can play in one Tournament and 2 Ring Games at the same

2  time, or a Satellite and 2 different Tournaments at the same time." (Exh. C, p.12, emphasis added).

3      72.    A person of ordinary skill in the art, having read the statements in paragraphs 70 and

4  71 above, in the context of the entire document, would understand Exhibit C to teach that the "non-

5  subscription player is limited to one entry per tournament," as disclosed in the '154 patent.

6      73.    It is my opinion that the limitation "non-subscription player is limited to one entry per

7  tournament" is an inherent part of most if not all computer networked game or tournament systems.

8  Accordingly, it is within the common knowledge of one of ordinary skill in the art that that

9  tournaments generally are inherently limited to one entry per tournament. A similar analysis can be

10  applied to other well known limitations found in the claims of the '154 patent.

11  **BugsysClub**

12      74.    I have considered the issues raised by MMJK in its Reply regarding BugsysClub.

13      75.    Attached hereto as **Exhibit V** is a detailed claim chart showing how certain claim

14  limitations, which MMJK's reply alleges are not taught by BugsysClub, are in fact taught by

15  BugsysClub. As support for why the limitations are taught, the claim chart contains only direct

16  quotes from the BugsysClub (Exh. A to the Hickman Affidavit) and portions of Exhibit C which

17  directly relate to BugsysClub.

18      76.    Attached hereto as **Exhibit W** is a detailed claim chart showing how each claim

19  limitation of the '154 patent is literally satisfied by BugsysClub. The right column of Exhibit W

20  includes direct quotes from Exhibit A to the Hickman Affidavit and from Exhibit C, which teach the

21  limit indicated in the left column to one of ordinary skill in the art. Accordingly, one of ordinary skill

22  in the art, having read Exhibit C and having understood BugsysClub, would understand the

23  references to teach all the limitations of the claims of the '154 patent, thereby rendering the '154

24  patent invalid.

25      77.    I have reviewed Exhibit C, and Exhibit A to the Hickman Affidavit, referenced above,

26  and find the following.

27      78.    MMJK asserts that "The BugsysClub.com Web site did not establish a subscription-

28  based membership by charging a fee for a predetermined period of time. Rather, players could

10

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY

1  register at the BugsysClub.com Web site and create a deposit account to use for a buy-in. There was

2  no requirement on the amount of money that the user had to deposit in the account." (Reply, p.6).

3    79.    Based on the assertion in paragraph 78, MMJK concludes that the limitation

4  "establishing a subscription-based membership for each player of the plurality of players by charging

5  each player a fee for a pre-determined membership time period," is not met.

6    80.    MMJK's assertion is wrong. Prior to playing in any Real Money games, a player is

7  required to set up an account. The account is funded by a credit card, etc. There is a minimum fee

8  required for each type of deposit method. This is required to activate the account in order to actually

9  play. A copy of the page indicating minimum deposit amounts for different types of payment

10  methods is attached in Exhibit A to the Hickman Affidavit.

11    81.    Exhibit C discloses the following: "Once you activate your account, you will be asked

12  if you want to go to the Cashier to fund your BugsysClub account. You need to deposit money into

13  your BugsysClub account to play in any BugsysClub games, so this is a logical next step to take."

14  (Exh. C, p.20.)

15    82.    Exhibit C also discloses the following: "Any Minimum to Open a Real-Money

16  Account? Up-to-date deposit limits are posted on BugsysClub's website for all deposit methods.

17  Click here to view deposit limits." (Exh. C, p.17; Exh. P.)

18    83.    Exhibit C also discloses the following: "BugsysClub: Anyone who registers at

19  BugsysClub gets $1000 in Play-Money which they can immediately use at PokerPages. BugsysClub

20  also has Freerolls (no fee to enter to win real money prizes), but you must have deposited at

21  BugsysClub within the past 6 months to qualify to play in these freerolls." (Exh. C, p.19.)

22    84.    A person of ordinary skill in the art, having read the statements in paragraphs 81, 82,

23  and 83 above, in the context of the entire document, would understand Exhibit C to teach

24  "establishing a subscription-based membership for each player of the plurality of players by charging

25  each player a fee for a pre-determined membership time period."

