UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MMJK, INC.,<br><br>            Plaintiff(s),<br><br>      v.<br><br>ULTIMATE BLACKJACK TOUR LLC,<br><br>            Defendant(s). | No. C07-3236 BZ<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

This patent dispute is between rival operators of online card game tournaments, which are operated legally if they conform with the Unlawful Internet Gambling Enforcement Act of 2006.[1] Plaintiff's tournament is protected by U.S. Patent No. 7,094,154 ("'154 patent"), filed on December 30, 2004, and issued on August 22, 2006. The patent is "directed to computer networked multi-player games of both chance and skill that allow subscription-based and non-subscription players

---

[1] All parties have consented to my jurisdiction, including entry of final judgment, pursuant to 28 U.S.C. § 636(c) for all proceedings.

(using an "alternative method of entry") a chance to win prizes that have immediate value (i.e., cash, cash-equivalent notes and objects)."  Pl.'s Mot. at 2.  Plaintiff has been operating online tournaments based on the '154 patent since November 2005.  Kellerman Decl. ¶ 3; Kellerman Supp. Decl. ¶ 4.  On June 17, 2007, plaintiff claims to have become aware that defendant was hosting online tournaments that infringe its patent.  Plaintiff sued defendant on June 19, 2007, and now moves to enjoin defendant from continuing to host the challenged tournaments.

"A preliminary injunction is a 'drastic and extraordinary remedy that is not to be routinely granted.'"  National Steel Car, Ltd. v. Canadian P. Ry., Ltd., 357 F.3d 1319, 1324 (Fed. Cir. 2004) (quoting Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993)).  The parties agree that, for plaintiff to prevail on its motion for preliminary injunction, it must establish "four factors: '(1) a reasonable likelihood of its success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's ... impact on the public interest.'"  Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1374 (Fed. Cir. 2006) (quoting Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001)).

To establish likelihood of success on the merits requires plaintiff to show "that, in light of the presumptions and burdens that will inhere at trial on the merits, (1) [plaintiff] will likely prove that [defendant] infringes the

1  ... patent, and (2) [plaintiff's] infringement claim will
2  likely withstand [defendant's] challenges to the validity and
3  enforceability of the ... patent." Amazon.com, Inc., 239 F.3d
4  at 1350 (citing Genentech, Inc. v. Novo Nordisk, A/S, 108 F.3d
5  1361, 1364 (Fed. Cir. 1997)).  In other words, if defendant
6  "raises a substantial question concerning either infringement
7  or validity, i.e., asserts an infringement or invalidity
8  defense that the [plaintiff] cannot prove 'lacks substantial
9  merit,' the preliminary injunction should not issue." Id. at
10 1350-51 (quoting Genentech, Inc., 108 F.3d at 1364).

11       In considering likelihood of success on infringement, the
12 court first, construes the scope and meaning of the patent
13 claims asserted and second, compares the construed claims to
14 the allegedly infringing device. Oakley, Inc. v. Sunglass Hut
15 Intern., 316 F.3d 1331, 1339 (Fed. Cir. 2003).  The burden of
16 proof remains on the plaintiff. See, e.g., Amazon.com, Inc.,
17 239 F.3d at 1350 (explaining that the movant must show that it
18 is likely prove infringement and that it will likely withstand
19 any invalidity defenses).

20       Based on the record before me, plaintiff has failed to
21 demonstrate the likelihood that it will succeed in its claim
22 construction arguments.  Independent claims 1 and 5 of the
23 '154 patent require the disbursement of "the prize pool to the
24 winning player and any eligible runner-up players in the form
25 of prizes that have immediate value, subsequent to completion
26 of the tournament."  A principal distinction between the rival
27 tournaments is the timing of the distribution of prizes.  In
28 plaintiff's tournaments, the prizes to the winner and the

1  runners-up are distributed after the tournament ends.  In
2  defendant's tournaments, most runners-up are credited their
3  "tournament point" prizes prior to the completion of the
4  tournament and can immediately use those points to enter
5  other tournaments.[2]  See Rosenthal Decl. ¶¶ 24-26; Def.'s
6  Surreply at 5.  Thus, defendant argues, its tournaments do not
7  infringe because the claim requires that all the prizes be
8  distributed after the tournament ends.