26    85.    MMJK asserts that "the BugsysClub.com Web site did not have 'subscription-based

27  players' and there was no 'predetermined membership time period.'" (Reply, p.7).

28  ///

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY

86.    Based on the assertion in paragraph 85, MMJK concludes that the limitation requiring "hosting at least one game tournament for subscription-based players...during the membership time period," is not met.

87.    MMJK's assertion is wrong. There is a specific time period which is applicable to permit continued play. A prior deposit is required during a 6-month period in order to play in Freerolls.

88.    Exhibit C discloses the following: "Once you activate your account, you will be asked if you want to go to the Cashier to fund your BugsysClub account. You need to deposit money into your BugsysClub account to play in any BugsysClub games, so this is a logical next step to take." (Exh. C, p.20).

89.    Exhibit C also discloses the following: "BugsysClub: Anyone who registers at BugsysClub gets $1000 in Play-Money which they can immediately use at PokerPages. BugsysClub also has Freerolls (no fee to enter to win real money prizes), but you must have deposited at BugsysClub within the past 6 months to qualify to play in these freerolls." (Exh. C, p.19).

90.    A person of ordinary skill in the art, having read the statements in paragraphs 88 and 89 above, in the context of the entire document, would understand Exhibit C to teach "hosting at least one game tournament for subscription-based players...during the membership time period," as disclosed in the '154 patent.

91.    MMJK asserts that "there was no subscription fee to play Real Money games at the BugsysClub.com Web site" and "all players had to pay a buy-in" (Reply, p.7).

92.    Based on the assertion in paragraph 91, MMJK concludes that the limitation requiring "providing a means for allowing a non-subscription player to participate in the tournament without payment of the fee," is not met.

93.    MMJK's assertion is wrong. Exhibit C establishes subscription-based players, as stated in paragraph 82 above. Further, the requirement of "without payment of the fee" is disclosed, as follows.

94.    Exhibit C discloses the following: "Where do I see what the minimum buy-in of a game is? Tournaments: The buy-in amounts **(when required)** for tournaments are identified on the

12

1   same line as the Game listing in the Lobby. They are also described on the Tournament Info Page."

2   (Exh. C, p.11, emphasis added.)

3       95.    Exhibit C also discloses the following: "How do I start playing for Free right now?

4   Play money games are available on our free software (in addition to Real Money Games). Click here

5   for Download instructions. Then click 'join BugsysClub' button on the Login Screen. Complete the

6   registration information requested. You will immediately be sent an email with an activation code in

7   it. Be sure to activate your account by clicking on the activation code within this email. Upon

8   activation, you'll automatically get $1,000 of Play-Money. You are ready to play! Launch the

9   software (double click on the icon), Login (using the UserName and Password you created). Then

10  click on the PokerPages tab. Select any Free/Fun game listed on the Lobby that says 'Sign-in', then

11  click 'Join Event'." (Exh. C, pp.18-19).

12      96.    Exhibit C also discloses the following: "Is it really FREE to play at the Play-Money

13  tables? PokerPages: It sure is Free. Not only does it cost you nothing to play, but at PokerPages you

14  can play in the many freeroll tournaments for free membership to the first totally online Poker

15  School: PokerSchoolOnline.com when you play in PokerPages free-rolls. BugsysClub: Anyone who

16  registers at BugsysClub gets $1000 in Play-Money which they can immediately use at PokerPages.

17  BugsysClub also has Freerolls (no fee to enter to win real money prizes), but you must have

18  deposited at BugsysClub within the past 6 months to qualify to play in these freerolls." (Exh. C,

19  p.19).

20      97.    A person of ordinary skill in the art, having read the statements in paragraphs 94, 95,

21  and 96 above, in the context of the entire document, would understand Exhibit C to teach "providing

22  a means for allowing a non-subscription player to participate in the tournament without payment of

23  the fee," as disclosed in the '154 patent.