9      To avoid defendant's argument, plaintiff contends that
10 "as properly construed" the term "any eligible runner-up
11 players" in the '154 patent does not require that every
12 conceivable prize be distributed after completion of the
13 tournament.  Rather, the "prize pool" is limited to "prizes
14 that have immediate value".  "Immediate," plaintiff claims,
15 limits the conception of "prizes" to those that have inherent
16 or intrinsic value, such as cash.  Thus, the runners-up need
17 only wait until after the tournament to collect prizes of
18 inherent value.  According to plaintiff, because defendant's
19 tournament points do not constitute "prizes that have
20 immediate value," and because defendant distributes its
21 inherently valuable prizes after its tournaments, defendant's
22 site infringes the claim.

23     Plaintiff has not persuaded me that its claim

---

[2] Defendant's practice is to award winners some combination of cash and/or tournament points, and to credit runners-up with tournament points upon elimination and prior to completion of the tournament. According to defendant, the tournament points, also referred to as prize points or playing chips, may be redeemed "to enter other games or tournaments," without waiting for that tournament to end. Def.'s Opp. at 5; see also Def.'s Surreply at 5.

4

constructions are likely to be adopted. First, plaintiff relies on a construction of "immediate" unsupported by the '154 patent. The text does not, as plaintiff contends, read out a temporal meaning to the term.[3] Indeed, plaintiff's unsupported interpretation moves away from the commonly understood meaning of the word. See Phillips v. AWH Corp., 415 F.3d 1303, 1312-14 (Fed. Cir. 2005) (en banc) (explaining that, absent intrinsic evidence to the contrary, terms are to be given their ordinary meaning as understood by one of ordinary skill in the art, which may involve "little more than the application of the widely accepted meaning of commonly understood words."). Insofar as defendant's tournament points have value in allowing a player immediately to enter another game, the '154 patent would seem to require that they be distributed after completion of the tournament.[4] Thus, defendant's distribution of the points during its tournaments presents a serious challenge to plaintiff's infringement argument.

Second, assuming that the only prizes that have to be

---

[3] The abstract describes the '154 patent as contemplating disbursement, after completion of the game or tournament, "of cash, cash-equivalent notes, or prizes that have inherent and immediate value." Noah Decl. ¶ 2, Exh. A ('154 patent Abstract). The phrase appears again in the invention summary, id. at col. 2, lines 29-33, and a nearly identical phrase appears in the detailed description of the preferred embodiment. See id. at col. 8, lines 64-65 (substituting "prizes that have immediate intrinsic value."). The patent's interchangeable use of the terms inherent and intrinsic in conjunction with the term immediate suggests that immediate has some meaning other than inherent or intrinsic.

[4] In context, plaintiff's argument that "any" does not mean "all" strains the plain meaning of the term.

5

1  distributed after completion of the tournament are prizes that
2  have inherent or intrinsic value, a serious question
3  nonetheless remains.  Because a player may immediately
4  exchange his points for entry into a new tournament which, in
5  turn, allows the player to compete for cash and other prizes,
6  plaintiff has not persuaded me that the points have no
7  inherent or intrinsic value.

8  Finally, plaintiff attempts to use the "prizes that have
9  immediate value" language to limit the concept of "prize
10 pool."  Yet, the patent does not define the conception of the
11 "prize pool" as something less than all the prizes.[5]
12 Moreover, assuming that the prize pool may be defined so as to
13 exclude tournament points, defendant's inclusion of such
14 points in its pools presents yet another challenge to
15 plaintiff's infringement claim.