24      98.    MMJK asserts that "Defendant has provided no evidence that the BugsysClub.com

25  Web site described the feature that the 'non-subscription player was limited to one entry per

26  tournament.'" (Reply, p.8).

27      99.    Based on the assertion in paragraph 98, MMJK concludes that the limitation that "the

28  non-subscription player is limited to one entry per tournament," is not met.

100.    MMJK's analysis is wrong. As stated previously there is "only one account at a time," and as stated below, a player cannot be seated at different tables in a single Tournament. Therefore, one of ordinary kill in the art would conclude from this that the non-subscription player is limited to "one entry per tournament."

101.    In addition, the rule of "one entry per tournament" is an inherent feature of a traditional tournament. Unless a tournament is untraditional for some reason, or explicitly allows re-buys, a traditional tournament limits players to one entry.

102.    Exhibit C discloses the following: "I would like to play under different names; can I have more than one account? Users may only have one Account at the same site at any time, which is part of preventing Collusion. BUT - you can play at up to three games at the same time using that one account." (Exh. C, p.3).

103.    Exhibit C also discloses the following: "Can I Play More Than One Table at the Same Time? We recommend that you play no more than three different games. But you cannot be seated at different tables in a single Tournament, because of the collusion that might occur as the tables collapse. So, for example, you can play in one Tournament and 2 Ring Games at the same time, or a Satellite and 2 different Tournaments at the same time." (Exh.C, p.12).

104.    A person of ordinary skill in the art, having read the statements in paragraphs 102 and 103 above, in the context of the entire document, would understand Exhibit C to teach that "the non-subscription player is limited to one entry per tournament," as disclosed in the '154 patent.

105.    This further supports my conclusion of invalidity based on my analysis of the claims of the '154 patent in light of the BugsysClub prior art Exhibit C.

### Herrmann References

106.    I have further reviewed and analyzed the Herrmann references Exhibits D and E, where Exhibit D is a true and correct copy of U.S. Patent Publication No 2004/0248634 ("Herrmann Patent Publication") and Exhibit E is a true and correct copy of provisional application No. 60/444,474 ("Herrmann Provisional Application"), to which the Herrmann Patent Publication claims priority, as previously considered, and the rebuttal made by MMJK to my prior conclusions. I respond to each of those rebuttals in turn.

14

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY

107.    Attached hereto as **Exhibit X** is a detailed claim chart showing how certain claim limitations, which MMJK's reply alleges are not taught by the Herrmann Patent Publication, are in fact taught by the Herrmann Provisional Application.  As support for why the limitations are taught, the claim chart contains only direct quotes from the Herrmann Provisional Application (Exh. E.)

108.    Attached hereto as **Exhibit Y** is a detailed claim chart showing how certain claim limitations, which MMJK's reply alleges are not taught by the Herrmann Patent Publication, are in fact taught by the Herrmann Patent Publication.  As support for why the limitations are taught, the claim chart contains only direct quotes from the Herrmann Patent Publication (Exh. D.)

109.    Attached hereto as **Exhibit Z** is a detailed claim chart showing how each claim limitation of the independent claims of the '154 patent is literally satisfied by both the Herrmann Patent Publication and the Herrmann Provisional Application.  The right column of Exhibit Z includes direct quotes from Exhibits D and E, which teach the limitation indicated in the left column, to one of ordinary skill in the art.  Accordingly, one of ordinary skill in the art, having read Exhibits D and E, would understand the references to teach all the limitations of the claims of the '154 patent, thereby rendering the '154 patent invalid.

110.    Firstly, MMJK was incorrect to state that Exhibits D and E do not teach games of chance and skill.  While in at least some embodiments, the Herrmann discloses removing skill from games, Herrmann references still teach games of chance and skill.