16 In short, plaintiff has failed to demonstrate that it is
17 reasonably likely to prove that the challenged tournaments
18 infringe the '154 patent, be it literal or under the doctrine
19 of equivalents.[6]  On this record, substantial questions remain

---

[5] Plaintiff asserts that the patent's text clarifies the issue.  <u>See</u> Noah Decl. ¶ 2, Exh. A, col. 8, lines 6-8 ("Other prizes, such as objects that have immediate value, can also be awarded to winners.").  This sentence, however, only suggests that one kind of prize that may be awarded is an object of immediate value.  Indeed, as already discussed, the patent clearly contemplates the distribution of other prizes, such as cash-equivalent notes.

[6] Insofar as defendant's distribution of tournament points prior to the conclusion of tournaments helps to maximize customer game play, Rosenthal Decl. ¶¶ 25, 26, the element is not insubstantially different from the '154 patent claim limitation.  <u>See, e.g.</u>, <u>Digital Biometrics, Inc. v. Identix, Inc.</u>, 149 F.3d 1335, 1349 (Fed. Cir. 1998).

6

as to plaintiff's likelihood of success on infringement.

Nor has plaintiff demonstrated that it is likely to overcome defendant's invalidity defenses. Where a defendant raises invalidity as a defense to a motion for preliminary injunction, the plaintiff retains the burden of establishing likelihood of success on the merits. See Oakley, Inc. v. Sunglass Hut Intern., 316 F.3d 1331, 1339 (Fed. Cir. 2003); Helifix, Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1351 (Fed. Cir. 2000). "Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial. The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself." Amazon.com, Inc., 239 F.3d at 1359.

If "the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains," the patent is invalid as obvious. 35 U.S.C. § 103(a). Recently, the Supreme Court rejected a rigid obviousness analysis requiring that "some motivation or suggestion to combine the prior art teachings ... be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art." KSR Intern. Co. v. Teleflex Inc., 127 S. Ct. 1727, 1734 (2007) (internal quotation and citation omitted). Instead, the Court explained:

> When a work is available in one field of

>           endeavor, design incentives and other
>           market forces can prompt variations of it,
>           either in the same field or a different
>           one. If a person of ordinary skill can
>           implement a predictable variation, § 103
>           likely bars its patentability. For the
>           same reason, if a technique has been used
>           to improve one device, and a person of
>           ordinary skill in the art would recognize
>           that it would improve similar devices in
>           the same way, using the technique is
>           obvious unless its actual application is
>           beyond his or her skill.

Id. at 1740.  The Court emphasized that if design needs or market pressures urge solution to a problem, "and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options...."  The combination of elements of prior art, under this circumstance, is more a matter of "common sense" and may demonstrate obviousness.  Id. at 1742.

Here, defendant claims that prior art rendered obvious the technology claimed in the '154 patent.  In particular, defendant points to online gaming networks maintained at Bugsysclub.com, Pokerschoolonline.com, and Pokerpages.com.  See Def.'s Opp. at 7.  In reply, plaintiff asserts that each site offered a different kind of gaming experience.  See Pl.'s Reply at 6-9.  Thus, Bugsysclub was a "play for money" only gaming site with no free play and no subscription-based memberships.  Id. at 6.  Pokerpages.com amounted to a "free play site only" with no subscription-based memberships.  Id. at 6, 8.  Pokerschoolonline.com hosted "a subscription site with no free play."  Id.  Defendant counters by explaining that the sites themselves are integrated by, for example,

8

allowing an individual to play on all three sites using the same software and the same username and password.  See Rosenthal Decl. in Support of Surreply ¶¶ 51, 52.