111.    Herrmann teaches and is replete with examples of games of chance and skill.  Moreover, the mere removal of some element of skill from games "designated as games of skill and chance" does not remove all the skill associated with that game.  Simply, having a player need to make a choice, whether to play, whether to bet, or how much to bet is a skill.  Thus even though there is an apparent intent to remove some skill from at least some embodiments of the inventions disclosed in the Herrmann references, Herrmann still discloses a game of skill and chance.

112.    The specifications in Exhibits D and E are replete with examples of games of skill and chance.  The Summary of the Invention points out that: "In another embodiment of the invention, the at least one game of skill and chance is a game having elements of skill and chance.  In another embodiment of the invention, the element of skill is removed from the game." (Exh. D, paragraph

15

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY

0019.) This clearly presupposes and supports that Herrmann discloses and teaches different games of skill and chance, and optionally that the Herrmann "invented" games retain skill.

113.    I have considered the issues raised by MMJK in its Reply regarding Herrmann.

114.    I have reviewed Exhibits X, Y, and Z referenced above, and find the following.

115.    MMJK asserts that "Herrmann is completely inapposite since it is expressly limited to games of chance that were adapted from games of chance and skill." (Reply, p. 9)

116.    Based on the assertion in paragraph 115, MMJK concludes that the limitation requiring "a game that has elements of both chance and skill" is not met.

117.    MMJK's assertion is wrong.  Skill and decision are still required and taught in Exhibits D and E.

118.    Exhibit D discloses the following: "[0004] The popular wagering card game of blackjack is discussed below as an illustrative example of how a player may improve the chances of winning with some knowledge. ..." (Exh. D, para. 0004.)

119.    Exhibit E also discloses the following: "The popular wagering card game of blackjack is discussed below as an illustrative example of how a player may improve the chances of winning with some knowledge." (Exh. E, pg. 18, lines 10-12)

120.    Exhibit D also discloses the following: "[0010] For the wagering games mentioned above and others, there are often numerous variation that can be played but in all cases, there is an ideal strategy to play for increasing the odds of winning as much as possible for the player(s). (Exh. D, para. 0010)

121.    Exhibit E also discloses the following: "For the wagering games mentioned above and others, there are often numerous variations that can be played but in all cases, there is an ideal strategy to play for increasing the odds of winning as much as possible for the player(s)." (Exh. E, pg. 2, lines 27-29)

122.    Exhibit D also discloses the following: "[0017] Another aspect of the present invention relates to games of chance developed from games of skill and chance. ... Such games may include, for example games of chance developed from games of skill and chances whose rules and game play are familiar to most players (e.g., blackjack, poker, etc.). ..." (Exh. D, para. 0017)

16

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY

123.    Exhibit D also discloses the following: "[0019] … In another embodiment of the invention, the at least one game of skill and chance is a game having elements of skill and chance. … In another embodiment of the invention, the game having elements of skill and chance is poker. …" (Exh. D, para. 0019)

124.    Exhibit E also discloses the following: "In another embodiment of the invention, the at least one game of skill and chance is a game having elements of skill and chance." (Exh. E, pg. 5, lines 9-10)

125.    Exhibit E also discloses the following: "In another embodiment of the invention, the game having elements of skill and chance is poker." (Exh. E, pg. 5, lines 11-12)

126.    Exhibit D also discloses the following: "[0066] … It should be appreciated that the invention is not limited to any particular game, but rather, any game of skill and chance may be used to develop a game of chance that uses a set of predetermined rules for playing the game." (Exh. D, para. 0066)

127.    A person of ordinary skill in the art, having read the statements in paragraphs 118 through 126 above, in the context of the entire document, would understand Exhibits D and E to teach "a game that has elements of both chance and skill," as disclosed in the '154 patent.

128.    MMJK asserts that "Herrmann clearly discloses that it does not apply to game of chance and skill that require the player to make decisions throughout the game." (Reply, p. 9).

129.    Based on the assertion in paragraph 128, MMJK concludes that the limitation requiring "the player to make decisions throughout the game," is not met.