Substantial questions exist about whether plaintiff is likely to overcome the obviousness defense.  All or nearly all of '154 patent claims appear to have been taught by the prior art and, in particular, the Bugsysclub "Frequently Asked Questions" page.  See Rosenthal Decl. ¶ 14, Exh. C.  Plaintiff opines that the '154 patent's inclusion of subscription and non-subscription-based paying and non-paying players in one site distinguishes it from the previous art.  Pl.'s Reply at 15.[7]  All this amounts to, however, is a combination of technology previously employed.  Bugsysclub's use of three separate sites did not teach away from that combination, particularly in light of the integration of the Bugsysclub sites and plaintiff's own explanations of the market forces at work in the online gaming industry.[8]  The record suggests that

---

[7] At hearing, plaintiff argued that the Bugsysclub sites did not teach "a means for allowing a non-subscription player to participate in the tournament without payment of the fee by submitting information relating to the non-subscription player . . . ."  See Noah Decl. ¶ 2, Exh. A, col. 11, lines 47-50; id. at col. 12, lines 30-33.  Screen shots of the Bugsysclub "Frequently Asked Questions" page provided by defendant, however, indicate that a person wanting to play for free was asked to complete registration materials first, and then play by clicking through the Pokerpages link.  See Rosenthal Decl. ¶ 14, Exh. C at 18.  Otherwise, plaintiff does not point to any other claim of the '154 patent not taught by the Bugsysclub prior art.  Pl.'s Reply at 15.

[8] Plaintiff's President and CEO asserts that "it is well known in this industry that if a provider of online gaming services reaches a 'critical mass' in terms of numbers of customers, it is nearly impossible for other providers to achieve comparable market shares."  Kellerman Decl. ¶ 7.  Thus, there is a constant push in the industry to expand market

a person experienced in the art might well have recognized that the teachings from the prior art could be beneficially combined. See Rosenthal Decl. ¶¶ 4-11, 33, 153-63; Rosenthal Decl. in Support of Surreply ¶ 176.[9] In light of the KSR case, plaintiff has failed to demonstrate that it is likely to overcome defendant's assertion that the '154 patent is invalid as obvious.

Plaintiff's failure to establish a likelihood of success on the merits alone precludes issuance of a preliminary injunction. See Polymer Technologies, Inc. v. Bridwell, 103 F.3d 970, 973-74 (Fed. Cir. 1996) (citing Reebok International Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994)). However, I additionally conclude that plaintiff has not demonstrated that existence of irreparable harm.

Where, as here, plaintiff fails to make a strong showing on likelihood of success, there is no presumption of irreparable harm. See Eli Lilly and Co. v. American Cyanamid Co., 82 F.3d 1568, 1578 (1996); Yamashita v. Wilbur-Ellis Co., 2006 WL 1320470, at *6 (N.D. Cal). Plaintiff's argument that

---

share. One obvious way to do so is to create a network that can capture both paying and non-paying players.

[9] Plaintiffs's efforts in its papers and at the hearing to undermine defendant's obviousness argument by attacking the Rosenthal declarations as conclusory or inadequate are not persuasive. In the context of discussing anticipation, Mr. Rosenthal compared the '154 patent claims to the prior art in detail. He then drew conclusions as to obviousness based on that analysis. In his supplemental declaration, he referred specifically to claim charts tracking the claims and the teachings, and discussed application of the legal test prior to and post-KSR. While some of plaintiff's contentions might provide productive cross-examination of Mr. Rosenthal, his opinions raise a serious question as to invalidity and plaintiff offered no expert declaration to the contrary.

10

it will suffer irreparable harm centers on the claim that it "may never be able to capture the market share Defendant has unlawfully obtained through its infringement." Pl.'s Mot. At 7; see also Pl.'s Reply at 18.[10]

Plaintiff's argument is flawed insofar as it presumes that it would succeed in capturing some material portion of defendant's customer base absent defendant's current presence in the market. At the hearing, the plaintiff contended its site and the defendant's site are the only two U.S.-based sites where U.S. players can legally play on-line poker tournaments. Defendant did not contest this assertion. Plaintiff, however, admitted that non-legal sites compete in the market. Thus, the degree to which plaintiff will lose customers to defendant's tournaments is speculative.