130.    MMJK's assertion is wrong.  The Herrmann references are replete with teachings that the player is to make decisions during the game.  The decisions disclosed include, among other things, options for playing a hand, making additional bets and the requirement for skill and knowledge, which implies decisions can be make using that skill and knowledge.

131.    Exhibit D discloses the following: "[0006] A player has numerous options for playing a hand. …" (Exh. D, para. 0006)

132.    Exhibit E also discloses the following: "A player has numerous options for playing a hand." (Exh. E, pg. 2, line 4)

17

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY

133. Exhibit D also discloses the following: "[0020] … In another embodiment of the invention, additional bets are made according to a set of betting rules after the initial bet level is determined by at least one of the plurality of players. …" (Exh. D, para. 0020)

134. Exhibit E also discloses the following: "In another embodiment of the invention, additional bets are made according to a set of betting rules after the initial bet level is determined by at least one of the plurality of players." (Exh. E, pg. 5, lines 21-23)

135. Exhibit D also discloses the following: "[0048] An important criterion for games that involve skill is the requirement for a player decision to be made following the initial bet and/or card or game play. … All of these requirements for a decision lead to a requirement of skill or knowledge to improve the player's chance of winning." (Exh. D, para. 0048)

136. Exhibit E also discloses the following: "An important criterion for games that have skill involved is the requirement for a player decision to be made following the initial bet and/or card or game play." (Exh. E, pg. 15, lines 25-26)

137. Exhibit E also discloses the following: "All of these requirements for a decision lead to a requirement of skill or knowledge to improve the player's chance of winning." (Exh. E, pg. 16, lines 1-2)

138. A person of ordinary skill in the art, having read the statements in paragraphs 131 through 137 above, in the context of the entire document, would understand Exhibits D and E to teach "the player to make decisions throughout the game", as disclosed in the '154 patent.

139. MMJK asserts that "Because there is no 'predetermined membership time period' disclosed in Herrmann, there is no disclosure of 'hosting at least one game tournament for subscription-based player … during the membership time period.' In other words, there are no 'subscription based players' and there are no tournaments 'during the membership time period.'" (Reply, p.10).

140. Based on the assertion in paragraph 139, MMJK concludes that the limitation requiring "establishing a subscription-based membership for each player of the plurality of players by charging each player a fee for a predetermined membership time period" is not met.

///

141.     MMJK's assertion is wrong.  Exhibits D and E teach and disclose a subscription-based membership for each player of the plurality of players by charging each player a fee for a pre-determined membership time period.  Exhibits D and E do create a "subscription to play a number of games" and this is not different from a time period.  MMJK has attempted to argue that this is different than a time period within which you can play as many games as you want.  However, there is nothing in the claims of the '154 patent stating that this freedom to play an indefinite number of games is a requirement of the time period of the '154 patent.  All that is required is a "time period."  Indeed, Exhibits D and E deal with "renewing of a subscription" as detailed below.  This presupposes that after a time period, some end to subscribing occurs.  This is a disclosure and teaching of the requisite time period of the claims of the '154 patent.

142.     Exhibit D discloses the following: "[0021] ... In another embodiment of the invention, at least one of the plurality of players is allowed to create a subscription to play multiple games.  In another embodiment of the invention, the at least one of the plurality of players is allowed to automatically renew the subscription. ..." (Exh. D, para. 0021)

143.     Exhibit E also discloses the following: "In another embodiment of the invention, at least one of the plurality of players is allowed to create a subscription to play multiple games.  In another embodiment of the invention, the at least one of the plurality of players is allowed to automatically renew the subscription." (Exh. E, pg. 5, lines 28-30)

144.     Exhibit D also discloses the following: "[0052] Prior to a game, a game player may need to pay for playing.  For example, a game player may pay using money or loyalty points. ... Also, rather than a player paying a set amount per game, a player may instead open an account and place money or loyalty points in the account as credit." (Exh. D, para 0052)