More importantly, the presence of only two legal competitors seriously undercuts plaintiff's argument that it will not be able to recapture market share, and strongly suggests that damages will be a sufficient remedy should defendant later be found to infringe. Assuming some portion of the pertinent U.S. gaming market will be drawn only to legal sites, if and when defendant is enjoined from its infringement plaintiff will be the only alternative for

---

[10] Defendant objected to a number of statements made in the Kellerman Declaration relating to the online gaming market and the nature and amount of harm plaintiff will suffer without issuance of an injunction, arguing that the statements demonstrated a lack of foundation for personal knowledge and, in some cases, amounted to an improper lay opinion or hearsay. See Def.'s Obj.'s to Evidence Nos. 2-5. In light of Mr. Kellerman's position with plaintiff, I find these objections to be without merit. They are therefore **OVERRULED**, and I will give the statements the weight each deserves.

11

1  defendant's lawful customers.[11]  And, despite plaintiff's
2  unsupported contention that its losses will be incalculable,
3  the presence of only one competitor would presumably make the
4  loss calculations easier.  Plaintiff has not persuaded me that
5  monetary damages in this case are incalculable or insufficient
6  to remedy the claimed harm.  See, e.g., Millar Decl.[12]

7       Defendant makes a number of other arguments, such as that
8  plaintiff engaged in inequitable conduct, that the court need
9  not reach.  Likewise, the other two remaining preliminary
10 injunction factors are not significant.  The public interest
11 is minimally implicated by the grant or denial of an
12 injunction.  The balance of the hardships should an injunction
13 issue arguably tips in defendant's favor.  Plaintiff's showing
14 about loss of market share is speculative, whereas an

---

[11] At hearing, plaintiff suggested that defendant may drive it out of business should they succeed in capturing a customer base "critical mass."  See also Kellerman Decl. ¶ 7, Kellerman Supp. Decl. ¶ 8.  This assertion, however, is undercut in part by the information Kellerman himself provides regarding the current strength of plaintiff's business.  See Kellerman Supp. Decl. ¶¶ 10-12.  At any rate, the claim is speculative; no other evidence in the record suggests that plaintiff will be driven out of business should a preliminary injunction not issue.

[12] In any event, "neither the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial."  Nutrition 21 v. U.S., 930 F.2d 867, 871 (Fed. Cir. 1991) (citing Nuclear-Chicago Corp. v. Nuclear Data, Inc., 465 F.2d 428 (7th Cir. 1972)).  This is not a case such as Oakley, Inc., in which the court, concluding that plaintiff would be afforded the presumption of irreparable harm, noted that plaintiff had demonstrated a nearly exclusive market share over the product in question, and that defendants were about to release a new product threatening that share.  316 F.3d at 1345.  Here, plaintiff has not established an exclusive market share in part because defendant's "product" is already on the market.

12

1  injunction would exclude defendant from the market and could
2  have collateral consequences to other aspects of defendant's
3  business, such as its television program.[13]  Cf. Pfizer v.
4  Teva Pharmaceuticals, USA Inc. 429 F.3d 1364, 1382 (Fed. Cir.
5  2005).
6      Since plaintiff has failed to carry its burden to
7  demonstrate a likelihood of success on the merits, or that it
8  will suffer irreparable harm absent court intervention,
9  plaintiff's motion for a preliminary injunction is **DENIED**.[14]
10 Dated: August 22, 2007

*Bernard Zimmerman*
Bernard Zimmerman
United States Magistrate Judge

G:\BZALL\-BZCASES\MMJK V.ULTIMATE BLACKJACK\Order Deny Prelim Inj 6 Post Hearing.wpd

---

[13] Plaintiff objected to Mr. Millar's statement concerning the probable effect an injunction would have on its television show for lack of personal knowledge and improper lay opinion. See Pl.'s Obj.'s to Evidence No. 3. Given Mr. Millar's function and role with defendant, however, Millar Decl. ¶ 3, plaintiff's objection is **OVERRULED**.

[14] Both plaintiff and defendant registered a number of objections to evidence. In this Order, I have ruled only on those objections relating to evidence I relied on in deciding plaintiff's motion. As to the remaining objections, they are **OVERRULED** as moot.

13