145.     Exhibit E also discloses the following: "Prior to a game, a game player may need to pay for playing.  For example, a game player may pay using money or loyalty points." (Exh. E, pg. 17, lines 4-5)

146.     Exhibit D also discloses the following: "[0053] In one embodiment of the invention, players may subscribe to play in multiple game sessions.  That is, the player pays at one time to play more than one game.  These games may be consecutive games, periodically disbursed over a period

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY

1  of time, or other distribution. … The player may also be able to manage his or her subscription

2  including setting spending limits, time-out periods or password protection." (Exh. D, para. 0053)

3       147.    Exhibit E also discloses the following: "In one embodiment of the invention, players

4  may subscribe to play multiple consecutive games.  That is, the player pays at one time to play many

5  consecutive games.  The player may also choose to have his or her subscription automatically

6  renewed.  The player may also be able to manage his or her subscription including setting spending

7  limits, time-out periods or password protection." (Exh. E, pg. 17, lines 16-20)

8       148.    Exhibit D also discloses the following: "[0057] … The wagering game of chance

9  player entering by AMOE may also be limited to enter in a small number of games within a given

10  period of time. …" (Exh. D, para. 0057)

11       149.    Exhibit E also discloses the following: "The wagering game of chance player entering

12  by AMOE may also be limited to a small number of games within a given period of time, for

13  example one game in one year or two games in one month." (Exh. E, pg. 18, lines 10-12)

14       150.    A person of ordinary skill in the art, having read the statements in paragraphs 142

15  through 149 above, in the context of the entire document, would understand Exhibits D and E to

16  teach "establishing a subscription-based membership for each player of the plurality of players by

17  charging each player a fee for a predetermined membership time period", as disclosed in the '154

18  patent.

19       151.    MMJK asserts that "The claims of the '154 patent further require that the 'non-

20  subscription player is limited to one entry per tournament.'  Herrmann does not disclose this. … A

21  single entry into a game, and entry into a single game, are two very different concepts." (Reply,

22  p.10-11).

23       152.    Based on the assertion in paragraph 151, MMJK concludes that the limitation

24  requiring "the non-subscription player is limited to one entry per tournament" is not met.

25       153.    MMJK's assertion is wrong.  Hosting at least one game tournament for subscription-

26  based players...during the membership time period is met, as stated above in the paragraphs 142-149,

27  since there is a "predetermined time period" and there are "subscription-based players" who

28  subscribe for that time period.

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY

154.    As discussed above, it is inherent that both subscription and non-subscription players participating in the tournament disclosed in the Herrmann references would be limited to one entry per tournament.  Therefore, the Herrmann Patent Publication discloses that a non-subscription player is limited to one entry per tournament.

155.    Exhibit D discloses the following: "[0057] … For example, the AMOE entry may be limited to entry in one game in a period of one year, two games in one month, etc. …" (Exh. D, para. 0057)

156.    Exhibit E also discloses the following: "The wagering game of chance player entering by AMOE may also be limited to a small number of games within a given period of time, for example one game in one year or two games in one month." (Exh. E, pg. 18, lines 10-12)

157.    A person of ordinary skill in the art, having read the statements in paragraphs 155 and 156 above, in the context of the entire document, would understand Exhibits D and E to teach "the non-subscription player is limited to one entry per tournament", as disclosed in the '154 patent.

158.    MMJK asserts that "Herrmann is completely silent with respect to disbursing the prize pool to any eligible runner-up players.  Herrmann only mentions paying out to the 'winners'." (Reply, p. 11).

159.    Based on the assertion in paragraph 158, MMJK concludes that the limitation requiring "disbursing the prize pool to the winning player and any eligible runner-up players in the form of prizes that have immediate value, subsequent to completion of the tournament" is not met.

160.    MMJK's assertion is wrong.  By disclosing a "plurality or players" and determining the "winners," which include runner-up players, from that plurality of players, even though it does not use the words "runner-up players", Herrmann discloses "runner-up players."  Additionally, Herrmann's disclosure of "wherein winners are automatically determined from the plurality of players" teaches to one of ordinary skill in the art that there are some number of winners selected from a plurality of players, therefore there must be "runner-up players."

161.    Exhibit D discloses the following: "[0018] … The game of chance comprises a plurality of players, and a predetermined set of rules by which the plurality of players play the game

///

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY
LA 126893289v2 8/8/2007

1    of chance, wherein winners are automatically determined from the plurality of players. ..." (Exh. D,
2    para. 0018)

3        162.    Exhibit E also discloses the following: "The game of chance comprises a plurality of
4    players, and a predetermined set of rules by which the plurality of players play the game of chance,
5    wherein winners are automatically determined from the plurality of players." (Exh. E, pg. 4, lines 26-
6    28)

7        163.    Exhibit D also discloses the following: "[0023] ... In another embodiment of the
8    invention, the computer system automatically notifies at least one of the plurality of players of their
9    winnings. ..." (Exh. D, para. 0023)

10        164.    Exhibit E also discloses the following: "In another embodiment of the invention, the
11   computer system automatically notifies at least one of the plurality of players of their winnings."
12   (Exh. E, pg. 6, lines 20-22)

13        165.    Exhibit D and E also disclose the following: "50. A method for conducting a game of
14   chance adapted from at least one game of skill and chance, the method comprising acts of: providing
15   entry of a plurality of players in the game of chance; providing a predetermined set of rules by which
16   the plurality of players play the game of chance; and automatically determining at least one winner
17   from the plurality of players." (Exh. D, p. 15) (Exh. E, p. 38)

18        166.    Exhibit D also discloses the following: "53. The method according to claim 50, further
19   comprising an act of automatically determining a payout to the at least one winner according to a
20   predetermined payout table." (Exh. D, p. 15)

21        167.    A person of ordinary skill in the art, having read the statements in paragraphs 161
22   through 166 above, in the context of the entire document, would understand Exhibits D and E to
23   teach "disbursing the prize pool to the winning player and any eligible runner-up players in the form
24   of prizes that have immediate value, subsequent to completion of the tournament" as disclosed in the
25   '154 patent.

26        168.    In my expert opinion, the invalidity of the '154 patent in light of one or more
27   Herrmann references is clear and the claims of the '154 patent would be obvious to one of ordinary
28   skill in the art based on combining either Herrmann reference with other prior art cited herein.  I find

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY

LA 126893289v2 8/8/2007

1  that the technology of the claims of the '154 patent is lacking in patentable merit for the reasons

2  stated and analyzed in detail above.

3  **THE '154 PATENT IS OBVIOUS**

4  169.    I conclude that the claims of the '154 patent lack novelty and/or are obvious in view of

5  numerous combination of Exhibits C, D, E, F and N and Exhibit A to the Hickman Affidavit.

6  170.    As a result of my analysis, I conclude that the claims of the '154 patent are invalid

7  because they would be obvious to one having ordinary skill in the art who reviewed any two or more

8  references selected from the group of Exhibits C, D, E, F, N and Exhibit A to the Hickman Affidavit,

9  except F and N alone.

10  171.    I refer to several claim charts references above which are attached as Exhibits U, W

11  and Z, which form part of the basis for my obviousness analysis. Although these claim charts

12  demonstrate how prior art references attached as Exhibits A to the Hickman Affidavit, C, and D and

13  E combined, anticipate the claims of the '154 patent, because they demonstrate the limitations which

14  are satisfied by the references, they are helpful for purposes of determining obviousness.

15  172.    Exhibits C, D, E, F, N and Exhibit A to the Hickman Affidavit are analogous art to

16  each other and to the '154 patent. Should anything in the language of the disclosures of Exhibits C,

17  D, E, F, **N** and Exhibit A to the Hickman Affidavit be missing relative to the exact language of the

18  claims of the '154 patent, it is clear that any aspect of the claims not taught by any of these references

19  in any combination would be inherent or explicitly taught in related prior art. In addition, it would be

20  obvious to one of ordinary skill in the art to apply the features, methods, systems and disclosure of

21  Exhibits C, D, E, F, N and Exhibit A to the Hickman Affidavit interchangeably among these prior art

22  reference.

23  173.    At the time when the '154 patent was examined in the Patent Office, the test of

24  obviousness was determined, in part, by whether there was sufficient "suggestion or motivation to

25  combine" the prior art in such a way that it rendered the claimed invention obvious in light of the

26  prior art.

27  174.    I know that this rigid application of the "suggestion or motivation to combine" test has

28  recently been rejected by the Supreme Court in *KSR International v. Teleflex Inc.* and that there

1  should also be a consideration of whether a combination of familiar elements according to known

2  methods is likely to be obvious when it does no more than yield a predictable result.

3      175.    In my opinion, had the Examiner applied the new test promulgated in the *KSR* case,

4  the claims of the '154 patent would have been found to be obvious and the '154 patent would not

5  have issued.

6      176.    I consider the disclosures of Exhibits C, D, E, F, N and Exhibit A to the Hickman

7  Affidavit to be so related that a person skilled in the art would have easily combined them for their

8  respective teachings, that there is a clear motivation and suggestion to combine them, and that

9  overall, the results of these teachings are clearly predictable.

10     177.    In my expert opinion, the invalidity of the '154 patent is clear as all the claims are

11 obvious to one or ordinary skill in the art in light of prior art Exhibits C, D, E, F, N and Exhibit A to

12 the Hickman Affidavit.  Accordingly, I find that the technology of the claims of the '154 patent is

13 lacking in patentable merit for the reasons stated and analyzed in detail above.

14                          **INEQUITABLE CONDUCT**

15     178.    Regarding inequitable conduct, MMJK argues that it "did not fail to disclose any

16 information to the Patent Office."

17     179.    MMJK is simply wrong.  The Notice of Allowance from the Examiner of the '154

18 patent indicated that the Herrmann publication **"has not been considered as to the merits."** (Exh. L

19 to Rosenthal Opening Declaration, page 2, emphasis added).

20     180.    Although MMJK provides some explanation as to why MMJK did not fail to disclose

21 one of the Walker references, MMJK's response to inequitable conduct allegations is noticeably

22 silent regarding why it is not guilty of intentionally preventing the Patent Office from considering the

23 Herrmann publication.

24     181.    Considering the Herrmann reference is not listed on the face of the '154 patent, it

25 cannot be disputed that it was never considered by the Patent Office.

26     182.    As discussed above and shown in Exhibit Z, the Herrmann reference is highly relevant

27 and anticipates all the independent claims of the '154 patent.

28 ///

                                24

1      183.    Accordingly, by intentionally refusing to provide the information which would have

2   allowed the Herrmann publication to be considered by the Patent Office, MMJK committed inequitable

3   conduct, rendering the '154 patent invalid.

4

5   I declare under penalty of perjury that the contents herein are true and correct.

6

7   DATED:  August 7, 2007                    _____/S/_____

8                                                                **L. Kenneth Rosenthal**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF L. KENNETH ROSENTHAL IN SUPPORT OF SURREPLY

LA 126893289v2 102741010300

## CERTIFICATE OF SERVICE

I, hereby certify that on August 8, 2007, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to the e-mail addresses denoted below:

DERGOSITS & NOAH LLP
Todd A. Noah (SBN 152328) (tnoah@dergnoah.com)
Paul K. Tomita (SBN 188096) (ptomita@dergnoah.com)
Four Embarcadero Center, Suite 1450
San Francisco, California 94111
Telephone:  (415) 705-6377
Facsimile:  (415) 705-6383


DATED:  August 8, 2007                    GREENBERG TRAURIG, LLP


                                          By:_____/S/_____
                                          MATTHEW S. STEINBERG
                                          Attorneys for Defendant
                                          Ultimate Blackjack Tour, Inc.

*LA 126894252v1 102741010300*

1